UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | Case No. CR16-132-001-E-BLW |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Pocatello, Idaho |
|     vs. | ) | July 11, 2017 |
| | ) | 1:45 p.m. |
| JESUS NIETO, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |
| . . . . . . . . . . . . . . . | ) | |

VOLUME I OF I
SENTENCING
BEFORE THE HONORABLE B. LYNN WINMILL
UNITED STATES CHIEF DISTRICT JUDGE


APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | MS. ANN WICK |
| | United States Attorney's Office |
| | 801 Sherman, Suite 192 |
| | Pocatello, Idaho 83201 |
| | |
| For the Defendant: | MR. DAVID PARMENTER |
| | Parmenter, Rivera, LLP |
| | 53 South Shilling |
| | Blackfoot, Idaho 83221 |
| | |
| COURT RECORDER: | TRANSCRIPTION BY: |
| | |
| PAM FULWYLER | TAMARA A. WEBER, CSR |
| U.S. District Court | P.O. Box 387 |
| | Caldwell, Idaho  83606 |
| | (208)454-1010 |


Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

I N D E X

| GOVERNMENT'S WITNESS: | PAGE | LINE |
|---|---|---|
| KNIGHT, Kristopher | | |
| Direct Examination by Ms. Wick | 5 | 16 |
| Cross-Examination by Mr. Parmenter | 39 | 24 |
| Examination by the Court | 46 | 8 |
| Recross-Examination by Mr. Parmenter | 48 | 14 |
| Redirect Examination by Ms. Wick | 49 | 1 |

| DEFENDANT'S WITNESSES: | | |
|---|---|---|
| None | -- | -- |

| GOVERNMENT'S ARGUMENT | 67 | 25 |
|---|---|---|
| DEFENDANT'S ARGUMENT | 82 | 8 |
| SENTENCING | 86 | 5 |

E X H I B I T S

| GOVERNMENT'S EXHIBITS: | PAGE | LINE |
|---|---|---|
| GE 1 - Report of Investigation 1 | | |
| Admitted | 14 | 8 |
| GE 2 - Jail Logs | | |
| Admitted | 14 | 8 |
| GE 3 - (Not identified) | | |
| Admitted | 14 | 8 |
| GE 4 - Police Report | | |
| Admitted | 14 | 8 |
| GE 5 - Police Report | | |
| Admitted | 14 | 8 |

| DEFENDANT'S EXHIBITS: | | |
|---|---|---|
| DE A - Incident Report | | |
| Admitted | 65 | 9 |

1                    (Proceedings begin.)

2          BAILIFF:  Ladies and gentlemen, please rise.  The

3    United States District Court for the District of Idaho is again

4    in session.  The Honorable B. Lynn Winmill presiding.

5          COURT:  Thank you.  Please be seated.

6          CLERK:  The Court will now hear the sentencing in Case

7    No. CR16-132, United States of America versus Jesus Nieto.

8          COURT:  Good afternoon, Counsel.  I apologize.  I'm

9    still trying to get logged on here.  It will take me just a

10   moment.  I apologize.

11         All right.  Let me just begin by indicating Mr. Nieto

12   entered a plea of guilty to Count 1 of the Superseding

13   Information.  The Court ordered a presentence investigation

14   report which has been provided to the Court and to counsel.

15         The plea agreement contained an agreement which the

16   government agreed to dismiss all counts in the Superseding

17   Indictment.  I assume the government will make that motion at

18   this time?  Is that non-accurate?

19         MS. WICK:  You mean dismiss the counts that have been

20   replaced with the Superseding Indictment?

21         COURT:  All right.  Well, there's a Superseding

22   Information which presumably replaces all counts in the

23   Indictment.

24         MS. WICK:  Correct.  Correct.  Your Honor's correct.

25         COURT:  All right.  So you're making that motion at

1  this time?

2      MS. WICK:  So moved.

3      COURT:  All right.  I will grant the motion and will

4  dismiss the Superseding Indictment since the defendant's plea of

5  guilty to Count 1 of the Superseding Information adequately

6  reflects the seriousness of the defendant's crime.

7      Let me inquire of the defendant.  Mr. Nieto, have you

8  had an opportunity to review the presentence report?

9      MR. NIETO:  Yes, Your Honor.

10      COURT:  And Mr. Parmenter, you've had a chance to

11  review the report with your client?

12      MR. PARMENTER:  I have.

13      COURT:  There were objections filed to the presentence

14  report.  Do either of you intend to call witnesses?

15      MS. WICK:  Yes.  One for the government, Your Honor.

16      MR. PARMENTER:  One by way of proffer.

17      COURT:  Is there any objection to the offering of a

18  statement from the audience without being placed under oath?

19      MS. WICK:  No, Your Honor.

20      COURT:  All right.  I think just to keep these clean,

21  let's take care of all of that first.  We'll take the first

22  witness -- or the first and perhaps only witness of the

23  government and then take the proffer from the defense and then

24  move into arguments.  Is that agreeable?

25      MR. PARMENTER:  That's fine.

1     MS. WICK:  Yes, Your Honor.

2     COURT:  All right.  Ms. Wick, call your first witness.

3     MS. WICK:  The government calls Special Agent Kris

4  Knight.

5     COURT:  Sir, would you please step before the clerk, be

6  sworn and then follow Ms. Fulwyler's directions from there?

7  Right here, sir.

8          (KRISTOPHER KNIGHT is sworn.)

9     CLERK:  Please state your full name and spell your last

10  name for the record.

11     WITNESS:  Full name is Kristopher R. Knight.  My last

12  name is spelled K-n-i-g-h-t.

13     CLERK:  Thank you.

14     COURT:  All right.  Ms. Wick, you may inquire.

15     MS. WICK:  Thank you.

16                     DIRECT EXAMINATION

17  QUESTIONS BY MS. WICK:

18  Q.  Special Agent Knight, how are you employed?

19  A.  I'm a special agent for Homeland Security Investigations.

20  Q.  How long have you been so employed?

21  A.  Since 2010.

22  Q.  Where are you based?

23  A.  My office is in Idaho Falls, Idaho.

24  Q.  And what kind of cases are you responsible for?

25  A.  I mostly work child sexual exploitation cases.

1  Q.  And have you received specialized training in that regard?

2  A.  I have.

3       COURT:  Ms. Wick, would you make sure the microphone is

4  somewhat pointed towards you just so we can hear you clearly.

5  Special Agent Knight's coming through loud and clear but I'm

6  missing your voice a bit.

7       MS. WICK:  I will try that and I'll try to speak up a

8  little bit as well, Your Honor.

9       COURT:  All right.  Thank you.

10 BY MS. WICK:

11 Q.  Special Agent Knight, what is your role or connection to the

12 case pending before this Court regarding Jesus Nieto?

13 A.  I'm the investigator for the case.

14 Q.  Primary responsible?

15 A.  Primary responsible.

16 Q.  And generally speaking, what kind of materials have you

17 reviewed over the course of the investigation?

18 A.  Facebook records, interviews with other -- interviews with

19 multiple female individuals related to this case.

20 Q.  American Falls police reports?

21 A.  Yes.

22 Q.  Interviews conducted by counterparts in another state?

23 A.  Yes.

24 Q.  Have you reviewed information that pertains to forensic

25 interviews of underaged girls?

1  A.  Yes.

2  Q.  Have you also reviewed information from the jail where

3  Mr. Nieto was housed at various points in time?

4  A.  Yes.

5  Q.  With regard to the overall investigation, are you aware of

6  any statements by Mr. Nieto that could be construed as

7  discussing flight from prosecution or escape in some fashion?

8  A.  Yes.

9  Q.  What kind of information did you review in that regard?

10  A.  Facebook records indicating Mr. Nieto had a conversation

11  with his mother about escaping to Mexico where she currently

12  resides.

13  Q.  Okay.  Can you be more specific about those communications

14  between Mr. Nieto and his mother?

15  A.  Can I refer back to my notes and reports?

16       MR. PARMENTER:  Your Honor, I'd ask for a little more

17  foundation.

18       COURT:  I think that's probably why he needs to refer

19  to his notes, to establish a time frame.

20       MR. PARMENTER:  Sure.  Yeah.  That's what I'm asking.

21       COURT:  All right.

22  BY MS. WICK:

23  Q.  Are you ready?

24  A.  Yes, ma'am.

25  Q.  Did you want to go ahead and answer my question now that

1  you've reviewed your notes?

2  A.  Yes.  In February after being accused of sexually assaulting

3  a victim in American Falls, Mr. Nieto contacted his mother on

4  Facebook and they exchanged messages back and forth.  At one

5  point during the --

6          COURT:  Excuse me.  Is that February of 2017?

7          MR. PARMENTER: '16.

8          COURT:  All right.  Thank you.

9  BY MS. WICK:

10  Q.  Actually I'm going to stop you to go ahead and put some

11  context behind this.  What was the nature of the initial

12  allegations that arose eventually leading to the federal case?

13  A.  That Mr. Nieto had sexually assaulted a 12-year-old female

14  that was 12 at the time of the allegation -- that was 12 at the

15  time of the police report.

16  Q.  When did the police report approximately get made?

17  A.  In February of 2016.

18  Q.  Okay.  And regarding the allegations, how old would the

19  underage female have been regarding the criminal conduct

20  alleged?

21  A.  Eleven.

22  Q.  And what was the nature of the criminal conduct alleged?

23  A.  Enticement using the internet and sexual contact.

24  Q.  Effectively a statutory rape?

25  A.  Yes.

1  Q.  Or other kind of sexual intercourse?

2  A.  Correct.

3  Q.  After those allegations were made, did you review these

4  Facebook records you referred to?

5  A.  Yes.

6  Q.  And what was the approximate time frame of the

7  communications in the Facebook records between Mr. Nieto and his

8  mother that you are going to be talking about?

9  A.  It was contemporaneous with him being accused of the sexual

10  assault.

11  Q.  But after that accusation had been made?

12  A.  After the accusation, yes.

13  Q.  Okay.  What did the two of them discuss specifically?

14  A.  They initially discussed that he had been alleged to

15  assaulting a minor female.  He told his mother that he believed

16  she was 15 at the time.  He then went on to tell her that he

17  wanted to leave for a while and that he would -- he would come

18  down there if she -- you know, if she would accept him, to

19  Mexico.

20  Q.  Okay.  I want to stay on the topic of flight or escape for a

21  moment.  Are there other statements between Mr. Nieto and his

22  mother on that topic to add to what you've already indicated?

23  A.  Not between his mother and him.  Just that he was going to

24  escape -- just go to Mexico and lay low for a while.  There were

25  further statements to the jailers in American Falls.

1  Q.  That's what I'm going to ask you about next, staying with

2  the topic of flight or escape.  What information did you become

3  aware of regarding statements to the jail on that topic?

4  A.  I received a call from the jail that Mr. Nieto had been

5  making threats about escaping.

6  Q.  About when was this that you received this phone call?

7  A.  I don't have the exact date in my notes but it was after he

8  had been indicted federally and charged federally for his crime.

9  Q.  And what did the caller indicate to you?

10 A.  He indicated that Mr. Nieto said that he was -- he -- in

11 their words, he asked what the feds would do if he escaped from

12 this place, the jail.  They told him that wouldn't be a good

13 idea and he advised them that they would never find him if he

14 escaped because he would be in Mexico.

15 Q.  Are these statements that the jail provided to you

16 documented somehow in records?

17 A.  Yes, they are.

18 Q.  What kind of document?

19 A.  They are part of the jail records that were given to me as

20 part of the investigation.

21 Q.  You collected them?

22 A.  I collected them.

23 Q.  Okay.  With regard to the communication between Mr. Nieto

24 and his mother, is that documented somewhere?

25 A.  Yes, it is.

1    Q.  In one of your reports?

2    A.  Yes.  ROI 1.

3    Q.  With regard to any conduct on Mr. Nieto's part, are you

4    aware of any on his part that could be construed as conduct in

5    furtherance or an attempt of escape of the jail specifically?

6    A.  Yes.  At the jail, he was alleged to have attempted to sneak

7    out a window of the cell block area into the main area.  From

8    there, he could have possibly made a full escape from the jail.

9    The jailers informed me that they watched the video and

10    Mr. Nieto was able to get an arm and a head through the window

11    opening but that's all he was able to get through and it

12    wasn't -- it was not a successful attempt by any means.

13    Q.  Do you know whether or not this conduct took place prior to

14    the statements or his inquiries about what would happen if he

15    tried to escape?

16    A.  It did.

17    Q.  Before or after?

18    A.  Before.  The attempt happened well before and then later

19    after the federal charges were brought, he made a statement

20    about --

21    Q.  Let me rephrase my question.  The statements that the jail

22    relayed to you about Mr. Nieto, what would happen to him if he

23    tried to escape, something along those lines, were those

24    statements by Mr. Nieto made before or after he tried to go out

25    the window?

1    A.  They were after.  The statements were after he attempted to

2    go out the window.

3    Q.  Okay.  Thank you.

4          MS. WICK:  I'd like to put a document on the ELMO if I

5    may, Your Honor.

6          COURT:  Yes.

7          MS. WICK:  It's Exhibit 1 that is attached to the

8    government's filing notice of sentencing materials.

9          COURT:  All right.  Why don't we refer to them by the

10   exhibit -- you've currently marked it as Exhibit 1?

11         MS. WICK:  Yes, Your Honor.

12         COURT:  All right.

13         MS. WICK:  It is a document consisting of Bates Nos. 1

14   through 13, Your Honor.

15   BY MS. WICK:

16   Q.  Special Agent Knight, do you see -- first of all, let me

17   show you the bottom where it's labeled Exhibit 1 and I'll scan

18   vertically.  Do you recognize at least that document, the first

19   page?

20   A.  Yes.

21   Q.  What do you recognize that as?

22   A.  That's ROI 1 from this case.

23   Q.  Okay.  Let me see if I can --

24   A.  And ROI stands for report of investigation.

25   Q.  Thank you.  I'll go ahead and go through to the last page.

1 Actually, I'll do Bates No. 12.  Do you recognize -- there's the

2 bottom.  Bates No. 12.  There's the top.  Do you recognize that

3 to be the last page of the narrative part of your report?

4 A.  Yes.

5 Q.  And Bates No. 13, do you recognize that as well?

6 A.  Yes.

7 Q.  That whole document, is that a true and accurate copy of

8 your report of investigation no. 1?

9 A.  Yes.

10   MS. WICK:  I would move to admit ROI number -- Exhibit

11 No. 1, Your Honor.

12   COURT:  Any objection?

13   MR. PARMENTER:  No objection.

14   COURT:  Exhibit 1 will be admitted.

15   MS. WICK:  Thank you, Your Honor.

16 BY MS. WICK:

17 Q.  I'd also like to show Special Agent Knight what's been

18 previously marked as Exhibit No. 2 also attached to the

19 government's filing.  It's a 3-page document.

20   MS. WICK:  And I presume I can just proceed with

21 showing, Your Honor?

22   COURT:  Yes.

23   MS. WICK:  Okay.

24   COURT:  Counsel, you've been provided as has the Court

25 with Exhibits I think 1 through 5?  Is there any objection to

1  any of those exhibits?

2          MR. PARMENTER:  No.

3          COURT:  All right.  I assume you want the Court -- you

4  want them to be admitted?

5          MS. WICK:  Yes, Your Honor.

6          COURT:  All right.  Exhibits 1 through 5 will all be

7  admitted.

8              (Government Exhibit Nos. 1 through 5 admitted.)

9  BY MS. WICK:

10 Q.  To be clear, Special Agent Knight, Exhibit No. 2 are the

11 jail logs that you referenced documenting the statements

12 regarding flight or escape?

13 A.  Correct.

14 Q.  Have you had opportunity to review a report -- a police

15 report, a law enforcement report related to a juvenile stalking

16 allegation that resulted in an adjudication for Mr. Nieto?

17 A.  Yes.

18 Q.  And so are you familiar then with at least the alleged facts

19 of that?

20 A.  Yes.

21 Q.  Have you also reviewed the charging documents in relation to

22 that case?

23 A.  Yes.

24 Q.  Do you note whether or not -- specifically referring to the

25 police reports and the charging documents together whether or

1    not the allegations there included a one-time event or a longer

2    time of events?

3    A.  It was a series of events.

4    Q.  And can you summarize the series of events that were

5    alleged?

6    A.  The allegation was that Mr. Nieto had been stalking a girl

7    in her -- in or about her house in her neighborhood.  The report

8    indicates that it all began after an allegation of rape against

9    the -- the young girl made against Mr. Nieto.

10    Q.  Or attempted rape?

11    A.  Attempted rape.  The allegation was that Mr. Nieto would

12    drive by the house and flip off the girl and her family and sit

13    down the street and watch them.  When the family called the

14    police, Mr. Nieto was indeed just down the street and the girl

15    pointed and said, "That's the person who's stalking me."

16         The officer contacted Mr. Nieto.  In the report, it

17    says Mr. Nieto became very agitated and told the officer that he

18    was just there to visit his aunt.  The officer then pointed out

19    to Mr. Nieto that if that was true, he had no need to drive past

20    the aunt's house and continue past the victim's house.  He could

21    turn around at his aunt's house and leave the neighborhood that

22    way.  He was eventually charged and convicted for stalking.

23    Q.  And do you note whether the time frame in the charging

24    document matches the time frame of the allegations in the police

25    report?

1   A.  It was contemporaneous, yes.

2   Q.  The month span --

3           COURT:  Well, could I -- I'm not sure I understand.

4           MS. WICK:  Let me ask a couple questions.

5           COURT:  All right.

6   BY MS. WICK:

7   Q.  The police report allegations --

8           COURT:  Are we talking about Exhibit 2?

9           MS. WICK:  Exhibit 5.

10          COURT:  I mean Exhibit 5, right.  I'm sorry.  Go ahead.

11          MS. WICK:  Let me ask it a different way, Your Honor.

12  BY MS. WICK:

13  Q.  Did you note whether or not the charging document that you

14  reviewed alleged conduct occurring between November 5, 2013 and

15  August 17, 2014?

16  A.  Yes.

17  Q.  And did you note whether or not that substantially matched

18  the time frame or the dates of conduct alleged in the police

19  report you reviewed?

20  A.  Yes.

21          COURT:  The police report regarding that incident that

22  led to the charge.

23          MS. WICK:  Correct.  Which is part of that exhibit.

24          COURT:  Which is what?

25          MS. WICK:  No. 5.

1    COURT:  Okay.

2  BY MS. WICK:

3  Q.  The juvenile victim involved in that case was how old at the

4  time?

5  A.  I believe she was 13 at the time.  I don't have that in

6  front of me.  I don't have the police report in front of me.

7  Q.  How about I show you just so I keep our record clear one of

8  the pages of the exhibit.

9  A.  She was 14 at the time.

10  Q.  Are you also familiar with the police reports that support

11  an adult stalking conviction for Mr. Nieto?

12  A.  Yes.

13  Q.  Can you summarize the police report there, the nature of the

14  allegations regarding stalking?

15  A.  The initial allegation was that Mr. Nieto had taken a girl

16  to Pocatello to a restaurant and kept her there against her

17  will.  When she asked to leave, he would not let her leave.

18  Eventually he took her back to American Falls and kicked her out

19  of the car and told her that if he saw her with another boy, he

20  would kill her or harm her.

21        Later, that same individual contacted the police and

22  said that Mr. Nieto was following her around as she was watching

23  a game at the junior high.  The police contacted Mr. Nieto.  The

24  report indicates that it appeared Mr. Nieto was attempting to

25  flee when he saw the police come to the area.  They contacted

1  Mr. Nieto.  He was in the car with two underaged girls.  One was

2  12 and the other was 13.

3  Q.  So if I heard you correctly, the victim in that case

4  notified the police twice regarding conduct by Mr. Nieto?

5  A.  Correct.  Mr. Nieto had been -- the investigation was

6  started when she alleged that he'd kept her at the restaurant

7  against her will.  Mr. Nieto had been warned to stop and then

8  when she called the police a second time and said that Mr. Nieto

9  was following her again, they dispatched an officer to go

10  investigate.

11  Q.  Between the two events, law enforcement warned Mr. Nieto to

12  stay away from this victim?

13  A.  Correct.

14  Q.  You indicated in the car when he was stopped after the

15  second event, he had underaged girls with him?

16  A.  Yes.

17  Q.  Of approximate ages what?

18  A.  12 and 13.

19  Q.  What was the first name of one of them that we'll talk about

20  later?

21  A.  Esmae (phonetic).

22       MS. WICK:  For the Court's benefit and the record's

23  benefit, the government offered and the Court admitted records

24  in Exhibit No. 4 that are covered by that summary testimony.

25       COURT:  All right.

BY MS. WICK:

Q. I want to move a little bit to the Jane Doe and Jane Doe 2 that are the substance of Mr. Nieto's federal charges and convictions ultimately. With regard to Jane Doe, she was how old at the time of the criminal conduct that's been pleaded guilty to?

A. She was 11.

Q. Did she undergo a forensic interview in relation to her allegations on that subject?

A. She did.

Q. And do you recall approximately when she did that interview?

A. It was in April of 2016.

Q. Okay. Do you know who did the forensic interview?

A. The Bright Tomorrows here in Pocatello.

Q. Are you familiar with them?

A. Yes.

Q. Do you know whether they are trained or otherwise conduct their interviews differently for children who are making allegations of this kind?

A. Yes, they are trained. Child Advocacy Center would train the interviewers and they conduct their interviews in accordance with standard policies.

Q. Is there something specific that they do that's a little bit different?

A. Yes. They are trained in interviewing children in a way

that they don't lead the children.  They just ask questions that
allow the children to talk and tell their story.

Q.  Was Jane Doe's forensic interview documented in a police
report that you reviewed?

A.  Yes.

Q.  And what is a summary of her disclosures during the forensic
interview?

A.  That Mr. Nieto had taken her back to his house.  That at
some point at his house that Mr. Nieto had attempted to engage
in sexual activity with her and she told him she wasn't ready
and he didn't care because he removed -- she says he apparently
didn't care because he removed her pants and panties anyway
after being told she wasn't ready.  She said she was nervous and
scared and that he put his penis inside of her vagina and it
hurt a lot.

Q.  Before that took place, did the two of them meet somewhere
outside of the residence?

A.  They met at a mall.

Q.  Were there other people present?

A.  There were two other -- according to the victim, there were
two other people -- two other females present.

Q.  Underaged females?

A.  Yes.

Q.  And did they -- did all of the underaged females go to the
residence with Jane Doe and Mr. Nieto?

A.  Yes, yes.

Q.  At the time of the intercourse that she reports, were the other underaged females still present?

A.  No, they had left.

Q.  Did she indicate any statements by Mr. Nieto during or after that were reported in the forensic interview?

A.  Yes.  She said that he didn't use a condom and she said that after sex, he told her he got what he wanted and that all he wanted was to have sex with her and he didn't want anything else from her.

Q.  Did she indicate that she did not consent to that sexual intercourse?

A.  She did.

Q.  Is there anything more specific than what you've already provided to the Court on that?

A.  Just that she told him she wasn't ready.

Q.  You've referred to some Facebook records that you reviewed. Is it correct that there are communications between Jane Doe and Mr. Nieto that precede this event at his home?

A.  Yes.

Q.  Are there other communications within that that refer to her readiness or willingness to engage in sex with Mr. Nieto?

A.  Yes.

Q.  Can you summarize those again with the context of what she reported in the forensic interview?

A.  She told him on multiple occasions that she was a virgin,
that she wanted to wait until she was married to have sex, that
she wasn't ready to have sex with him, things of that nature.

COURT:  Just so I'm clear, what was the approximate
date when the act of intercourse took place?  Was that in late
2015?

WITNESS:  Sometime after December 24, 2015.

COURT:  So it could have been early 2016?

WITNESS:  Correct.

COURT:  Do we know the latest date it could have been
from reference?

WITNESS:  I don't have anything like that.  According
to the defendant, I can give you a date.

MS. WICK:  May I inquire?

COURT:  You may.

MS. WICK:  Because there's quite a bit of differing
information on that subject.  Thank you, Your Honor.

BY MS. WICK:

Q.  Regarding Jane Doe's statements, when did she indicate to
the best of her ability this event at the residence occurred
that involved sexual intercourse?

A.  She said approximately two months before her initial
disclosure.

Q.  And her initial disclosure was --

A.  In February of 2016.

1  Q.  Okay.  So that could put it back, I'm approximating, late

2  November would be the earliest?

3  A.  Correct.

4  Q.  Okay.  In terms of the Facebook records you reviewed, when

5  was the earliest communication on the subject matter of sex

6  between Mr. Nieto and Jane Doe?

7  A.  The earliest communication on sex?  Just a second, please.

8  It was either the 2nd or the 3rd of December.

9  Q.  So early December?

10 A.  Yes.

11 Q.  Would you disagree if I indicated December 2, there was a

12 statement by Jane Doe about can't lose her virginity?

13 A.  Correct.

14 Q.  When would Jane Doe -- when did Jane Doe turn 12?

15 A.  December 31, 2015.

16 Q.  Okay.  And I assume through preparation for today's hearing,

17 you became aware of statements by Mr. Nieto about when this

18 sexual intercourse took place?

19 A.  Correct.

20 Q.  And is it your understanding that he indicated on or about

21 January 1 of 2016?

22 A.  Correct.

23 Q.  Are you able to put those dates in some kind of context,

24 make sense of all of them?

25 A.  Yes.

1    Q.  Well, before -- go ahead.  I'll let you answer that

2    question.

3    A.  In regards to his statements and the statements --

4    Q.  Trying to pin down when the sexual intercourse took place.

5    A.  Correct.  Mr. Nieto says that he learned the victim was

6    turning 12 just before her birthday and that three days after

7    the birthday is when he engaged in sexual intercourse with her.

8    He also stated that he learned on a previous occasion that he

9    had attempted to insert his finger into her vagina and that was

10   the point at which he learned that she was a virgin.

11         Facebook records indicate that she made him aware she

12   was a virgin on December 2 through the Facebook communication

13   and then again on December 24, she tells him that he was the

14   first person to kiss her, first person to touch her boobs and he

15   acknowledges that if they had sex, it would be her first time.

16   Q.  On the December 24 date?

17   A.  Correct.

18   Q.  You indicated some comments --

19         COURT:  Just a moment.  So that's why you say it

20   happened after December 24?

21         WITNESS:  Correct.

22         COURT:  And the defendant says it happened three days

23   after her birthday which would be January 2nd or 3rd, 2016.

24         WITNESS:  Correct.  And then he indicated that he

25   attempted to put his finger in her vagina before learning she

was a virgin and the records show that they talked about her

virginity on December 2 and December 24.

COURT:  Okay.  Which would suggest that act occurred

sometime before December 24.

WITNESS:  Correct.

COURT:  And the victim in her interview in February

2016 said that the act of intercourse occurred roughly two

months earlier.

WITNESS:  Correct.

COURT:  Which could be early December.  Sometime late

November through late December.

WITNESS:  And if -- the disclosure was made towards the

end of February and so it could have been the end of December.

Approximately two months would be towards the end of December.

COURT:  But regardless, the act of intercourse took

place either just before or just after her 12th birthday?

WITNESS:  Yes, sir.

COURT:  With some indications that it was just before

and the defendant saying it was just after.

WITNESS:  Correct.

COURT:  Okay.

BY MS. WICK:

Q.  Where or in what context did Mr. Nieto make the statements

about the digital penetration that you referred to?

A.  In his polygraph evaluation.

1 Q. In like the pre-interview questions?

2 A. Correct.

3 Q. And to be clear, he indicated --

4   COURT: Just a moment. Was the polygraph done post

5 plea? I mean I'm concerned. I'm not sure we're to consider

6 admissions made post plea.

7   MS. WICK: It was -- I don't know -- I could look. I

8 could look it up. It was negotiated part of the plea agreement

9 that it would be done and provided to the government and the

10 Court.

11   COURT: Okay. Go ahead.

12 BY MS. WICK:

13 Q. I want to make sure we understand his statement. His

14 statement indicated that he did the digital --

15   COURT: I guess the bottom line is it is somewhat

16 exculpatory in any event because he had claimed during that

17 polygraph process that the events took place after her 12th

18 birthday. Is that correct?

19   MS. WICK: Correct.

20   COURT: All right. Go ahead.

21 BY MS. WICK:

22 Q. Regarding the digital penetration, did he indicate that he

23 did that act prior to knowing that she was a virgin?

24 A. Yes.

25 Q. And that as a result of that act, that's when he learned she

1  was a virgin?

2  A.  Correct.

3  Q.  If I understood you correctly, on December 2, there's a

4  Facebook communication where the two, Mr. Nieto and Jane Doe,

5  discussed that she can't lose her virginity.

6  A.  Correct.

7  Q.  And there's additional subsequent statements by Jane Doe

8  that also refer to not losing her virginity prior to marriage.

9  A.  Correct.

10  Q.  So what he says about the digital penetration had to either

11  occur before December 2.

12  A.  Correct.

13  Q.  Or he's -- or Mr. Nieto's lying about when he knew she was a

14  virgin.  Is that the two conclusions that have to be drawn, one

15  or the other?

16  A.  Yes.

17  Q.  With regard to Jane Doe 2 then, another minor that's part of

18  the charges before the Court, just a couple small areas of

19  inquiry.  Were there Facebook records with regard to Jane Doe 2

20  that you reviewed?

21  A.  Yes.

22  Q.  Within those Facebook records, is there some kind of

23  indication that Mr. Nieto sent Jane Doe 2 pictures -- pictures

24  or videos that would be of his penis?

25  A.  Yes.

1  Q.  Can you tell us a little bit more about that, please?

2  A.  Yes.  On December 9, Mr. Nieto says he wants to send --

3         COURT:  Again, 2015?

4         WITNESS:  2015, yes, sir.

5         COURT:  All right.  Thank you.

6         WITNESS:  Mr. Nieto says he wants to send a good

7  picture to victim 2.  Her response -- she asks if it's a D pic

8  indicating dick picture.  Mr. Nieto responds for her to look

9  quick and that he will delete it.

10        After a short period, Mr. Nieto says, "Did you like the

11 video?"  And then in her CAC interview with the victim, the Jane

12 Doe 2, she indicates to us that Mr. Nieto had sent her pictures

13 and videos of his penis.

14 BY MS. WICK:

15 Q.  When you say CAC interview, what is that?

16 A.  Child Advocacy Center.

17 Q.  So subsequent to -- well, as part of your investigation, was

18 Jane Doe 2 interviewed?

19 A.  Yes.

20 Q.  With a forensic interview?

21 A.  Correct.

22 Q.  And you're indicating that she disclosed in that interview

23 process that Mr. Nieto sent pictures and videos of his penis?

24 A.  Yes.  On a second occasion, Mr. Nieto -- the victim 2 asked

25 for a picture of Mr. Nieto and his response was, "Like of my

face, my dick or what?"  And Jane Doe 2 says she requested a

picture of his face.

Q.  This is preceding the video conversation?

A.  This was after the video.  This is a second instance.

Q.  Within the communications between Mr. Nieto and Jane Doe 2,

is there something that could be characterized as a fantasy on

the part of Mr. Nieto about the underaged 15-year-old Jane Doe

2?

A.  Yes.

Q.  Okay.  Could you summarize it and do the best you can to

perhaps sanitize for explicit information?

A.  Yes.  I just need to find my notes that I wrote.

Q.  I would note for the record that there are underaged people

present in the courtroom so if you could be as clean as

possible.

        COURT:  Well, you know, that's a decision of the

guardians of the children and whether to have the children here

or not, I'm not sure it is a good idea but this is a court

proceeding and I can't ask the witness to sanitize the

testimony.

BY MS. WICK:

Q.  Then go ahead and give us the summary, please.

        COURT:  Well, it's up to the parents or guardians of

the children to make that decision so I think we just need to

proceed.  Go ahead.

1      MS. WICK:  Thank you, Your Honor.

2  BY MS. WICK:

3  Q.  With that in mind, would you go ahead and summarize what I

4  asked about as something that can be characterized as a fantasy

5  on Mr. Nieto's part?

6  A.  Yes.  In a sexting conversation with the Jane Doe --

7      COURT:  You said a sexting conversation?

8      WITNESS:  Sexting.

9      COURT:  All right.  Thank you.

10      WITNESS:  Where Mr. Nieto was fantasizing about having

11  sexual relations with Jane Doe 2, Mr. Nieto said that he was

12  looking forward to riding on top and fucking you.  He also --

13  after the video he sent to her and told her he was going to

14  delete and she asked if it was a D picture, he said, "I want to

15  do that to you so bad.  Slide in between your legs and OMFG.  I

16  want to make you drip and come."  And he also said, "I can

17  imagine how tight you are."

18  BY MS. WICK:

19  Q.  What was the approximate time frame of this communication?

20  A.  The last three were all in the same time and then the other

21  one was a separate incident, the first --

22  Q.  Can you just give us what year approximately?

23  A.  This was 2015, the end.  During their conversations.

24  Q.  Okay.  Finally with regard to Jane Doe 2, did she allege

25  anything about Mr. Nieto threatening her in relation to the

1   pictures that she ultimately sent him?

2   A.  Yes.

3   Q.  How did she make those allegations?

4   A.  During her Child Advocacy Center interview, her forensics

5   interview, she stated that Mr. Nieto threatened her that if she

6   didn't send pictures to him, he would come and kill her family

7   and take her away.

8   Q.  Did she indicate how he communicated those threats?

9   A.  Through Facebook Messenger.

10   Q.  And did your review of Facebook information include Facebook

11   Messenger's documents?

12   A.  Yes.

13   Q.  Did you find anything to corroborate those statements?

14   A.  I did not find any threats.

15   Q.  Did she indicate when those threats were made that would

16   somehow explain how they wouldn't be in Messenger?

17   A.  She didn't explain when they were made.  The fact that

18   they're not in Messenger could mean they were deleted before a

19   search warrant or preservation request was made.

20   Q.  So there is a possible reason why they wouldn't be in there

21   even if true?

22   A.  Correct.

23   Q.  Transitioning, if you would, Special Agent Knight, after

24   Mr. Nieto was in custody on the state allegations and in fact

25   after he'd been indicted federally, are you aware of

communication between Mr. Nieto and law enforcement agencies

surrounding his offer to cooperate?

A.  Yes.

Q.  And how did you become aware of the first such incident?

A.  I received a phone call from you regarding Mr. Nieto's being

in contact with Idaho State Police Detectives.

Q.  And what did you do in response to my phone call?

A.  I called the Idaho State Police Detectives.

Q.  And what was your objective in that effort?

A.  To figure out why they were in contact with Mr. Nieto.

Q.  Okay.  And what did you learn from the ISP personnel that

you contacted?

A.  That Mr. Nieto had called them on multiple occasions.  That

he had told them that his lawyer had directed him to call them.

His lawyer, Steve Richert, had directed him to call them, that

he had information about drug smuggling in the area.  After they

went to the jail and realized that he wasn't -- he wasn't being

directed by his lawyer, that they didn't have anything they

wanted to talk to him about based on his charges, they cut

contact with him.

        Mr. Nieto then called them again and told them to

disregard Mr. Richert, that he was no longer their attorney --

he was no longer Mr. Nieto's attorney and that he needed to talk

to them about the information he had on drug smuggling.

Q.  Do you know whether or not by the time of this communication

1   from Mr. Nieto Steve Richert still represented Mr. Nieto?

2   A.  At the time of that communication, he did.

3   Q.  What happened in response to that phone call by Mr. Nieto?

4   A.  There was a court hearing and --

5   Q.  Not regarding Mr. Richert and representation.  The phone

6   call from Mr. Nieto to law enforcement, the second reach out to

7   ISP?

8   A.  They disregarded him completely.  They did not want to talk

9   to him.

10   Q.  What did he do next?  What did Mr. Nieto do next?

11   A.  He passed a note to the jail staff and said that a law

12   enforcement officer's life was in danger and that he needed to

13   talk to ISP about the threat.

14          COURT:  I'm sorry.  He needed to talk to --

15          WITNESS:  The Idaho State Police about the threat.

16          COURT:  Okay.

17   BY MS. WICK:

18   Q.  Did ISP respond to that?

19   A.  No.

20   Q.  Did another law enforcement respond?

21   A.  Yes.  The agency that had officers -- where the officers

22   that were being threatened responded.

23   Q.  What did Mr. Nieto indicate in terms of what agency was

24   under threat?

25   A.  Oneida County Sheriff's Department.

1   Q.  Do you know how Oneida Sheriff's Department was notified of

2   his allegations in this regard?

3   A.  Just that Bannock County where Mr. Nieto was being held at

4   the time contacted them about the threat and the note.

5   Q.  So Oneida County Sheriff's personnel responded?

6   A.  Correct.

7   Q.  Did they speak with Mr. Nieto?

8   A.  They did.

9   Q.  Were you present in some fashion?

10  A.  I was.

11  Q.  And having observed that interaction, can you summarize the

12  nature of it?

13  A.  Yes.  Mr. Nieto began, you know, the interview and stated

14  that he had information for the Idaho State Police.  The

15  investigators in the room told him that they were -- he told

16  them that he had information about a certain officer with a

17  death threat put out against him.  The officer indicated that he

18  was the officer who was being threatened.  Mr. Nieto was

19  surprised because he had planned on talking to Idaho State

20  Police and he told them that.

21          He then proceeded to tell them that his cellmate had

22  made a confession to him about murdering people in Oneida County

23  and Mr. Nieto then went on to give pretty good details about the

24  murder and the way it was done and things of that nature.  The

25  police then left the room, came into the observation room where

I was and told me that everything Mr. Nieto had just told them about the murder was incorrect.

Q. Can you be more specific about -- for an example of something significant that was incorrect?

A. The method of murder. Mr. Nieto had the exact -- a very wrong way that the people were murdered.

Q. Stabbing versus shooting kind of discrepancy?

A. Correct, exactly.

Q. Anything else material that you recall in terms of being inaccurate?

A. The number of people murdered was inaccurate.

Q. What was the general impression then about the reliability or accuracy of the information that Mr. Nieto was relaying?

A. They said he had zero reliability, zero credibility and they were not interested in talking to him.

Q. Did they leave not concerned that there was any actual threats being made?

A. Correct.

Q. Finally, Special Agent Knight, are you aware of some underaged minor females that were interviewed or identified in some fashion in connection with the investigation in this case?

A. Yes.

Q. Specifically, I'm going to ask you about three by first name. Are you familiar with one by the name of Ida?

A. Correct.

1  Q.  And generally speaking, how are you familiar with -- what's
2  her relationship to the investigation?
3  A.  She was identified as part of the forensics interviews as a
4  person who had a relationship with Mr. Nieto.
5  Q.  She was identified by another individual?
6  A.  Correct.
7  Q.  During the course of a forensic interview?
8  A.  Correct.
9  Q.  The other individual was another minor female?
10  A.  Correct.
11  Q.  Are you familiar with -- what was Ida's age at the
12  approximate time frame of the forensic interview?
13  A.  She was 13 in April 2016.
14  Q.  Are you familiar with a girl by the name of Danielle again
15  through the course of this investigation in some fashion?
16  A.  There is a Daniella who Mr. Nieto was convicted of stalking.
17  Q.  Do you recall whether that's the adult conviction of
18  stalking or the juvenile adjudication?
19  A.  The adult conviction of stalking.
20  Q.  And are you familiar with one by the name of Esmae?
21  A.  Yes.
22  Q.  In what context is she identified in the course of this
23  investigation?
24  A.  She was identified through the Child Advocacy Center
25  forensics interviews.

Q. Did she submit to one herself or was she identified by someone else's?

A. She submitted to one herself.

Q. Okay. Did she speak about Mr. Nieto in that forensic interview?

A. She did.

Q. What did she indicate?

A. She indicated that she was in the car with Nieto -- Mr. Nieto when he was arrested for stalking Daniella. That he had kissed her on the neck and mouth and that he showed her nude pictures of another underaged female that was later interviewed through the CAC, that he had showed her nude pictures of her that had been sent to Mr. Nieto.

Q. Are there initials for this other individual?

A. Yes. MS.

Q. Was MS known to Esmae?

A. Yes.

Q. And Esmae knew the pictures were of MS?

A. Correct.

Q. And MS was later interviewed by law enforcement?

A. Correct.

Q. Forensic interview as well?

A. Yes.

Q. Did she corroborate the nude pictures?

A. She did. She said that Mr. Nieto asked her to send nude

pictures.  She said she sent nude pictures and then clarified

that she meant pictures in her bra and panties.  She also said

that Mr. Nieto asked her why she didn't want to lose her

virginity to him and she told the interviewer that she knows

Mr. Nieto had showed -- had shown the pictures that she took and

sent to him to other people.

Q.  She said that she knew he had shown the pictures?

A.  She said she knew, correct.

Q.  What was the time frame of MS's forensic interview?

A.  It was during April 2016.

Q.  How old was she at that time?

A.  She was 13 at the time of the interview.

Q.  And what was the time frame of Esmae's forensic interview?

A.  The same.  April 2016.

Q.  And how old was Esmae at that time?

A.  She was 13 at the time of the interview.

Q.  I need to return -- we've kind of come full circle back to

the Facebook records and your documentation of things in ROI 1,

report of investigation 1.  You indicated there were some

communications between Mr. Nieto and his mother that were about

something other than flight.

A.  Correct.

Q.  Were those about contacting Jane Doe or Jane Doe's family?

A.  They were.

Q.  And what time frame were those communications taking place?

1    A.   During that initial -- when he was -- in 2016 after he had

2    been alleged to assault --

3    Q.   Around the same time frame as the flight conversation?

4    A.   Fleeing, yes.

5    Q.   What was the communication between Mr. Nieto and his mother

6    and please be as specific as possible.

7    A.   Yes.  Mr. Nieto sent a message to his mother that said,

8    "Listen, mom.  Can't you speak to her mom and have a serious

9    conversation with her and see if we can come to an agreement and

10   even pay her money if she wants also."  His mother replies, "Of

11   course I can talk to her.  Send me her number.  I hope she

12   accepts."  Mr. Nieto told his mother that he didn't have the

13   number but he provided her with a screen shot of the mother's

14   Facebook account information.

15   Q.   Does that end the conversation regarding that contact?

16   A.   And then the mother asked is that the mother or is that the

17   brat?

18   Q.   Did Mr. Nieto respond to that question?

19   A.   That's all I have.

20        MS. WICK:  I have no further questions at this time,

21   Your Honor.

22        COURT:  Mr. Parmenter.

23        MR. PARMENTER:  Thank you.

24                        CROSS-EXAMINATION

25   QUESTIONS BY MR. PARMENTER:

1   Q.  Special Agent Knight -- it's special agent, right?

2   A.  Yes, sir.

3   Q.  Okay.  Mr. Nieto's date of birth, September 20, 1996?

4   A.  That sounds right.

5   Q.  Okay.  So he's I guess 20 now.  He was 18 years old during

6   some of this conduct?

7   A.  Boy, I'd have to do the math, sir.  I thought he was 19 at

8   the time.

9   Q.  Okay.  You're talking about --

10  A.  I apologize, sir.  No, he was -- I have his date actually in

11  one conversation.  He was 19 years and 2 months and 13 days old

12  during the time he told victim 1 that he was 18.

13  Q.  Okay.  Jane Doe 2 for example he'd communicated with over a

14  significant period of time.  A year and several months, right?

15  A.  That is what he said, yes, sir.

16  Q.  Don't you have those records?

17  A.  I only have the records that I made notes of.

18  Q.  Okay.  All right.  So is that what she informed you when you

19  interviewed --

20  A.  Yes, that they had been talking for a while.

21  Q.  Okay.  So she confirmed that they had an ongoing dialogue on

22  Facebook?

23  A.  Correct.

24  Q.  Okay.  And there was some discussion as well about her

25  coming to visit him at some point in time?

A.  Correct.

Q.  But that never actually happened?

A.  No, sir.

Q.  Okay.  And did you actually go and personally interview her yourself?

A.  No, sir.

Q.  Okay.  And there's some assertion that he made some kind of threat against her but it's not part of their Facebook record?  Is that what I understand?

A.  Correct.

Q.  And did you -- did she tell you that personally or the other person that talked to her?

A.  She told it during the interview.

Q.  Okay.  But you weren't present during the interview?

A.  No, sir.

Q.  With Jane Doe 1, I guess it's fair to say there's some question about when exactly the sexual intercourse took place.

A.  Yes, sir.

Q.  Okay.  And Mr. Nieto has indicated that that happened shortly after her 12th birthday?

A.  Yes, sir.

Q.  Okay.  And as part of the psychosexual evaluation -- you've reviewed that I assume?

A.  Yes, sir.

Q.  Okay.  Many if not all of these other names that you've

1   referred to have come into play in that -- in that report.

2   A.  I would not say that's accurate.

3   Q.  Okay.  Some of the names have been mentioned?

4   A.  As far as the psychosexual, no.  As far as the polygraph

5   with the psychosexual, then names were --

6   Q.  Well, all right.  So when I say psychosexual, I'm also

7   referring by implication to the polygraph report.

8   A.  Okay.

9   Q.  Is it fair to say that some of those names came out in

10  conjunction with the polygraph examination?

11  A.  Yes, sir.  But the ages are in dispute.

12  Q.  Okay.

13  A.  So I don't know.  What I'm saying is I don't know because

14  the age that I think Mr. Nieto said he had sex with a girl named

15  Esmae who was 15, the Esmae that I know of was 13 at the time of

16  the disclosure.  So again, I don't know if those names are the

17  same names.

18  Q.  All right.  And there was a Daniella mentioned in the

19  polygraph report?

20  A.  Correct.  Danielle, yep.

21  Q.  You assume that's the same one?

22  A.  I assume that's the same one that was the conviction of

23  stalking but I don't have --

24  Q.  And also there was an Ida mentioned as well?

25  A.  Correct.  There was an Ida and she was identified as part of

1  the CAC and she was 13 at the time of identification.

2  Q.  And presumably that's the same Ida that was referred to?

3  A.  If it is, Mr. Nieto gave incorrect ages.

4  Q.  Okay.  Be that as it may, do you believe there were other

5  victims with those same names or that these are basically who

6  we're talking about?

7  A.  I believe that they're the same people we're talking about,

8  yes, sir.

9  Q.  Okay.  So just differentiation on what their ages were from

10  Mr. Nieto's report in the polygraph versus what the girls

11  actually reported when they came in?

12  A.  Yes, sir.  I believe that's true.

13  Q.  Okay.  And isn't it true that he came out with a non-

14  deceptive polygraph?

15  A.  Yes, sir.

16  Q.  Okay.  You'd indicated that Mr. Nieto initially contacted

17  Idaho State Police through Mr. Richert?

18  A.  No, sir.  He contacted Idaho State Police on his own and

19  told them that his lawyer, Mr. Richert, had told him to contact

20  them.

21  Q.  When Mr. Richert was representing him?

22  A.  Correct.

23  Q.  The contact with Mr. Nieto's mother, you're relying on the

24  transcript of the communication device which I assume was -- was

25  that Messenger?

1  A.  Correct.  It was Facebook records.

2  Q.  Facebook?

3  A.  Yes, sir.

4  Q.  Okay.  And that was in Spanish?

5  A.  Correct.

6  Q.  And that was translated by you or someone else?

7  A.  No, sir.  It was translated by Special Agent Brad Roedell

8  (phonetic).

9  Q.  Okay.  And all of that's part of the record that we have

10  before us, right?

11  A.  Correct, sir.

12  Q.  Okay.  And as I understand it, his contact with his mother

13  referred to the possibility of coming down and visiting her?

14  A.  Correct.

15  Q.  Okay.  He'd not had any at least physical contact with his

16  mother for many years?

17  A.  That's what I was told, sir.

18  Q.  Okay.  So as far as you know, he hadn't seen his mother for

19  a long, long time.

20  A.  Correct.  That's what I was told.

21  Q.  And he's a U.S. citizen?

22  A.  Yes, sir.

23  Q.  So he would probably need a passport to go visit her?

24  A.  No, sir.

25  Q.  No?

1  A.  You'd only need a passport to come back into the U.S.

2  Q.  Okay.

3  A.  And only then to make it easier to come back into the U.S.

4  Q.  Okay.  Aren't passports required for U.S. citizens now to go

5  to Mexico?

6  A.  No, sir.  You can still get into Mexico without a passport

7  if you --

8  Q.  With a birth certificate?

9  A.  If you just want to cross the border, you could.

10  Q.  Was there any follow-up conversation with his mother by you

11  or any other investigators?

12  A.  No, sir.

13  Q.  So you don't know what capacity, if any, his mother had to

14  even make communication with another individual on his behalf?

15  A.  No, sir.

16  Q.  Okay.  And as far as any money, any capability of paying

17  anything --

18  A.  I have no idea on her finances.

19  Q.  Do you recall when this communication with his mother was?

20  A.  I could tell you if you give me just a second.

21  Q.  Okay.

22  A.  February 11.

23  Q.  Okay.  So it was after the state charge -- or before the

24  state charge.  I guess it was before the state charge, right?

25  A.  It was after the allegation was brought to the police but

1   before it was charged, yes.

2   Q.  Before it was charged.

3   A.  Yeah.

4   Q.  Okay.  All right.

5        MR. PARMENTER:  That's all I have, Your Honor.  Thank

6   you.

7        COURT:  Just as a quick follow-up.

8                        EXAMINATION

9   QUESTIONS BY THE COURT:

10  Q.  I'm assuming from the testimony you've given that Jane Doe 1

11  did not -- well, my question really is this:  If Jane Doe 1

12  turned 12 on December 30th or 31st, I'm assuming from the lack

13  of any testimony to that effect that when she was interviewed in

14  February, she did not reference that point as being of

15  significance.  In other words, that the act of intercourse

16  either took place before or after that date.

17       The reason I ask that is a birth date is kind of an

18  important date and December 31 is kind of an important -- I mean

19  a New Year's Eve birth date and maybe age 12 is kind of an

20  important date as becoming kind of a teenager and I'm just

21  wondering if Jane Doe 1 ever made any specific reference to that

22  birth date whether the act of intercourse occurred before or

23  after that.  She did not I assume.

24  A.  No, sir.  Her only indication was that it was approximately

25  a couple months before.

1  Q.  Okay.  One other question.  You indicated that I think it

2  was Jane Doe 2 had indicated that the defendant had made kind of

3  a threat to her if she didn't provide him with explicit photos

4  of herself and did so using Facebook Messenger but that either

5  she suggested or you assumed that they may have been deleted

6  because they weren't found.  But I'm assuming no effort was made

7  to subpoena records from Facebook to see if there was any

8  available deleted messages from their files?  Do you understand

9  my question?

10  A.  I do.  I do.  I'm trying to answer it the best way I can.

11  The Facebook messages that we got were based on a search warrant

12  from American Falls Police Department which included all records

13  which would have been deleted records.

14  Q.  From Facebook.

15  A.  From Facebook.

16  Q.  Okay.

17  A.  So if -- if they existed, they would have been deleted.  I

18  don't know that they existed though.

19  Q.  Okay.  But did Facebook indicate that they were not

20  responding to a request for deleted messages or did they just

21  provide you with a bunch of messages that they said were

22  responsive to the subpoena?

23  A.  They provided us with every -- every message that they had

24  in relation to the accounts requested.  If they were deleted,

25  Facebook only keeps deleted records for a certain period of time

1  before they override that data to reuse the hard drive space.

2  Q.  You know that from other investigations?

3  A.  Yes, sir.

4  Q.  Okay.  You don't know what that time frame is?

5  A.  No, sir.  It depends on how much hard drive they have and at

6  what point they get overridden.

7  Q.  But the request was made perhaps as much as a year later?

8  A.  Correct.

9  Q.  Okay.  All right.  Thank you.

10         COURT:  Ms. Wick -- Mr. Parmenter --

11         MR. PARMENTER:  Just one other question in follow-up to

12  what the Court asked.

13         COURT:  All right.

14                        RECROSS-EXAMINATION

15  QUESTIONS BY MR. PARMENTER:

16  Q.  Was there any indication of any deleted records with Jane

17  Doe 2?

18  A.  There were plenty of indications of deleted records.  We

19  have indications that these conversations were taking place on

20  multiple platforms and there were non-linear conversations that

21  had to be pieced together by me during the investigation.  There

22  were chunks of data missing that we don't know what was there.

23         MR. PARMENTER:  Thank you.

24         COURT:  Okay.  Ms. Wick, redirect?

25         MS. WICK:  Thank you, Your Honor.

REDIRECT EXAMINATION

QUESTIONS BY MS. WICK:

Q.  With regard to the Facebook records and Special Agent Brad Roedell's translation, he is another special agent with Homeland Security?

A.  He is.

Q.  What is his Spanish familiarity and background if you know it?

A.  He served a Spanish-speaking mission for the LDS church.  He then further went to get a degree in Spanish and I don't know if it was a major or a minor.  I just know that he received credentials in Spanish as part of -- he's also certified by HSI to be a Spanish speaker and he is certified at the level that he does not need to retest every year.

Q.  Okay.  Is he frequently called upon to provide translation?

A.  He is.

Q.  Are you also familiar with Spanish?

A.  I am.

Q.  Presumably not to the same level as Special Agent Roedell?

A.  No, ma'am.  Not to the same level.

Q.  Can you say between your familiarity and Special Agent Roedell's translation that they're at least consistent?

A.  Yes.

Q.  With regard to the psychosexual evaluation, the polygraph report that's incorporated to a certain degree and the names of

1  the underaged girls that have been discussed, did you make --

2  did you make some notes about the disclosures by Mr. Nieto

3  regarding his sexual contact with underaged minors within the

4  evaluation and the polygraph?

5  A.  Yes.

6  Q.  How many underaged minors did Mr. Nieto report in one

7  mechanism or another between the evaluation and the polygraph

8  having some kind of sexual contact with after he reached the age

9  of 18?

10  A.  Nine.

11       COURT:  After he was what?

12       MS. WICK:  After he reached the age of 18.

13       COURT:  Okay.

14  BY MS. WICK:

15  Q.  Of those nine, are the names Ida, Daniella and Esmae within

16  that?

17  A.  Yes.

18  Q.  And do you have notes where you can quickly reference what

19  the disclosures were with regard to those three?

20  A.  Yes.  Mr. Nieto indicated that he had sex with Esmae, that

21  he had sex with Danielle and that he engaged in fondling with

22  Ida.

23  Q.  At what age did he indicate he had those contacts with those

24  three girls?

25  A.  Mr. Jesus indicated that he was 18 or 19 when he had sex

with 15-year-old Esmae.  In his words 15.  He indicated that he

was 18 or 19 when he had sex with 15-year-old Danielle.  Again

his words 15.  And he was 18 when he engaged in fondling with

14-year-old Ida and again those are his words 14.

Q.  Do those ages as reported by Mr. Nieto jive with those

girls' dates of birth and his date of birth as far as the

accuracy of that information?

A.  No.

Q.  In what regard?

A.  Esmae is 13 -- Esmae was 13 in April of 2016.  Danielle

was -- Danielle, Daniella was 13 when Mr. Nieto was arrested for

stalking her based upon a previous relationship and Ida was 13

at the time of the disclosure in April 2016.

Q.  And at the time that those girls would have been their true

ages, how old would Mr. Nieto have been if you're able to say?

A.  I don't know because I don't know at what point Mr. Nieto

engaged them in sexual contact.

Q.  With regard to his report to the polygrapher regarding

Daniella, did he indicate he was 18 at the time of his

interaction with her?

A.  18 and then later 19.  He indicated that he was 18 or 19.

Q.  At the time that she would have been what age truly?

A.  13 is when he was arrested for stalking her and their

relationship was.

Q.  With regard to Esmae, did he report how old -- that he was

1    18 at the time of --

2    A.  18 or 19.

3    Q.  At the time of contact with her?

4    A.  Correct.

5    Q.  And according to him, she was 15 at that time?

6    A.  Correct.

7            COURT:  But she was in fact 13.

8            WITNESS:  She was 13 in April of 2016.

9            COURT:  So if the event occurred when he was 18 which

10   would have been a year earlier --

11           WITNESS:  Correct.

12           COURT:  -- she might have been 12.

13           WITNESS:  Correct.

14           COURT:  Okay.

15   BY MS. WICK:

16   Q.  And then the same question with regards to Ida.  He reported

17   to the polygrapher that he was how old at the time of his

18   contact with her?

19   A.  Eighteen.

20   Q.  At the age of her being 14?

21   A.  At the age of her being 14.

22   Q.  And then her true age in that time frame was what?

23   A.  She was 13 in April 2016 which would have made her at least

24   12 when he was 18, if not younger.

25   Q.  The sum total is that the ages reported by Mr. Nieto in the

1  polygraph questionnaire or questions was he reported the girls

2  as older than their true age.

3  A.  Correct.  I believe so.

4  Q.  At some point in your investigation, did you learn from some

5  source that Mr. Nieto's mother did in fact try to communicate

6  with Jane Doe's family?

7  A.  She -- the mother of the victim indicated that she'd

8  received some sort of friend request from what she believed was

9  Mr. Nieto's mother but she did not accept it.

10  Q.  When did she report this attempted communication?

11  A.  I do not have that in front of me.  I'd have to --

12  Q.  Before or after the communication from Mr. Nieto to his

13  mother on Facebook?

14  A.  Oh, after.  It was after he had been charged.

15  Q.  Do you know whether the attempted communication or friend

16  request by Mr. Nieto's mother occurred before or after the

17  communication between the two of them about reaching out to Jane

18  Doe's family?

19  A.  It was after that.

20  Q.  Finally, you were asked about a conversation between

21  Mr. Nieto and Jane Doe 2 coming to visit Mr. Nieto here in Idaho

22  and you indicated there was such conversation?

23  A.  Correct.

24  Q.  What was the substance of that conversation?

25  A.  Mr. Nieto told our victim that he would pay for her plane

ticket to come up here and visit him.

Q. And the time frame of this communication was what?

A. In late 2015, early 2016 when he was --

Q. What was the purpose of her visit to be?

A. According to the conversations, it was so that they could have sex.

Q. And was there discussion about her age in relation to that purpose?

A. Yes. She told him that she was 15. That she had just had her quincineara. Reminded him that she'd just had her quincineara.

Q. Do you recall whose idea it was for her to come visit Mr. Nieto?

A. Only that he said he would buy her a plane ticket if she were able to come up here.

Q. Thank you.

        MS. WICK: I have nothing further.

        COURT: Recross.

        MR. PARMENTER: I don't believe I have any other questions, Your Honor.

        COURT: All right. You may step down.

        MR. PARMENTER: Your Honor, my client indicates he needs to use the restroom.

        COURT: All right. We were going to take a break in just a few minutes anyway. We might as well take it now. We'll

be in recess for let's say 10 minutes.

BAILIFF:  Please rise.  The Court will be in recess.

(Recess taken.)

BAILIFF:  Ladies and gentlemen, please rise.  The United States District Court for the District of Idaho is again in session.  The Honorable B. Lynn Winmill presiding.

COURT:  Thank you.  Please be seated.  Ms. Wick, that was your only witness; is that correct?

MS. WICK:  Correct.  I have some brief proffer but no further witness.

COURT:  Victim proffer --

MS. WICK:  Proffer from myself, Your Honor.

COURT:  Okay.  Do you want to make that now?

MS. WICK:  I can.

COURT:  Okay.  Go ahead.

MS. WICK:  It just -- my proffer completes -- completes the story in a little ways on a couple things where there just really wouldn't be another witness or at least Special Agent Knight wouldn't be the appropriate witness to call.

For example, in relation to the Idaho State Police communication with Mr. Nieto, Special Agent Knight indicated he received a call from myself that prompted him to reach out to the Idaho State Police and then relayed what he learned.

My call was a result of a call from Mr. Richert where Mr. Richert was inquiring why was Idaho State Police contacting

his client and then the full picture that Your Honor heard had
to do with his client contacted Idaho State Police and
presumably didn't tell Mr. Richert.

COURT:  Okay.

MS. WICK:  And then of course Mr. Richert is no longer
involved in the case.  The other area where I needed to proffer
and there's really -- Special Agent Knight wouldn't be the
appropriate person to call on that.  There are -- there's
overlap with United States Deputy Marshals who could testify to
some of it but there is some reference to alleged threats that
Mr. Nieto provided information on regarding myself and AUSA
Fica.  And there were letters written from Mr. Nieto to my
office, at least one letter to myself and two letters to
Mr. Fica -- more than two actually but the letters to Mr. Fica
surrounded allegations of drug trafficking information that Mr.
Nieto could discuss or provide.

There was also communication about a supposed threat by
another inmate.  Regarding the letter to myself, there was an
allegation that another inmate, another one of the defendants on
my case load, a Mr. Dixon, the letter didn't contain his name
but the letter alluded to Mr. Dixon as someone who had
threatened my safety and knew things about where I lived, for
example, and other details that presumably supported Mr. Nieto's
knowledge about the matter.

That letter was relayed to the United States Marshal

Service as well as the FBI and of course they investigated. If I called U.S. Deputy Marshal Brandon Snyder, he could testify to some of the events that was the investigation of the threats -- alleged threats against myself and Mr. Fica.

Mr. Nieto was interviewed as a result of the letters he sent. With regards to Mr. Dixon, he did in that interview with the marshals service indicate that Mr. Dixon was the person he alluded to in the letter as the person supposedly threatening myself.

The two of them, Mr. Dixon and Mr. Nieto, were separated as you might expect would happen and Mr. Dixon was interviewed and Mr. Dixon denied making such threats. He was convincing to those interviewing him, the law enforcement, the U.S. Marshal's Service making that interview and made statements -- Your Honor's familiar with Mr. Dixon but he made statements to the effect of Ms. Wick has given me a plea agreement where she could have made things worse for me and I have no ill will about that. I just want to do my time. I didn't make these threats. And the whole matter was resolved with basically a finding that the threats were not supported. What Mr. Nieto said were not supported facts or allegations.

There really isn't any other way to put that in. U.S. Marshal Deputy Ryan Wiesar (phonetic) was more of a primary or lead on that investigation and he is not available this week to come in and explain further and I don't have sufficient

information to feel comfortable proffering the circumstances around the threat against Mr. Fica that was alleged other than that the result was that it was not found to be a credible or reliable threat on that one either.

I will leave it at that, Your Honor.

COURT:  All right.  Thank you.  Mr. Parmenter.

MR. PARMENTER:  Your Honor, I would call Jesus Nieto, Sr.

COURT:  Not as a witness?

MR. PARMENTER:  As a proffer.  As a character witness.

COURT:  Okay.  Again, Ms. Wick, there's no objection to Mr. Nieto just addressing the Court from the microphone?

MS. WICK:  Correct, Your Honor.

COURT:  All right.  Mr. Parmenter, I'm not sure the microphone is actually on.  Apparently it is so if you want to have --

MR. PARMENTER:  Okay.  Mr. Nieto.

COURT:  Mr. Nieto, also when you get to the microphone, would you start off by pronouncing and spelling your last name for the record.

MR. NIETO, SR.:  Sure.  My name is Jesus Nieto.  My last name's spelled N-i-e-t-o.

COURT:  Okay.

MR. NIETO, SR.:  And I'm senior.  We have the same name but I'm his father.

1       I really don't know where to start.  I mean I wasn't

2 prepared to talk but I just want to outline his -- pretty much

3 his lifestyle which hasn't been a really good one starting from

4 when him and his mother -- myself and his mother were together.

5 We had a lot of personal issues together which he had to see and

6 everything being a child and he had a lot of problems that ended

7 up causing him to have seizures as a child.  He was only about

8 the age of 2.

9       One time I was at work and I got a call saying that he

10 was passed out so I ran home.  I found him unconscious in the

11 living room.  I took him outside to the car and he wasn't

12 breathing.  I mean he wasn't -- he was just limp as could be and

13 I didn't know what to do.  I just performed some CPR on him and

14 he came to.

15       After that, probably a week later, same thing happened.

16 I got called to work and they had already took him in the

17 ambulance to the hospital and when I got to the hospital, he was

18 on -- pretty much had him on life support.  They told me that

19 they -- they didn't know if he was going to make it or if he was

20 going to have brain damage because he had been without oxygen

21 for such a long time.  They ended up airlifting him to

22 Pocatello.  I'm sorry.  It's hard to think about that.

23       COURT:  What was the cause?  What was the underlying

24 medical problem?

25       MR. NIETO, SR.:  They couldn't explain to us.  They

didn't give us an exact reason why he was going through that but he had to be put to sleep for about a week because if he woke up, he would have those seizures. And finally when the week was through, he was in the hospital and they told us that they were going to let him wake up and that's when we were going to know if he had any brain damage or anything if he was even going to be able to recognize us. As he awoke, the first word that came out of his mouth was peta (phonetic) which means bottle. He was hungry. So that was a good sign, you know. He recognized us all and everything.

They told us that he would have to take some medication which was pretty nasty medication for the rest of his life is all that they told us. They didn't give us an explanation for what and it was very expensive medication. I didn't have very good money at that time so I gave that medication to him for about a year and I didn't have the money to buy it anymore. I took him off it and I took him to another doctor. They evaluated him again and they said that they didn't know why he was even taking that medication. There was no problems with him that they could find.

So I mean after that, you know, his mother and I separated and she went back to Mexico to stay with her father because her father was the only one residing in Mexico and he was alone over there so since our relationship didn't work out, she ended up going back to Mexico with her father.

Me and my son lived with my mother who's sitting right here behind me and that's where we resided. My mom and I worked and I mean most of the time, I didn't even work because I didn't have anybody to watch him. I had to stay at home and watch my son and my mom would work and support us both.

Later on in life, you know, I got friends and everybody involved, family. They started helping me watch him so I could get myself back to work and start helping support and I mean we have a really close family. Growing up -- I remarried in 2002 and -- well, I told him, you know, we're going to have to go move to a new house and I took him with me and he didn't even -- not even an hour later, you know, he's like, "Dad, I understand that you're remarried and everything but I don't want to leave my mom," because that's what he calls my mother is his mom. That's who he knows as his mom. He said, "I don't want to leave my mom by herself." So he's like, "If it's okay with you, I want to live with her." I didn't have any issues with that because my mother at the time was alone because we had all married and moved on and she was alone so he went to live with her.

And throughout the life, I can't say I was a perfect father because I mean I should have been there a lot more with him and everything and showing him the guidelines of life and everything but my mom's pretty much the one that brought him up. Later on, my sister, she passed away also in 2013 but she moved

in with my mom with her husband and kids so she was another
mother to him.  But in 2004, we lost one of my brothers which to
him was like a brother as well in a car accident, a really bad
car accident that brought a lot of pain into him.  Like I said,
I wasn't there as a father that I should have been to help and
support and understand these things going on.

Later on in life like I said in 2013, my sister died in
a head-on crash with a semi.  That was his second mother to him
and again, he didn't have any -- I think ever since he was
young, having these things going through his head, you know, and
all these things happening, he should have had some counseling
or something.  I should have been with him more as a father but
I think that's when he started having a lot of issues at school
and everything.

At school, he had kids bullying him and making fun of
his aunt's death and I had no knowledge of this until I got the
call from the school saying that he was going to get expelled
because I guess he had physically attacked one of the kids that
was making fun of his aunt's death which in all reality, if
somebody had done that to me, I would have done the same thing
but I mean, like I said, I haven't been there until maybe two
years ago.  I've finally got the nerve to tell him, "You know
what?  You're coming back to live with me."

Me and my wife right now, we're still married but we
are separated because we were having issues as well so it was

just me and him at my house.  But even then, like I worked a lot
so he was -- I was never really a true father.  Like I said, I
should have been there a lot more for him.  He's had a hard life
and I mean all these things that I'm learning here in court is
something that I had never -- I don't think anybody that's here
in this room from my side of the family understands.  I mean
we're all -- he's had issues, like I said, but he's a really
good kid.  He's hard-working.  He's dedicated to his family and
I mean that's just a little way I can put his life.  I mean he
hasn't had an easy life and I just want -- I don't want his life
to end here.  I mean he's too young.  His life is barely
starting and we're all here to support him and hopefully get him
home and get him in the lifestyle that he should be in.  Me as a
father especially.  That's pretty much what I got.

     COURT:  All right.  Thank you very much --

     MR. NIETO, SR.:  Thank you.

     COURT:  -- Mr. Nieto.  Mr. Parmenter, any other proffer
or witnesses?

     MR. PARMENTER:  I do have one document I'd like to
submit.

     COURT:  Is that the Jefferson County incident report?

     MR. PARMENTER:  Yes.

     COURT:  I was provided a copy earlier.

     MR. PARMENTER:  Okay.  Do you want me to --

     COURT:  Yeah, go ahead.

1          MR. PARMENTER:  Just go ahead and submit this

2    officially or --

3          COURT:  Is there any objection to it being admitted as

4    Exhibit A?

5          MS. WICK:  There's not.  I presume it will be filed

6    under seal?  With that, I have no objection.

7          COURT:  I'm not sure I know why.  It's a fairly high

8    standard to file something under seal.  Is there -- does it

9    contain sensitive information and if so, can you describe it in

10   a way that won't reveal its contents?

11         MS. WICK:  It's an unredacted incident report that has

12   the names of other witnesses and the suspects with dates of

13   birth and --

14         COURT:  Can we redact the names?

15         MS. WICK:  And dates of birth and addresses and phone

16   numbers.

17         COURT:  Okay.  Why don't we -- Mr. Parmenter, if you

18   could submit a copy which you and Ms. Wick have agreed upon in

19   terms of redactions.  By federal statute, we're required not to

20   include in the public record any personal identifying

21   information of third parties.  So I think that's a legitimate

22   concern.  But I think the answer is not to file it in its

23   entirety under seal but to rather have it redacted so as to

24   protect that private information.

25         MR. PARMENTER:  Sure.

1          COURT:  All right.

2          MR. PARMENTER:  Is that something you'd like us to do

3     right now or should we --

4          COURT:  No, we can go ahead and proceed now.  Let's not

5     refer to names, addresses or any other kind of identifying

6     information.

7          MR. PARMENTER:  I'm certainly agreeable with that.

8          COURT:  All right.

9               (Defendant's Exhibit A admitted.)

10         MR. PARMENTER:  Other than that, I don't have anything

11    else, Your Honor.

12         COURT:  I've not had a chance to review this.  It was

13    provided earlier but it was just before I came into court.

14         MR. PARMENTER:  And I can give the Court a brief

15    summary in my comments.

16         COURT:  If you could.

17         MR. PARMENTER:  Your Honor, as Ms. Wick has indicated,

18    Mr. Nieto has made other efforts to try and pass on information

19    through authorities.  I've been involved with some of that.  I

20    think he certainly indicated that he's willing to cooperate.

21         This came to my attention just a month or so ago.  I

22    think it was actually a couple months ago, a little less than a

23    couple months ago.  He and I -- he again provided me information

24    indicating that he had information about individuals in the jail

25    passing on narcotics and wanted me to come up and meet with him

and a detective and the captain of the jail. We did that. He provided information.

Based on that information, this report was issued and it's my understanding -- I just obtained this report this morning. There's another report that's a little different but basically provides the same information that based on his information, they were able to apprehend or at least stop the transfer of drugs into the jail. So that's in effect what the report provides.

COURT: All right. I glanced at it and I could tell that's pretty much -- I understand that. Do you have any dispute of that, Ms. Wick?

MS. WICK: No. I'll have further comments but that's the gist.

COURT: All right. All right. If there's nothing else, then I'll just here the arguments and recommendations of counsel. Ms. Wick.

Ms. Wick, here's the challenge in this case. I just as soon you know what I'm thinking. We're faced with a 10-year -- as I understand it, a 10-year mandatory minimum, correct?

MS. WICK: Correct.

COURT: All right. And the guideline range is 30 years to life based upon the various aggravating factors. So to me, we're looking at, you know, there's no way -- I have no discretion even to impose less than a 10-year prison sentence.

1    That's an absolute given.

2         You're recommending 30 years.  The probation office

3    recommended 30 years.  What I'm concerned with is the challenge

4    and charge of 3553(a)(2).  What is the sentence which is

5    sufficient but not greater than necessary to protect the public,

6    impose a just sentence, et cetera, et cetera.

7         Why is 30 years necessary as compared to say 20 years

8    whether -- under a best case scenario, the defendant's out of

9    prison when he's 30, worst case scenario based on your argument,

10   he's going to be 50.  Why is something less than 30 years him

11   getting out of prison when he's 50 necessary to achieve those

12   3553(a)(2) objectives?  I've reviewed pretty much everything.

13   Certainly feel free to highlight anything but that's really

14   where -- what I'm struggling with.

15        MS. WICK:  Certainly.

16        COURT:  Okay.  And I am mindful of the psychosexual

17   evaluation putting him at a moderate to high risk of reoffending

18   which is somewhat extraordinary.  I mean of course maybe it's

19   because more the child pornography cases, typically they almost

20   always indicate a low risk of reoffending.  This is moderate to

21   high which is very troubling to the Court.  The predatory nature

22   of his conduct with multiple victims and potential victims is

23   also very troubling.  But then the question is why is 30 years

24   as opposed to say 20 years the appropriate sentence?  Go ahead.

25        MS. WICK:  Certainly.  Well, I'll reorganize where I

would have normally started to be a little bit more responsive
to the Court's inquiry.

COURT:  Well, go ahead and make your full --

MS. WICK:  I don't mean that negatively.  Just to
signal that I'm kind of reorganizing instead of starting where I
would have.  The psychosexual's an interesting point to make
with regard to where he comes in as a category because aside
from the risk that's in there that's identified by Ms.
Hatzenbuehler, you have her -- also her note that he doesn't
think he has a problem to be addressed or an issue to be
addressed and that if he could be convinced, then he would
benefit.

And that's a reasonable position in pretty much any
evaluation I suppose I would take where if the person's not
willing to even acknowledge they have a problem, then they're
not amenable to treatment and that's where we are with Mr. Nieto
on top of the other things.

Regarding the risk that the Court noted, quite frankly,
the sentencing memo from the government alluded to some flaws in
the evaluation.  Some of those flaws have to do with the
statements that Mr. Nieto made during the course of the
evaluation, what he informed Ms. Hatzenbuehler, what he told the
polygrapher that was inconsistent with one another, what he told
them that was inconsistent with just uncontested facts that are
in his plea agreement for example and the fact that the

evaluation doesn't ever really reconcile some of the material

factual discrepancies and one instance -- at least one instance,

there's an area where that failure to reconcile the inconsistent

statements affects the scoring that Ms. Hatzenbuehler gives him.

So regarding the static -- I want to say it's the

Static 7.  Yeah, Static 2007.  There's a score with regard to

using sex to cope with negative emotions such as stress and so

forth.  Mr. Nieto tells Ms. Hatzenbuehler that part of the

reason he had sex with Jane Doe is because he was under stress

and having negative emotions essentially.

She gives him a zero on that score and the difference

where he's at in terms of the risk that she assesses him being

what it is anyway, if she'd given him only one point on that

based on his admission to her that that was part of his

explanation for his criminal conduct, it would bump him into the

next highest level of risk.  And I just -- I say that to point

out the significance of her notable findings anyway are what the

Court reflected and worth some serious consideration where then

there are areas in the evaluation that you can point to that

then add to that and make it a much more serious concern.

And that's just one example.  There's other examples in

the evaluation that aren't necessarily flaws of the evaluation

but they are the discrepancies that Mr. Nieto offers that are

not confronted and resolved between the evaluation or the

polygraph in any way that I can make sense of out of in the

report anyway but he doesn't admit to knowing it was wrong to

have sex with Jane Doe at her age whereas in the polygraph

process, he indicates that he knew it was wrong to have sex with

a 15-year-old because his story is that he originally thought

she was 15.  It was wrong to have sex with her and -- but then

later on when he learns her true age, he still has sex with her

at the age of 12.  He tells Ms. Hatzenbuehler, according to her

evaluation, that he doesn't admit to knowing it was wrong to

have sex with Jane Doe at the age she was.

He tells her he doesn't use the internet to sexually

interact with a minor.  That's not even true based on the

factual basis of his plea agreement.  He denies having attempted

to engage a child in sexual activity.  Again, that's refuted by

the factual basis of the plea agreement.  It's refuted by

statements to the polygrapher.  His list of underaged girls that

he's interacted with either full intercourse or groping or

makeout sessions and so forth is -- refutes his having --

denying having attempted to engage a child in sexual activity.

He denies fantasizing about sex with children.

Sure, people could take a different view about children

being -- whether a 15-year-old is really a child but there's

still some fantasy involved in his offense conduct with Jane Doe

2.  Ms. Hatzenbuehler indicates that he's got kind of a lesser

knowledge in some way about the human anatomy.  Again, that's

refuted by the communication to Jane Doe 2 that's rather

explicit and demonstrates quite a knowing -- understanding of
the human anatomy in regards to sex.

So there's those inconsistencies that if nothing else
reflect some honesty problems for Mr. Nieto.  That of course
ties directly into whether he's really accepting responsibility
for what he's done.  He's done enough to get the acceptance of
responsibility points.  I'm not at all suggesting not.  Someone
else could form a different opinion but in terms of addressing
the Court's question about what sentence is sufficient, he isn't
coming in here and taking the position of -- A, he can't come in
here and claim this was a one-time thing.  Whoops.  I on one
occasion had inappropriate sexual contact with an 11-year-old or
12-year-old.  He can't factually claim that.

However, he could come in and say, you know, bad
judgment on my part.  I'm really immature and on these with Jane
Doe 1 and Jane Doe 2, I really made some bad judgment calls and
that's the end of it and I'm really sorry.  That is not the Mr.
Nieto that is before this Court.  It's not the Mr. Nieto present
in the evaluation.  It's not the Mr. Nieto present in the
polygraph.  It's not the Mr. Nieto present in any way regarding
his Facebook records and it's not the Mr. Nieto that was -- that
quite frankly wrote a letter to the Court at some point during
the pendency of this case where he swears to God that he didn't
have sex with Jane Doe or Jane Doe 2.  I think it's Jane Doe
that he's specifically talking about in that letter in September

 1   2016 that he wrote to the Court that he's now had to correct the

 2   record on.  So that plays a significant role in the government's

 3   recommendation for the low end of the guideline.

 4           And the government's mindful of other cases before the

 5   Court, especially where you can say the ages are comparable.  So

 6   Mr. Rodriguez was a case and I won't get into it because counsel

 7   wasn't that counsel but the age is similar to Mr. Nieto close in

 8   years.  The case involved physical contact with an underaged

 9   girl of a very tender age.  His offense conduct itself was less

10   than full on intercourse and it was certainly less than rape --

11   vaginal rape that Jane Doe alleges in this case and that

12   individual got over 20 years and that individual, from the

13   government's perspective, presented as remorseful.

14           So the fact that Mr. Nieto is predatory because really

15   that is the accurate descriptor and then recognizes nothing

16   wrong with what he did and then continues to lie about it and

17   other things makes him a very real danger to the community.

18           He has two stalking cases before he gets to where he's

19   using Facebook to interact with these other two young girls and

20   before he makes the call.  Whether she was 12 or 11, he thought

21   it was an okay thing to have sex with her and again, whether it

22   was forced or not, he still thought it was okay to have sex with

23   an underaged girl who for about a month leading up to it had

24   continually said, "I'm not ready for sex.  I can't lose my

25   virginity.  I don't want to lose my virginity before I get

married.  My heart says one thing.  My brain says another."

His response to this 11-year-old girl is, "A promise is a promise.  I mean basically you told me at some point that you were willing to have sex once you got that birth control in your arm.  A promise is a promise, little girl."  And that's -- that's really what encapsulates the problem with trying to assess Mr. Nieto's danger to the community is that's his take on things.

There's a demonstrated sexual interest in underaged girls.  There's a demonstrated admitted history of sexual contact and sexual intercourse with underaged girls when Mr. Nieto is 18 or older so I'm setting aside, you know, anything leading up to it.

He indicates in his -- between the polygraph and the psychosexual evaluation, I believe it's 9 if you include Jane Doe.  Nine underaged girls that he had sexual contact with total and he indicates that he's 18 to 19 years old for all of those nine that I just referenced.

Ms. Hatzenbuehler notes in the evaluation --

COURT:  Dr. Hatzenbuehler.  Did you say Ms.?

MS. WICK:  Uh-huh.

COURT:  It's Dr. Hatzenbuehler but just --

MS. WICK:  Dr. Hatzenbuehler indicates in her evaluation three individuals that he had sexual contact with where the difference in age was greater than three years.  So

1   even when you (inaudible) that.

2          One further note on the polygraph.  I'm not really

3   going to -- I don't ever offer the results.  Even when it's

4   stipulated as part of our plea agreement to get them, I don't

5   get into that unless it's favorable to the defendant quite

6   frankly.  I will tell the Court in candor that they passed a

7   polygraph and I guess technically, he did pass the polygraph

8   here where the results from Mr. Nelson are that he was not

9   deceptive after they reconcile an issue.

10          This polygraph to me is not the same as others where I

11  can say that he passed with flying colors because one of the

12  material questions limits his conduct to outside of the State of

13  Idaho with no apparent reason to limit that question.

14          So okay.  Mr. Nieto passed on that question but it

15  ignores all the allegations from these local girls and there's

16  other things but I don't really want to beat up the process on

17  that too much other than to indicate why it's to me not as --

18  not the same as saying he passed a polygraph that has little

19  more objective indicators of usefulness.

20          Speaking to the 3553(a) factors, you have an offense

21  that involved two girls and we sometimes forget Jane Doe 2.  We

22  meaning PSR, even myself when we talk about the offense conduct

23  because the offense conduct with regard to Jane Doe is much more

24  aggravating.  It's much more coercive and oppressive if you

25  will.  It results in the full on sexual intercourse that Jane

Doe says is actual, you know, forcible rape over her consent and

so -- and it results in the higher guideline calculation.

If the Court doesn't overrule any of the defense

objections, Jane Doe 2's calculations for offense conduct

doesn't come close to Jane Doe 1's.  So Mr. Nieto's guideline

calculations are based on the conduct with Jane Doe 1 in all

material regard if the Court adopts the PSR the way it is and

the calculations that are in there.  However, his offense

conduct with regard to Jane Doe 2 is significant to consider in

the big picture and in answering the Court's question about

sufficient but not more than necessary sentence.

He manipulates Jane Doe 2.  She's 15.  She's older but

when you read the communications, it's very clear that he uses

the romantic nature of things, this relationship, to apply the

pressure to her to do what he wants and then he threatens to

withdraw his affections if she doesn't want to do what he wants.

He gets very upset over the idea that is she having -- I think

is she having sex with other boys or something to that effect

and he displays kind of this jealousy type of side of him if you

will.

So even though she's older, there is this manipulation.

She does -- she initially tells him that she doesn't want to

send him nude pics because he asked her something to the -- this

is all in the -- either a factual basis is most of this or the

ROI 1 has some of this as well.  This is not contested facts

1   really.

2       He asked her about, "When are you going to send me a

3   nude pic already," or a pic of her behind, something like that.

4   And she says, "Never."  That's where her starting point was in

5   the communications that we have and eventually, she's convinced

6   to send these other pictures of herself.

7       With regard to Jane Doe 1, we've already gone over that

8   quite a bit but his offense conduct does include telling her to

9   hide the relationship from her family.  He actually tries to lie

10   to her about his age and she calls him on it.  He tells her that

11   he's 18 when he's 19.

12       Small things but they add up especially for an

13   individual who leading up to this stalks little girls.  That's

14   what his history is is to stalk 11, 12, 13-year-old girls to the

15   point where the authorities get involved and have ample evidence

16   to use to prosecute a case.  The juvenile case is in November

17   from one year till I believe August of the following year course

18   of conduct and it starts as a felony stalking.  It's amended to

19   a misdemeanor.

20       I actually pulled the code to see what the difference

21   was for what, you know, was the basis of that amendment.

22   Looking at it, it looks like it was a felony because the victim

23   was under 16 at the time.  She was 14.  And so when they amend

24   it, it no longer becomes an element that she's under 16 so then

25   now it's a misdemeanor.  That's the difference as far as I can

tell.  There's nothing that would suggest otherwise.  And he makes the admission.

And then you have the second girls.  You have two separate girls, two separate courses of conduct and in between the first report by the second girl and the one that ends up really getting him in trouble, he's warned to just leave this girl alone and he can't, he won't.

When he's caught, he's got two other little girls with him and at least one of them, Esmae, is referenced in other context and he appears to be honest to a degree when he reports having sexual contact with three of the girls that we've talked about because it corroborates information that's learned in the investigation except for when the rubber hits the road, he says they're about two years older than they actually were because it's significant.  If he was 18 and they were 13, it looks lots worse than if he was 18 and they were 15 and so forth.

So I just -- go ahead.  I'm sorry.

COURT:  No, no, no.  You must have been reading my mind because I was going to ask but I didn't think I had indicated that.  The difference between before December 30, 2015 and after for guideline purposes really does not make a difference because there was an admitted contact, not full blown intercourse before that, correct?

MS. WICK:  Correct.

COURT:  It just requires sexual contact.

1     MS. WICK:  There's actually a better reason for why it

2  doesn't matter.

3     COURT:  Right.

4     MS. WICK:  And the better reason is that that guideline

5  that you're -- you're talking about a guideline enhancement,

6  correct?

7     COURT:  Right.

8     MS. WICK:  The guideline enhancement refers to the

9  offense conduct involving unless I'm mistaken which

10  calculation -- I believe -- is the Court referring to the 2-

11  point enhancement?

12     COURT:  No.  I'm talking about the 8-level increase.

13  2G1.3(b)(5).

14     MS. WICK:  Correct.  I am getting to the right point on

15  that.  I just wanted to make sure we didn't confuse

16  enhancements.

17     With regard to that one, if you look at 2G1.3, it

18  refers to the offense involving a minor who had not attained the

19  age of 12 years old.  His offense is the enticement conduct

20  that's covered by the factual basis in the plea agreement.

21     His offense does not require completion of the sex act

22  such as the intercourse whether it was forced or not.  There's

23  no contest about the intercourse taking place now.  His offense

24  covered when she was 11.  In fact, if I'm not mistaken regarding

25  Jane Doe 1, the offense -- the criminal conduct that's captured

in the Facebook records ends prior to the sexual intercourse

taking place.  Yeah.  Clear up to December 24, this

communication and his factual basis information I think starts

around December 2.

COURT:  Okay.

MS. WICK:  So that encapsulates -- that's his offense

conduct.  If nothing else, that is the agreed offense conduct

that was in the factual basis of his plea agreement.  She was

11.  Plus to the extent that it matters to the Court or the

calculation that there was sexual contact, Mr. Nieto admits to

digitally penetrating Jane Doe's vagina prior to learning that

she was a virgin.  He says in that disclosure that that's when

he learned she was a virgin.

It's clear from the December 2 communication that

that's when she's also telling him she was still a virgin.  So

if you got -- if you're going to take him at his word and put it

in the timeline, they did that before December 2.

COURT:  Okay.

MS. WICK:  So anyway, so either way, I believe that's

supported but the government's position is not that the sexual

contact itself is required given that it's the offense conduct

at issue.

The Court -- there's a number of things as I suggested

in the government's sentencing memorandum that do not go to a

guideline calculation and that also are not required to support

1   a guideline sentence in this case.  There are a number of

2   contested facts meaning Mr. Nieto's objections to various

3   factual statements in the PSR that do not go to a guideline

4   calculation and are not necessary to a guideline sentence.

5        There's certainly information that the Court can

6   consider at sentencing.  For example, an easy one is the escape

7   conduct referring to his attempt to go out a window that gets to

8   the main area of the jail from which he could escape.

9   Especially when you view it in context of his statements that

10   demonstrated genuine interest in what would happen if I tried to

11   escape, that kind of thought process on his part.

12        However, the government's not asserting unless -- other

13   than as an alternative basis that that be the reason for the

14   obstruction of justice enhancement.  And quite frankly, given

15   the totality of information before the Court about Mr. Nieto's

16   overall predatory behavior and the forecast of his danger to the

17   community that the escape conduct is so minor that the Court

18   literally can make a finding that it's not material to whatever

19   sentence the Court imposes and I would urge the Court to make

20   such findings where there's information that is -- especially

21   where it's contested that it's not part of the sentence

22   ultimately imposed or if it is something that weighs in favor,

23   I'd ask the Court to make that finding as well.

24        I do think it's significant that he early on asked his

25   mom to intervene on his behalf with the victim's family and

suggest paying them off. That just adds a little bit of salt to the wound if you will. It's not just reach out to them and see if you can talk to them. It's even pay them off if they want it. And from the government's perspective, it's not required that she do what he asked. However, she indicates a willingness which means she's taking him somewhat seriously. He takes the next step of sending the Facebook profile and then the victim's family indicates that she sent a friend request.

So it didn't amount to an interference it sounds like. It's significant that he went through that thought process again when he's also thinking about what would happen if I tried to escape.

It gets to a point where it almost feels a bit like piling on because there is quite a record of negative information about Mr. Nieto especially again when you consider he really doesn't think he did anything wrong which means what's he ever going to do to change his behavior and that's significant in terms of are you really ever going to be safe out in the community? Are you going to continue as you age to prey on girls that are 11, 12 and 13 and 15 years old? Because that's -- that's really the only evidence that's before the Court that that's his target. He demonstrates an interest in particularly girls that are still virgins and has no interest in addressing an issue in regards to his sexual activity there and his behavior with these young girls.

So unless the Court has questions or wants me to make specific argument on the objections, I did -- again, there's a sentencing memorandum that incorporates my arguments on some of the legal matters.

COURT:  I've reviewed that.

MS. WICK:  Thank you, Your Honor.

COURT:  Thank you.  Mr. Parmenter.

MR. PARMENTER:  Your Honor, this has been a difficult case for me and let me just make some comments that I think are kind of geared to what you were asking originally when Ms. Wick stood up.

Mr. Nieto is obviously fairly young and I understand the Court often sees young defendants before it.  I think his age and immaturity is certainly a big part of what's happened. His upbringing, those kinds of factors have all kind of played in.  His father pointed out that, you know, he may not have been the best guide growing up and leaving him with his grandmother and so on but it is what it is and that's what he's had to deal with.

I'm not making excuses for him.  I would indicate that contrary to what Ms. Wick says, he does acknowledge that he's done something wrong.  I think it's been an ongoing process for him to realize what he's looking at, what he's dealing with.  My frustration with Mr. Nieto has primarily been just being able to communicate with him because he does have somewhat tangential

thoughts. I must be getting hard of hearing because I have a

hard time hearing him because he speaks in such a low voice that

I have to several times ask him to repeat what he's saying.

But again, contrary to what she says, I think that he

does understand what's going on. I think he's amenable to

treatment. I've discussed that with him at length. I've

represented similar -- or clients in similar situations mostly

on a state level. I don't think I've ever had a case quite like

this on a federal level but it seems to me that many times when

it comes to treatment, successful rehabilitation, it takes them

a while to comprehend that, hey, this is something I need to

deal with, something I need to factor in. I think that's

something that Mr. Nieto has gravitated to, something that he

realizes that, you know, he needs assessment for.

Getting to the offense conduct itself, it certainly is

abhorrent, what he did, and the circumstances that have been

committed here. I would point out that there are several

factors that enter in. The fact that he was essentially

abandoned by his mother and his father hasn't had a lot of

contact with him being raised by his grandmother and his aunt.

Those are certainly all factors that have played into his life

not to say that anybody else in similar circumstances would act

the same way but in paragraph 24 in the PSR, there's one of the

young ladies that was being interviewed and she basically said,

you know, he was desperate for love or something special and I

think that probably hits home to me as much as anything that he
was just looking for somebody to care for him, to have a
relationship with and he couldn't do that among young ladies
that were his peers agewise or they weren't responsive and so he
started hanging out with younger girls.

Certainly inappropriate. Certainly illegal and is
certainly something for which he needs incarceration and some
time and rehabilitation but I don't think that he needs to be
thrown away. I think that he would be amenable to treatment. I
know that he would in addition to what Dr. Hatzenbuehler
reports. I guess I would point out that she talks about his
impulsivity. He admits readily his impulsivity. I don't know
that he readily admits poor judgment when I first started
representing him but I think he certainly acknowledges now that
and that he was emotionally needy. Her comment was that his
offense was the product of poor judgment and insecurity with
peer-age females rather than deviant sexual desires and I think
that's really where he's at.

So I -- and I certainly acknowledge and noted, as the
Court did, that he was on the moderate to high level on some of
the risk factors that she discussed. That's concerning but I
think it's something that he can deal with as he grows and
matures and as he goes through whatever treatment.

The Court certainly needs to punish him and I know the
Court will and I know the Court will also consider deterrence to

himself and others but I think ultimately rehabilitation is what

the Court needs to consider. How long is it going to take for

him to be able to get to the point where he can be released in

society and I don't think it takes 30 years. I don't think it's

going to take 20 years. I think it's going to take some time

and certainly he's looking at a mandatory fixed 10 years but

that's what I would recommend. Thank you.

COURT: All right. Mr. Nieto, is there anything you

want to say in your own behalf?

MR. NIETO: Do I speak here or up --

COURT: That's fine. You can stand there. Sit there,

whatever.

MR. NIETO: Well, Your Honor, first of all, I want to

apologize to you and to the prosecutor for putting us through

this. In sentencing, once I've been in here, it made me realize

the person I was before. It's helped me become a better man.

I'm trying to show you and the government I can make a better

life for myself. I don't think what she's recommending is fair,

30 years. Yes, I made this mistake. I take full responsibility

for that. I'm trying to do my best for my family (inaudible)

suffering through all this but I thank you for putting me into

this because I found my way towards God. I read a Bible every

day and I'm trying to be a better man for society and for you

guys.

I'm just asking that you please reconsider the stuff

1    that they're trying to give me and I hope you find it in your

2    heart that you can forgive me through all of this that I've

3    done.  I'm really sorry for my actions and that's all I've got,

4    Your Honor.

5           COURT:  Okay.  All right.  Well, I'm going to have to

6    take a few minutes and go through some objections that were made

7    to the presentence report and indicate my rulings.  I'll then

8    move on to kind of lay out my evaluation of this case under the

9    sentencing statute and the factors the Court's required to

10   consider and then finally pronounce sentence.  It takes some

11   time for me to create a record here as to my rulings.

12           First, I would note that there were a lot of

13   objections.  A number of them were to items that do not affect

14   the guideline range or they were -- resulted in an amendment to

15   the presentence report by the probation officer.  Those include

16   paragraphs 6, 7, 72, 75, 84, 85, 87, 90, 92, 94, 95 and 96.  So

17   I'm not going to address those specifically because I think

18   they're now moot since they were -- either resulted in changes

19   in the presentence report or agreements to the objection made by

20   the defense.

21           Turning to the objections that I think are still

22   unresolved and need to be resolved, there's an objection to

23   paragraph 34.  The defendant objects to a 2-level increase in

24   the offense level pursuant to guideline section 2G1.3(b)(2)

25   arguing that he did not use undue influence over I think it's

referred to as NV 1 but Jane Doe 1 in the presentence report.

The defendant maintains he never forced anyone to engage in sex and relying on a promise does not rise to the level of undue influence.  And he further contends that undue influence should not apply where the victim already possesses some inclination to commit the offense before any pressure by the defendant.

Guideline section 2G1.3(b)(2) states that if a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct increase by 2 levels.  According to comment note I think it's 3B, the Court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior and the voluntariness of the minor's behavior may be compromised without prohibited sexual conduct occurring.

As noted in the probation officer's response to the objection, it's quite clear that during his communication with Jane Doe 1, Mr. Nieto repeatedly told her he wanted to have sex with her but she repeatedly told him she was not ready.  He also urged her to keep her promise to have sex with him when she was on birth control which she apparently had begun using.  And during a forensic interview, Jane Doe 1 told the investigators that Mr. Nieto took her to his home, undressed her, had full vaginal intercourse with her, did not wear a condom and all that occurring despite her having told him she was not ready for sex.

1    I think these actions clearly fall within the category

2    of undue influence under the guidelines.  Moreover, the case

3    cited by the defense, the Meyers (phonetic) case, really does

4    not have application here.  In that case, the district court

5    found evidence that the defendant had not compromised the

6    victim's voluntariness because she had already contemplated

7    running away and she stated that the plan to run away was both

8    of their ideas.

9    Here, there's direct evidence that the victim stated

10   she was not ready for sex and that the defendant continued to

11   pressure her despite her objections and finally she either --

12   well, he either with or without her consent had sexual

13   intercourse with her.  Consent obviously is not a defense in

14   this case and it's clear from the circumstances that there was

15   undue influence applied by the defendant to the victim Jane Doe

16   1.

17   There's also objections to paragraphs 35 and 43

18   objecting to the 2-level increase for the use of a computer

19   arguing that using a telephone and personal contacts with Jane

20   Doe 1 and Jane Doe 2 did not involve a computer.  However,

21   guideline section 2G1.3 note 1 explains that a computer under 18

22   U.S. Code Section 1030(e)(1) is defined as including any

23   electronic or other high speed data processing device performing

24   logical arithmetic or storage functions and it includes

25   essentially a wide range of devices.

Here, this communication occurred through Facebook which is the social media network. The Facebook message cannot be used through a simple telephone. It can only be used through a computer, tablet or smartphone which really is a mobile personal computer through the internet.

This fits the definition of computer under the statute and, based upon the information, I think it is clear that the defendant used his smartphone which is a computer and the internet to entice, encourage, offer or solicit a person in prohibited sexual conduct with a minor.

There was also kind of an oblique reference to the Court's practice in child pornography cases not to impose a 2-level enhancement called for by the guidelines for the use of a computer but child pornography is far different from the offense here. All child pornography is accessed with computers and the same cannot be said of soliciting sexual conduct with a minor.

There's an objection to paragraphs 19 and 37 and this is a significant factor because it resulted in an 8-level increase. This turns upon whether Jane Doe 1 was 12 at the time she engaged -- well, whether she was 12 at the time of the prohibited conduct. According to the factual basis of the plea agreement which was signed by the defendant, the defendant agreed that he raped Jane Doe 1, a 12-year-old female child, at his residence in American Falls, Idaho and that based on Jane Doe's birth date, she was 11 years old at the time. It seems to

1  me that essentially is an admission in the plea agreement that

2  resolves the dispute.

3          Moreover, as I think Ms. Wick has pointed out, the

4  critical date is the date in which the conduct occurred, that is

5  the solicitation and here, that solicitation clearly goes back

6  to early December, well before the defendant -- the victim

7  turned 12.

8          Finally, the enhancement applies where the defendant

9  commits a sex act or sexual contact and that contact is defined

10 as the intentional touching either directly or through the

11 clothing of genitalia, anus, groin, breast, inner thigh or

12 buttocks of any person with an intent to arouse or gratify the

13 sexual desire of any person.  There's clear reference to the

14 defendant touching the victim's breasts sometime on or before

15 December 16 and December 24, 2015.  There's clear reference to

16 that occurring and so even on that basis, the objection's

17 overruled.  For the record, I think based upon the admission in

18 the plea agreement, the act of intercourse took place before the

19 victim turned 12.

20         There was an objection in paragraphs 41, 48 and 49

21 suggesting that the total offense level should be 27 but that's

22 based upon objections which I've now overruled.

23         There was also an objection to the assessment of a

24 criminal history point under 4A1.1(c) because Mr. Nieto was a

25 juvenile during the commission of the offense.  However, the

guideline is clear that even a juvenile sentence can be used to calculate the criminal history category if it was imposed within five years of the defendant's commencement of this offense.  So therefore, it was properly included.

The defendant also indicates that he was pressured to admit the earlier offense and that this should result in the Court not considering it.  However, it's absolutely clear that the Court cannot and must not permit collateral attacks on prior convictions in state court as part of the sentencing process in federal court if there was some defect in the defendant's conviction in state court with the exception of an uncounseled plea, that has to be taken up in state court and that conviction expunged or removed before sentencing in federal court or the Court must consider it.

There was an objection to paragraphs 62, 63 and 66 which were a little cryptic.  I think the objection was to the assessment of two additional criminal history points because he argues he was no longer on probation for the offense discussed in paragraph 62 and 63 but the guidelines clearly say that you add 2 points if the defendant committed this offense while under any criminal justice system including probation.

The information presented in these paragraphs is based on documents provided in Power County Magistrate and District Court.  According to their records, there's no indication of the disposition of the probation violations.  Only that they were

1 filed. The records show that the judge in that case did not

2 order the revocation proceeding take place but rather that the

3 defendant's probation term be allowed to expire given his

4 custody on the federal charges. Thus, the defendant was on

5 probation from December 9, 2015 through December 9, 2016 and the

6 offense under the Superseding Information took place between

7 November 3, 2015 and January 28, 2016. Thus, there was clearly

8 an overlap in the commission of the offense and the period of

9 time in which the defendant was on probation. So I think I will

10 limit it to that and overrule those objections as well.

11 There was an objection to the criminal history category

12 but that's based upon the foregoing objections which I'm

13 overruling.

14 I assume Ms. Wick, you had moved for the third level

15 for acceptance of responsibility?

16 MS. WICK: So moved.

17 COURT: I'll grant that motion. I'm overruling all

18 objections and adopting the presentence report and specifically

19 the addendum to the presentence report as my findings in this

20 matter and to the extent I've not done so explicitly, I'm also

21 adopting the addendum as my response to the objections to the

22 presentence report. This results in a guideline range of 360

23 months to life and a criminal history category 3.

24 Now, Mr. Nieto, I need to take some time and I know

25 this is -- it's been a long proceeding today and this may seem

rather impersonal but that's kind of the process in federal

court. We have to go through this process. But now I'm

required to go through a process of identifying what it is about

this case that justifies the sentence that I'm going to impose.

And there's specific sentencing factors I have to consider.

Sometimes I balk at them but in this case, I think they fairly

nicely lay out what is the critical issue in this case, some of

which I've already addressed.

The first factor I'm to consider is the nature and

circumstances of the offense. Here, the crime, Mr. Nieto, with

which you have been charged, you pled guilty and you're now

before the Court for sentencing arose from a report made in

February of 2016 to law enforcement. This was a response to a

disturbance between the parents of yourself and that of Jane Doe

1. It was alleged that you had engaged in sexual contact with

Jane Doe 1 when she was 11.

During the investigation, the police learned that you

had communicated with Jane Doe 1 through Facebook Messenger and

sought sex with her, that she had repeatedly refused, but that

you had had sexual contact with her on or before December 16,

2015 through December 24, 2015 and that you had had sex with her

on an unknown date but prior to her 12th birthday.

It is notable to me that when you were under

investigation for this offense, you asked your mother to reach

out to Jane Doe's family to see if you could reach an agreement

and even pay her money if she wants also.  While investigating
the offense against Jane Doe 1, the police also discovered that
you had communicated with Jane Doe 2 over Facebook and in those
communications discussed the desire to have sex with Jane Doe 2
who is also a child I think age 15, that you had sent sexually
explicit images to her, solicited her sending sexually explicit
images to you and in fact she did send such an image that would
qualify as child pornography.

In addition, law enforcement learned of multiple
additional juvenile females with whom you had had contact
including sexual contact and solicitations requesting naked
images from them.  What this points out, Mr. Nieto, is this kind
of predatory conduct that we've described.  This is not a single
incident.  It was essentially what you were spending a great
deal of your time doing was seeking out these very young pre-
teen children and young teen children to have sexual intercourse
with them, to solicit sexual images from them.

The suggestion was made in the briefing submitted by
your counsel that as evidenced by your own parents' relationship
when they were very young that resulted in your birth that there
may be some cultural difference between Hispanic culture and
other cultures in the United States.  I reject that as a
justification.  There's been no studies submitted indicating
that there is any cultural justification or difference.  In
fact, I was curious and even tried to find if there had been any

studies.  The only studies I indicated indicated there really is
no difference between Hispanic and non-Hispanic culture in that
regard and that would be -- I'm not sure it would be a
justification under any circumstance but there's just no factual
predicate for that explanation.  The bottom line is as a 18, 19
or 20-year-old man, you have no business engaging in sexual acts
with 11, 12, 13, 14, 15-year-old children.  It's against the law
in every state and it certainly could not have been understood
by you as being anything but criminal conduct.

   The next factor I'm to consider is your history and
characteristics.  You're a single 20-year-old white male of
Hispanic origin.  You have no children.  Report no significant
romantic relationships.  You dropped out of high school.  Your
work experience is limited to washing and repairing farm
equipment and driving 10 wheeler trucks.

   As I noted, your parents were very young at the time of
your birth.  Your mother was reportedly abusive and that you
were thereafter raised initially by your father and grandmother
and then later by your grandmother and aunt.  Your aunt who was
a mother figure to you died in an automobile accident and I
recognize this had a significant impact on you.

   As you grew older, your father played a more
significant role in your life.  You've been in fairly good
health but lately have suffered from some minor health problems.
You apparently had seizures as a child and as your father

related, had some other health problems that were never really

sorted out as to what their cause was.

According to a psychosexual evaluation, you have below

average intelligence. Suffer from an unspecified depressive

disorder. You were misinformed about sex, anatomy and

physiology. You have a preference for young pubescent females.

You've had sexual contact with multiple underaged females and

falls in the moderate to high risk category for being charged or

convicted for another sexual offense.

And as I noted, my experience is that it really is

exceptional for someone before this Court to be categorized as

anything but a low risk of reoffending. It may be that your

expression that you don't understand that you really have a

problem and until literally today appearing in court have not

expressed any interest in treatment, that may be one explanation

but I think it's also the predatory nature of your conduct. All

of this is great concern to the Court obviously and this forces

me then to kind of address what I think drives the sentence in

this case.

I'm required by statute to impose a sentence sufficient

but not greater than necessary to achieve certain objectives

including reflecting the seriousness of the offense, promoting

respect for the law, providing just punishment, adequate

deterrence, protection to the public and any needed training,

care or correctional treatment.

1      I think this case turns on a number of those factors.

2 First, the seriousness of the offense.  Any adult age 18 or

3 older who engages in sexual contact with children who are 11, 12

4 and 13 years old, clearly that is an extremely serious offense.

5 But I think what is probably more important in this case is

6 frankly the need to protect the public and to deter others from

7 engaging in this conduct.

8      Particularly protecting the public.  Given the

9 psychosexual evaluation assessment of your risk of reoffending,

10 the predatory nature of your conduct, your unwillingness to

11 acknowledge the seriousness of this matter until fairly

12 recently, the fact that you apparently are willing to say or do

13 virtually anything to avoid being held responsible for this as

14 evidenced by communications with your mother trying to buy your

15 way out of this problem, repeated unsuccessful efforts to

16 essentially cooperate in an untruthful way with government

17 authorities to try to minimize responsibility and your only

18 recent expression of your willingness to engage in treatment,

19 all of that seriously calls into question the reliability of

20 your willingness to make changes and accept responsibility here.

21      Another major factor is the need for correctional

22 treatment but until an individual faced -- or dealing with these

23 kinds of problems is willing to embrace their problem and engage

24 in treatment voluntarily, it's not at all clear whether that

25 treatment could be successful.

1    Now, it may be as Mr. Parmenter has suggested that

2  you've made some strides in that direction. It may be that

3  within the next 5, 10, 15 years you'll make major strides in

4  that direction and be amenable to treatment but the problem is

5  we don't know. All we know is that up till this point in time,

6  almost literally this day in court, you have not expressed or

7  embraced wholeheartedly both the need and the willingness to

8  participate in such treatment. And when I weigh that against

9  the need to protect the public against what is a clear predatory

10  pattern of conduct, I have to err on the side of protecting the

11  public.

12    Now, having said that, I don't believe that a 30-year

13  prison sentence is necessary but I also feel that a 10-year

14  prison sentence, the mandatory minimum, is no where near enough

15  to protect society and for that reason, I will impose the

16  following sentence which I think is reasonable and just under

17  the circumstances and it is that sentence which is sufficient

18  but not greater than necessary to achieve the 3553(a)(2) factors

19  that I've discussed in some detail here.

20    Mr. Nieto, if you'll stand, I'll pronounce sentence.

21  The defendant, Jesus Nieto, Jr., having pled guilty to Count 1

22  of the Superseding Information and the Court being satisfied

23  that you're guilty as charged, I hereby order and adjudge as

24  follows: Pursuant to the Sentencing Reform Act of 1984, it is

25  the judgment of the Court that you be committed to the custody

of the Bureau of Prisons for a term of 300 months.  It is
further ordered that you pay to the United States a special
assessment of $100 which will be due immediately.  The Court
finds you do not have the ability to pay a fine.  Accordingly,
the fine will be waived in this matter.

All monetary penalties will be due and payable
immediately.  After considering your financial resources, I will
order payments of the special assessment under the following
schedule unless modified by the Court.  While in custody, you
will submit nominal payments of not less than $25 per quarter
pursuant to the Bureau of Prisons Inmate Financial
Responsibility Program and during the term of supervised
release, will submit nominal monthly payments of 10 percent of
your gross income but not less than $25 per month.

Let me digress.  Ms. Wick, my understanding is there
were no restitution requests submitted by the victims in this
matter as of the -- my understanding is as of the preparation of
the presentence report, that was true but perhaps I'm mistaken.

MS. WICK:  No, that's correct.  And we've -- we the
government have reached out.  The only thing that would bear on
restitution is that there was a request made by Jane Doe 2 to
the state crime victim's comp fund.  Crime victim's comp fund
requested additional information because they weren't seeing the
connection and I myself haven't seen what that was for.

I was prepared to ask the Court, you know, maybe for

1   another 30 or 60 days just to make sure that I don't

2   unwillingly, you know, waive someone's right to collect for

3   counseling or something but I haven't received an actual request

4   from Jane Doe myself where the government has and it's just been

5   through the crime victim's comp fund.  So I would, you know,

6   defer to the Court on what to do.

7           But Jane Doe 1 for sure has not submitted a restitution

8   request but the reason just while I'm speaking, I was going to

9   double-check.  I believe there's a $5,100 special assessment in

10  this case?  I was going to double-check and make sure that we

11  were under that statutory requirement versus the $100.  It all

12  depends on the date -- I think his offense --

13          COURT:  I will admit, I'm going off from --

14          MS. WICK:  I'm going to double-check the plea

15  agreement.

16          COURT:  The recommendation the probation office is $100

17  and Ms. McDonald, do you know?

18          MS. McDONALD:  Your Honor, I believe that the defendant

19  is subject to the Justice for Victims Trafficking Act and it is

20  an additional $5,000 special assessment.

21          COURT:  All right.  Then I will modify that to $5,100.

22  Mr. Parmenter, do you have any reason to dispute that?

23          MR. PARMENTER:  No.  I don't have any reason to dispute

24  it.  I don't think I've ever seen any number.

25          COURT:  All right.  I'm inclined -- you know, as long

as the victims were properly notified.  If they have not
responded, then I'm just not inclined to leave matters open but
I will modify my -- the special assessment will actually be
$5,100 but the same payment schedule will apply.  $25 per
quarter while incarcerated.  $25 per month during supervised
release.

Mr. Nieto, upon your release from incarceration, you'll
be placed on supervised release for a term of 15 years.  Within
72 hours after your release from the custody of the Bureau of
Prisons, you will report in person to the probation office in
the district to which you are released.

Supervised release will be imposed upon the following
terms and conditions:  First, that you not commit any federal,
state or local crimes.  The Court will find that you pose a low
risk of future substance abuse and therefore will suspend
immediate drug testing.  You will be prohibited from possessing
any firearms, ammunition, destructive devices or any other
dangerous weapons.  You will cooperate in the collection of a
DNA sample as directed by your probation officer.  You will
comply with the requirements of the Sex Offender Registration
and Notification Act in any state in which you reside, work or
are a student or were convicted of a qualifying offense.

You will pay the special assessment that I've imposed
in accordance with the schedule of payments as ordered by the
Court.  You will comply with all general and special terms of

1  supervised release and all standard conditions of supervision as

2  will be outlined in the Court's written judgment to be filed

3  later in this proceeding.

4      You'll also comply with the following special

5  conditions of supervision:  You will not be employed in any

6  capacity related to children under the age of 18 nor will you

7  perform any unpaid or volunteer activities in this area during

8  the term of supervised release without the permission of the

9  probation officer.  You will submit your person, property,

10  house, residence, vehicle, papers, office as well as your

11  computer as defined in U.S. Code Section 1030(e)(1) and other

12  electronic communications or data storage devices or media to a

13  search conducted by a U.S. Probation Officer.  You will warn

14  other occupants that the premises may be subject to searches

15  pursuant to this condition.

16      You'll not be allowed to possess or use a computer

17  again as defined by statute 18 U.S. Code Section 1030(e)(1)

18  without the prior permission of your probation officer.  You

19  will comply with the requirements of the U.S. Probation Office's

20  computer monitoring program as directed and will consent to the

21  U.S. Probation Offices conducting ongoing monitoring of your

22  computers, hardware, software and other electronic devices and

23  media.

24      The monitoring may include the installation at your

25  expense of hardware or software systems which allows evaluation

of your computer use.  Monitoring may also include the retrieval

and copying of all data from your computers or other electronic

devices and media.  Monitoring may occur at any time with or

without reasonable suspicion of violation of supervised release

or probation.

You will participate in a program of mental health

treatment as directed by your probation officer with the cost to

be paid by both yourself and the government based upon your

ability to pay.

You will participate at the direction of your probation

officer in an evaluation for sexual deviancy by a qualified

mental health professional who is experienced in treating and

managing sexual offenders.  You agree to waive any right to

confidentiality and allow the treatment provider to supply a

written report to the U.S. Probation Office.

You will successfully complete any course of treatment

related to your offense as directed by your probation officer

including but not limited to cognitive and behavioral treatment

for sexual deviancy under the direction of a qualified mental

health professional who is experienced in treating and managing

sexual offenders.  You will follow the rules of the treatment

program as if they are orders of the Court with the cost to be

paid by both yourself and the government based upon your ability

to pay.

You will participate in polygraph testing at the

1  direction of your probation officer and/or treatment staff to

2  monitor compliance with treatment conditions and supervised

3  release conditions specific to the supervision of a sex offender

4  with the cost to be paid by both yourself and the government

5  based upon your ability to pay.

6        Throughout the term of supervised release, you will

7  participate in GPS monitoring at the discretion of your

8  probation officer to ensure that you do not frequent restricted

9  locations with the cost to be paid by both yourself and the

10 government based upon your ability to pay.

11       You will not knowingly have unsupervised contact with

12 children under the age of 18 without the written approval of

13 your probation officer and then only in the company of an adult

14 approved by your probation officer and treatment provider who is

15 trained to serve as a chaperone for sexual offenders.

16       You will not reside or loiter within 500 feet of school

17 yards, parks, playgrounds, arcades or other places primarily

18 used by children under the age of 18.

19       You will be prohibited from residing at 560 Calder

20 Avenue in American Falls, Idaho given that it is within view of

21 the William Thomas Middle School.  You will not possess any

22 obscenity or sexually explicit or nudist visual material

23 involving minors or persons who appear to be minors nor will you

24 knowingly patronize anyplace where such material or

25 entertainment is available.

1      You will not possess any written text material

2  describing sex with minors except that which may be necessary to

3  complete sex offender treatment and to prepare collateral

4  challenges to aspects of your case and/or sentence.

5      You will have no contact either directly or through a

6  third party with the victims in this case or the three

7  individuals identified as additional witnesses in the

8  investigative materials.

9      If determined by the results of the test of adult basic

10  education and you have the cognitive ability to do so, you will

11  obtain your GED or high school equivalency during the term of

12  supervised release with the cost of education and testing to be

13  paid by yourself.

14      Mr. Nieto, do you have any questions about the

15  conditions of supervised release that I've imposed?

16      MR. NIETO:  No.

17      COURT:  Okay.  I would advise you that if you violate

18  the terms of supervised release, you will be brought back before

19  the Court and a further sentence of incarceration will be

20  imposed.

21      Typically, a defendant has the right to appeal their

22  conviction or sentence but you have signed a plea agreement

23  which contains a provision waiving essentially all of those

24  rights with just a few exceptions.  Such waivers are generally

25  enforceable but you may argue to the contrary.  However, because

1   you may wish to file an appeal to challenge the waiver of your

2   appeal rights or to appeal an issue not waived by the terms of

3   your plea agreement, I will advise you of your appeal rights

4   despite the waiver of those rights in your plea agreement.

5          If you wish to pursue an appeal, you must file a Notice

6   of Appeal within 14 days after judgment is entered in your case.

7   If unable to pay the cost of an appeal, you may apply for leave

8   to appeal in forma pauperis.  If you so request and qualify, the

9   clerk of the court will arrange for legal representation and

10  will prepare and file a Notice of Appeal on your behalf.

11         Ms. Wick, I don't believe there's any forfeiture in

12  this case; is that correct?

13         MS. WICK:  I don't believe so, Your Honor.  The only

14  physical item that was ever recovered by law enforcement was the

15  phone and I don't --

16         COURT:  Yeah, that's why I --

17         MS. WICK:  I don't believe it's in federal custody.

18         COURT:  All right.  All right.  Then I won't -- I will

19  not issue any orders on forfeiture.  I will recommend to the

20  Bureau of Prisons that Mr. Nieto receive credit for all time in

21  federal custody.  Is there any recommendation as to a place of

22  confinement?

23         MR. PARMENTER:  I would normally recommend Sheridan,

24  Oregon but I don't know.  Do they handle sex offender treatment,

25  those kinds of issues or do we know?

1        COURT:  Ms. McDonald, do you know?

2        MS. McDONALD:  I'm not aware of their programming, Your

3   Honor.

4        COURT:  There are some programs available I think at

5   every institution.  Well, the option Sheridan, Oregon or

6   Florence, Colorado which are closest to this area.  I think

7   probably the best course is to recommend one of those two

8   locations and then the Bureau of Prisons will ultimately make

9   the determination based upon his needs.  I think all things

10  being equal, it would be far better if he'd be close to where

11  his family can visit him which I assume would be one of those

12  two locations but -- all right.

13       MR. PARMENTER:  Yeah, he has no preference at this

14  time.

15       COURT:  Perhaps I'll just make a recommendation that he

16  be placed as close to southeastern Idaho as possible given needs

17  for correctional treatment and perhaps mental health counseling

18  and other factors considered by the Bureau of Prisons and leave

19  it at that.

20       All right.  Ms. Fulwyler, Mr. Metcalf, Ms. McDonald,

21  did I overlook anything?

22       MS. McDONALD:  No, Your Honor.

23       CLERK:  No, Your Honor.

24       COURT:  And Ms. McDonald, in terms of the reason for

25  the variance or sentence below the guidelines, it's really just

1    keyed to 3553(a)(2) and the parsimony requirement there.  I

2    just simply imposed a sentence that was the minimum sentence

3    that I thought would achieve those objectives.

4            So Mr. Nieto, I don't know what to say.  This is a hard

5    case.  Obviously it's an extremely long prison sentence.  I

6    can't say that Ms. Wick was wrong in making the recommendation

7    that she made or a lesser sentence as recommended by your

8    attorney.  I simply had to exercise my judgment.  At the end of

9    the day, I have to protect the public.  And your conduct has

10   been such that there's a great deal of concern in that regard

11   and while I exercised some leniency, I just simply couldn't do

12   anything more in this case given the background, the facts and

13   circumstances of this case.

14           I do wish you the best of luck.  We'll be in recess.

15           BAILIFF:  Please rise.  The Court will be in recess.

16                   (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


__/s/ Tamara A. Weber_____          __9/24/17

Signature of Approved Transcriber          Date


__Tamara A. Weber_____

Typed or Printed Name