UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO


**UNITED STATES OF AMERICA,**          )
                                       )     **CASE NO.: 4:16-CR-0132-BLW**
                  Plaintiff,           )
                                       )
         vs.                           )
                                       )
**JESUS NIETO,**                       )
                                       )
                  Defendant.           )     Pocatello, Idaho
                                       )     July 11, 2017
_____       )     1:45:42 p.m.
And related parties and cases )


**SENTENCING**


THE HONORABLE B. LYNN WINMILL PRESIDING
DISTRICT JUDGE OF THE U.S. DISTRICT COURT


DEPUTY CLERK/ESR:

PAMELA FULWYLER
U.S. District Court


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

APPEARANCES:


FOR THE PLAINTIFF:

    **ANN T. WICK,**
    Assistant U.S. Attorney
    801 E. Sherman, #192
    Pocatello, ID 83201
    208-478-4166
    Ann.Wick@usdoj.gov


FOR THE DEFENDANT:

    **DAVID N. PARMENTER, CJA Counsel**
    P.O. Box 700
    Blackfoot, ID 83221
    (208) 785-1290
    parlaw@gmail.com


ALSO PRESENT:

    **TONYA McDONALD,**
    U.S. Probation Officer

4:16-CR-0132-BLW      **U.S. v. Nieto**      07/11/17      **Sentencing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com    2

<u>WITNESS and EXHIBIT INDEX</u>

**<u>Witnesses</u>**

<u>WITNESS FOR THE PLAINTIFF:</u>                          <u>PAGE #</u>

**KRISTOPHER KNIGHT**
    Direct Examination by Ms. Wick                    7
    Cross-Examination by Mr. Parmenter               44
    Examination by the Court                         52
    Cross-Examination (Continued) by Mr. Parmenter   54
    Redirect Examination by Ms. Wick                 55

<u>WITNESS FOR THE DEFENDANT:</u>

STATEMENT BY JESUS NIETO, SR.
    [Father]                                          66

* * * * *

**<u>Exhibits</u>**

<u>EXHIBITS FOR THE PLAINTIFF:</u>                        <u>ADMITTED</u>

Exhibit 1      ROI-1                                   15
Exhibit 2      Jail logs                               16
Exhibit 3                                              16
Exhibit 4      Police Report                           16
Exhibit 5      Police Report                           16

<u>EXHIBITS FOR THE DEFENDANT:</u>

Exhibit A      Incident Report                         73

* * * * *

4:16-CR-0132-BLW          **U.S. v. Nieto**          07/11/17          **Sentencing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                 3

**POCATELLO, IDAHO**                    **TUESDAY, JULY 11, 2017**

2                               **\* \* \* \* \***

3                    PROCEEDINGS BEGAN AT 1:45:41 P.M.

4              THE CLERK:  Ladies and Gentlemen, please rise.

5   The United States District Court for the District of Idaho

6   is again in session.  The Honorable B. Lynn Winmill

7   presiding.

8              THE COURT:  Thank you.  Please be seated.

9              THE CLERK:  The Court will now hear the sentencing

10  in case number CR-16-132, the United States of America versus

11  Jesus Nieto.

12             THE COURT:  Good afternoon, counsel.  I apologize,

13  I'm -- in fact I'm still trying to get logged on here.  It'll

14  take me just a moment.  I apologize.

15             All right, let me just begin by indicating that

16  Mr. Nieto entered a plea of guilty to Count One of the

17  Superseding Information.

18             The Court ordered a presentence investigation

19  report which has been provided to Court and to counsel.

20             The plea agreement contained an agreement in which

21  the government agreed to dismiss all counts in a Superseding

22  Indictment.  I assume the government would make that motion

23  at this time?  Is that not accurate?

24             MS. WICK:  You mean dismiss the counts that have

25  been replaced with the Superseding Indictment?

1          THE COURT:  Well, there's a Superseding Information

 2    which --

 3          MS. WICK:  Oh.  Thanks.

 4          THE COURT:  -- presumably replaces all counts in

 5    the --

 6          MS. WICK:  Correct.

 7          THE COURT:  -- Indictment.

 8          MS. WICK:  Correct.  Your Honor's correct.  So

 9    moved.

10          THE COURT:  All right.  So you're making that

11    motion at this time?

12          MS. WICK:  So moved.

13          THE COURT:  All right.  I will grant the motion

14    and will dismiss the Superseding Indictment since the

15    defendant's plea of guilty to Count One of the Superseding

16    Information adequately reflects the seriousness of the

17    defendant's crime.

18          Let me inquire of the defendant.  Mr. Nieto, have

19    you had an opportunity to review the presentence report?

20          DEFENDANT JESUS NIETO:  Yes, Your Honor.

21          THE COURT:  And, Mr. Parmenter, you've had a chance

22    to review the report with your client?

23          MR. PARMENTER:  I have.

24          THE COURT:  There were objections filed to the

25    presentence report.  Do either of you intend to call

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    5

1  witnesses?

2         MS. WICK:  Yes.  One for the government, Your

3  Honor.

4         THE COURT:  Okay.

5         MR. PARMENTER:  One by way of proffer to that mic.

6         THE COURT:  Is there any objection to the offering

7  of a statement from the audience without being placed under

8  oath?

9         MS. WICK:  No, Your Honor.

10        THE COURT:  All right.  I think just to keep things

11 clean though, let's take care of all of that first.  We'll

12 take the first witness -- or the first and perhaps only

13 witness of the government and then take the proffer from the

14 defense and then move into arguments.  Is that agreeable?

15        MR. PARMENTER:  That's fine.

16        MS. WICK:  Yes, Your Honor.

17        THE COURT:  All right.  Ms. Wick, call your first

18 witness.

19        MS. WICK:  The government calls Special Agent Kris

20 Knight.

21        THE COURT:  Sir, would you please step before the

22 Clerk, be sworn, and then follow Ms. Fulwyler's directions

23 from there.  Right here, sir.

24        **KRISTOPHER KNIGHT, PLAINTIFF'S WITNESS, SWORN**

25        THE CLERK:  Please take a seat.  Would you please

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    6

 1  state your full name and spell your last name for the

 2  record.

 3          THE WITNESS:  My full name is Kristopher R. Knight.

 4  My last name is spelled K-N-I-G-H-T.

 5          THE COURT:  All right.  Ms. Wick, you may inquire.

 6          MS. WICK:  Thank you.

 7                      **DIRECT EXAMINATION**

 8  BY MS. WICK:

 9  Q.   Special Agent Knight, how are you employed?

10  A.   I'm a Special Agent for Homeland Security Investigations.

11  Q.   How long have you been so employed?

12  A.   Since 2010.

13  Q.   Where are you based?

14  A.   My office is in Idaho Falls, Idaho.

15  Q.   And what kind of cases are you responsible for?

16  A.   I mostly work child sexual exploitation cases.

17  Q.   And have you received specialized training in that

18  regard?

19  A.   I have.

20          THE COURT:  Ms. Wick, would you make sure the

21  microphone is somewhat pointed towards you, I -- just so we

22  can hear you clearly.  Special Agent Knight is coming through

23  loud and clear but I missing your voice a bit.

24          MS. WICK:  I will try that.

25          THE COURT:  Thank you.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1    MS. WICK:  And I'll try to speak up a little bit as

2  well, Your Honor.

3    THE COURT:  All right.  Thank you.

4  BY MS. WICK:

5  Q.   Special Agent Knight, what is your role or connection to

6  the -- the case pending before this Court regarding Jesus

7  Nieto?

8  A.   I'm the investigator for the case.

9  Q.   Primary responsible?

10 A.   Primary responsible.

11 Q.   And generally speaking, what kind of materials have you

12 reviewed over the course of the investigation?

13 A.   Facebook records, interviews with other -- interviews

14 with multiple female individuals related to this case.

15 Q.   American Falls Police reports?

16 A.   Yes.

17 Q.   Interviews conducted by counterparts in another state?

18 A.   Yes.

19 Q.   Have you reviewed information that pertains to forensic

20 interviews of underage girls?

21 A.   Yes.

22 Q.   Have you also reviewed information from the jail where

23 Mr. Nieto was housed at various points in time?

24 A.   Yes.

25 Q.   With regard to the overall investigation, are you aware

4:16-CR-0132-BLW       U.S. v. Nieto       07/11/17       Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          8

1  of any statements by Mr. Nieto that could be construed as

2  discussing flight from prosecution or escape in some fashion?

3  A.   Yes.

4  Q.   What kind of information did you review in that regard?

5  A.   Facebook records indicating Mr. Nieto had a conversation

6  with his mother about escaping to Mexico where she currently

7  resides.

8  Q.   Okay.  Can you be more specific about those

9  communications between Mr. Nieto and his mother?

10  A.   Can I refer back to my notes and report?

11        MR. PARMENTER:  And, Your Honor, I'd ask for a

12  little more foundation.

13        THE COURT:  I think that's probably why he needs to

14  refer to his notes to establish -- a time frame, I just --

15        THE WITNESS:  Sure.  Yeah.

16        THE COURT:  Yeah.

17        THE WITNESS:  That's what I'm asking.

18        THE COURT:  All right.

19                (Pause in the Proceedings)

20  BY MS. WICK:

21  Q.   Are you ready?

22  A.   Yes, ma'am.

23  Q.   And did you want to go ahead and answer my question

24  after you read though your notes?

25  A.   Yes.  In February, after being accused of sexually

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  assaulting a victim in American Falls, Mr. Nieto contacted

2  his mother on Facebook and they exchanged messages back and

3  forth.  At one point during the --

4          THE COURT:  Excuse me.  It's the February 2017?

5          THE WITNESS:  '16.

6          THE COURT:  All right.  Thank you.

7  BY MS. WICK:

8  Q.   And actually I'm going to stop you and go ahead and put

9  some context behind this.  What was the nature of the initial

10 allegations that arose, eventually leading to the federal

11 case?

12 A.   That Mr. Nieto had sexually assaulted a 12-year-old

13 female, that was 12 at the time of the allegation.  Was 12 at

14 the time of the police report.

15 Q.   And when did the police report, approximately, get made?

16 A.   In February of 2016.

17 Q.   Okay.  And regarding the allegations what -- how old

18 would the under age female have been regarding the criminal

19 conduct alleged?

20 A.   11.

21 Q.   And what was the nature of the criminal conduct

22 alleged?

23 A.   Enticement, using the Internet and sexual contacts.

24 Q.   Effectively a statutory rape?

25 A.   Yes.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  Q.   As other kind of sexual intercourse?

2  A.   Correct.

3  Q.   After those allegations were made, did you review these

4  Facebook records you referred to?

5  A.   Yes.

6  Q.   And what was the approximate time frame of the

7  communications in the Facebook records between Mr. Nieto and

8  his mother that you are going to be talking about?

9  A.   It was contemporaneous with him being accused of the

10 sexual assault.

11 Q.   But after the accusation had been made?

12 A.   After the accusation, yes.

13 Q.   Okay.  What did the two of them discussed, specifically?

14 A.   His -- they initially discussed that had been alleged to

15 assaulting a minor female, he told his mother that he

16 believed she was 15 at the time.  He then went on to tell her

17 that he wanted to leave for awhile and that he would -- he

18 would come down there if she, you know, if she would accept

19 him, to Mexico.

20 Q.   Okay.  With -- well, I want to stay on the topic of

21 flight or escape for a moment.  Are there other statements

22 between Mr. Nieto and his mother on that topic to add to what

23 you've already indicated?

24 A.   Not between his mother and him, just that he was going

25 to escape to Mexico -- or just go to Mexico and lay low for a

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  while.  There were further statements to the jailers in

2  American Falls.

3  Q.   And that's what I'm going to ask you about next,

4  staying with the topic of flight or escape.  What

5  information did you become aware of regarding statements to

6  the jail on that topic?

7  A.   I received a call from the jail that Mr. Nieto had been

8  making threats about escaping.

9  Q.   About when was this that you received this phone call?

10  A.   I have the exact date in my notes, but it was after he

11  had been indicted federally and charged federally with the

12  crime.

13  Q.   Okay.  And then what did the caller indicate to you?

14  A.   He indicated that Mr. Nieto said that he was going to --

15  he -- in their words, he asked what the feds would do if he

16  escaped from this place, the jail?  They told him that

17  wouldn't be a good idea and he advised them that they would

18  never find him if he escaped because he would be in Mexico.

19  Q.   Are these statements that the jail provided to you,

20  documented somehow in records?

21  A.   Yes, they are.

22  Q.   What kind of documents?

23  A.   They are part of the jail records that were given to me

24  as part of the investigation.

25  Q.   You collected them?

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  A.    I collected them.

2  Q.    Okay.  With regard to the communication between Mr. Nieto

3  and his mother, is that documented somewhere?

4  A.    Yes, it is.

5  Q.    In one of your reports?

6  A.    Yes, ROI-1.

7  Q.    Okay.  With regard to any conduct on Mr. Nieto's part,

8  are you aware of any, on his part, that could be construed as

9  conduct in furtherance or an attempt of escape, of the jail

10 specifically?

11 A.    Yes, of the jail he was alleged to have attempted to

12 sneak out a window of the cellblock area into the main area.

13 From there he could have possibly made a full escape from

14 the jail.  The jailers informed me that they watched the

15 video and Mr. Nieto was able to get an arm and a head through

16 the window opening but that's all he was able to -- to get

17 through and it wasn't -- it was not a successful attempt by

18 any means.

19 Q.    Do you know whether or not this conduct took place prior

20 to the statements or his inquiries about what would happen if

21 he tried to escape?

22 A.    It did.

23 Q.    Before or after?

24 A.    Before.  The attempt happened well before.  And then

25 later after the federal charges were -- were brought, he --

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    13

1   Q.   Let me --

2   A.   -- he made a statement about --

3   Q.   -- let me rephrase my question.  The statements that the

4   jail relayed to you about Mr. Nieto, what would happen to him

5   if he tried to escape, something along those lines, were

6   those statements by Mr. Nieto made before or after he tried

7   to go out the window?

8   A.   They were after.  The statements were after he attempted

9   to go out the window.

10  Q.   Okay.  Thank you.

11          MS. WICK:  I'd like to put a document up on the

12  Elmo, if I may Your Honor.

13          THE COURT:  Yes.

14          MS. WICK:  It's Exhibit 1 that is attached to the

15  government's filing, notice of sentencing materials.

16          THE COURT:  All right.  Why don't we refer to them

17  by the exhibit you've -- apparently marked it as Exhibit 1?

18          MS. WICK:  Yes, Your Honor.

19          THE COURT:  All right.

20          MS. WICK:  It is a document consisting of Bates

21  Numbers 1 through -- I want to make sure -- 13, Your Honor.

22  BY MS. WICK:

23  Q.   Special Agent Knight, do you see -- first of all, let me

24  show you the bottom where it's labeled Exhibit 1 and I'll

25  scan vertically, you recognize, at least that document, the

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  first page?

2  A.   Yes.

3  Q.   What do you recognize that as?

4  A.   It's an ROI-1 from this case.

5  Q.   Let me see if I can --

6  A.   And ROI stands for Report of Investigation.

7  Q.   Thank you.  I'll go ahead and go through to the last

8  page.  Actually I'll do Bates number 12.  Do you recognize --

9  so there's the bottom, Bates number 12, there's the top.  Do

10 you recognize that to be the last, what, page of the

11 narrative part of your report?

12 A.   Yes.

13 Q.   And then number, Bates number 13, do you recognize that

14 as well?

15 A.   Yes.

16 Q.   Okay.  That whole document, is that a true and accurate

17 copy of your Report of Investigation number 1?

18 A.   Yes.

19         MS. WICK:  I would move to admit ROI number -- or

20 Exhibit Number 1, Your Honor.

21         THE COURT:  Any objection?

22         MR. PARMENTER:  No objection.

23         THE COURT:  Exhibit 1 will be admitted.

24             (Plaintiff's Exhibit 1, admitted)

25         MS. WICK:  Thank you, Your Honor.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  BY MS. WICK:

2  Q.  I'd also like to show Special Agent Knight what's been

3  previously marked as Exhibit Number 2, also attached to the

4  government's filing.  It's a three page document.

5          MS. WICK:  And I presume I could just proceed with

6  showing, Your Honor?

7          THE COURT:  Yes.

8          MS. WICK:  Okay.

9          THE COURT:  Well, Counsel, you've been provided, as

10  has the Court with exhibits, I think 1 through 5.  Is there

11  any objection to any of those exhibits?

12          MR. PARMENTER:  No.

13          THE COURT:  All right.  And I assume you want the

14  Court -- or you want them to be admitted?

15          MS. WICK:  Yes, Your Honor.

16          THE COURT:  All right.  Exhibits 1 through 5 will

17  all be admitted.

18          (Plaintiff's Exhibits 1 thru 5, admitted)

19  BY MS. WICK:

20  Q.  To be clear, Special Agent Knight, Exhibit Number 2 are

21  the jail logs that you referenced, documenting the statements

22  regarding flight or escape?

23  A.  Correct.

24  Q.  Have you had opportunity to review a report, a police

25  report, or law enforcement report related to a juvenile

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  stalking allegation that resulted in an adjudication for Mr.

2  Nieto?

3  A.   Yes.

4  Q.   And, so you're familiar then with at least the alleged

5  facts of that?

6  A.   Yes.

7  Q.   Have you also reviewed the charging documents in

8  relation to that case?

9  A.   Yes.

10  Q.   Do you know whether or not, specifically referring to

11  police reports and those charging documents together, whether

12  or not the allegations there included a one-time event or a

13  longer time of event?

14  A.   It was the -- it was a series of events.

15  Q.   And can you summarize the series of events that were

16  alleged?

17  A.   The allegation was that Mr. Nieto had been stalking a

18  girl in her -- in or about her house in her neighborhood.

19  The report indicates that it all began after an allegation of

20  rape against the young girl made against Mr. Nieto.

21  Q.   Or attempted rape?

22  A.   Attempted rape.  The allegation was that Mr. Nieto would

23  drive by the house and flip off the girl and her family and

24  sit down the street and watch them.  When the family called

25  the police, Mr. Nieto was indeed just down the street and the

---

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

 1  girl pointed and said that's -- that's the person who's

 2  stalking me.  The officer contacted Mr. Nieto.  Mr. -- in the

 3  report it says Mr. Nieto became very agitated and told the

 4  officer that he was just there to visit his aunt.  The

 5  officer then pointed out to Mr. Nieto that if that was true

 6  he had no need to drive past the aunt's house and continue

 7  past the victim's house.  He could turn around at his aunt's

 8  house and leave the neighborhood that way.  He was eventually

 9  charged and convicted for stalking.

10  Q.   And do you note whether the time frame in the charging

11  document matches the time frame of the allegations in the

12  police report?

13  A.   It was contemporaneous, yes.

14  Q.   But the month span.

15  A.   Oh.

16          THE COURT:  What -- I'm not sure I understand.

17          MS. WICK:  Let me ask a couple questions.

18          THE COURT:  All right.

19  BY MS. WICK:

20  Q.   The police report allegations --

21          THE COURT:  Are we talking about Exhibit 2?

22          MS. WICK:  Exhibit 5.

23          THE COURT:  I mean Exhibit 5.  Right.  I'm sorry.

24          Go ahead.  Now I --

25          MS. WICK:  Let me ask it a different way, Your

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

 1  Honor.

 2  BY MS. WICK:

 3  Q.   Did you note whether or not the charging document that

 4  you reviewed alleged conduct occurring between November 5,

 5  2013 and August 17, 2014?

 6  A.   Yes.

 7  Q.   And did you note whether or not that substantially

 8  matched the time frame or the dates of conduct alleged in the

 9  police report you reviewed?

10  A.   Yes.

11          THE COURT:  The police report regarding that

12  incident that led to the charge?

13          MS. WICK:  Correct.  Which is in part of that

14  exhibit.

15          THE COURT:  Which is what?

16          MS. WICK:  Number 5.

17          THE COURT:  Okay.

18  BY MS. WICK:

19  Q.   The juvenile victim involved in that case was how old at

20  the time?

21  A.   I believe she was 13 at the time.  I don't have that in

22  front of me.  I don't have the police report in front of me.

23  Q.   How about I show you, just so we keep our record clear,

24  page -- one of the pages of the exhibit.

25  A.   She was 14 at the time.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          19

1  Q.   You're also familiar with the police reports that

2  support an adult stalking conviction for Mr. Nieto?

3  A.   Yes.

4  Q.   Can you summarize the police report there?  The nature

5  of the allegations regarding stalking.

6  A.   The initial allegation was that Mr. Nieto had taken a

7  girl to Pocatello to a restaurant and kept her there against

8  her will.  When she asked to leave he would not let her

9  leave.  Eventually he took her back to American Falls and

10  kicked her out -- kicked her out of the car and told her that

11  if he saw her with another boy he would kill her or harm her.

12  Later, that same individual contacted police and said that

13  Mr. Nieto was following her around as she was watching a game

14  at the junior high.  The police contacted Mr. Nieto, the

15  report indicates that it appeared Mr. Nieto was attempting to

16  flee when they saw the police come to the area.  They

17  contacted Mr. Nieto, he was in the car with two underage

18  girls.  One was 12 and the other was 13.

19  Q.   So if I heard you correctly, she -- the victim in that

20  case notified the police twice, regarding conduct by Mr.

21  Nieto?

22  A.   Correct.  Mr. Nieto had been -- the investigation was

23  started when she alleged that he had kept her at the

24  restaurant against her will.  Mr. Nieto had been warned to

25  stop.  And then when she called the police a second time and

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          20

1  said that Mr. Nieto was following her, again they dispatched

2  an officer to go investigate.

3  Q.   Between the two events law enforcement warned Mr. Nieto

4  to stay away from this victim?

5  A.   Correct.

6  Q.   And you indicated -- in the car when he was stopped,

7  after the second event, he had underage girls with him?

8  A.   Yes.

9  Q.   Of approximate ages, what?

10  A.   12 and 13.

11  Q.   What was the first name of one of them that we'll talk

12  about later.

13  A.   Ismay [phonetic].

14       MS. WICK:  For the Court's benefit and the record's

15  benefit, the government offered and the Court admitted

16  records in Exhibit Number 4 that are covered by that summary

17  testimony.

18       THE COURT:  All right.

19  BY MS. WICK:

20  Q.   I want to move a little bit to the Jane Doe and Jane

21  Doe 2 that are the substance of Mr. Nieto's federal charges

22  and convictions ultimately.

23       With regard to Jane Doe, she was how old at the time of

24  the criminal conduct that's been pleaded guilty to?

25  A.   She was 11.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          21

1  Q.    Did she undergo a forensic interview in relation to her

2  allegations on that subject?

3  A.    She did.

4  Q.    And do you recall approximately when she did that

5  interview?

6  A.    It was in April of 2016.

7  Q.    Okay.  Do you know who did the forensic interview?  The

8  agency?

9  A.    Bright Tomorrow's here in Pocatello.

10 Q.    Are you familiar with them?

11 A.    Yes.

12 Q.    Do you know whether they are trained or otherwise

13 conduct their interviews differently for children who are

14 making allegations of this kind?

15 A.    Yes, they are a trained Child Advocacy Center with

16 trained interviewers and they conduct their interviews in

17 accordance with standard policies which --

18 Q.    Is there something specific that they do that's a little

19 bit different?

20 A.    Yes, they are trained in interviewing children in a way

21 that they don't lead the children.  They just ask questions

22 that allow the children to talk and tell their story.

23 Q.    Was Jane Doe's forensic interview documented in a police

24 report that you reviewed?

25 A.    Yes.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1 Q.   And what is a summary of her disclosures during the

2 forensic interview?

3 A.   That Mr. Nieto had taken her back to his house.  That at

4 some point in -- at his house, that Mr. Nieto had attempted

5 to engage in sexual activity with her and she told him she

6 wasn't ready and he didn't care because he removed -- he --

7 she said he apparently didn't care because he removed her

8 pants and panties anyway, after being told she wasn't ready.

9 She said she was nervous and scared and that he put his penis

10 inside of her vagina and it hurt a lot.

11 Q.   Before that took place, did the two of them meet

12 somewhere outside of the residence?

13 A.   They met at a mall.

14 Q.   Were there other people present?

15 A.   There were two other -- according to the victim there

16 were two other people, two other females present.

17 Q.   Underage females?

18 A.   Yes.

19 Q.   And did they -- did all of the underage females go to

20 the residence with --

21 A.   Yes.

22 Q.   -- Jane Doe and Mr. Nieto?

23 A.   Yes.

24 Q.   At the time of the intercourse that she reports, were

25 the other underage females still present?

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  A.   No, they had left.

2  Q.   Did she indicate any statements by Mr. Nieto during or

3  after --

4  A.   That --

5  Q.   -- that were reported in the forensic interview?

6  A.   Yes.  She said that he didn't use a condom.  And she

7  said that after sex he told her he got what he wanted and

8  that all he wanted was to have sex with her and he didn't

9  want anything else from her.

10 Q.   Did she indicate that she did not consent to that sexual

11 intercourse?

12 A.   She did.

13 Q.   Is there anything more specific than what you've already

14 provided to the Court on that?

15 A.   Just that she told him she wasn't ready.

16 Q.   You've referred to some Facebook records that you

17 reviewed.  Is it correct that there are communications

18 between Jane Doe and Mr. Nieto that precede this event at

19 his home?

20 A.   Yes.

21 Q.   Are there other communications within that, that refer

22 to her readiness or willingness to engage in sex with Mr.

23 Nieto?

24 A.   Yes.

25 Q.   Can you summarize those, again with the context of what

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          24

1  she reported in the forensic interview.

2  A.    She told him on multiple occasions that she was a

3  virgin, that she wanted to wait until she was married to have

4  sex; that she wasn't ready to have sex with him.  Things of

5  that nature.

6            THE COURT:  Counsel, just so I'm clear.  When --

7  what was the approximate date when the act of intercourse

8  took place?  Was that in late 2015?

9            THE WITNESS:  Sometime after December 24th, 2015.

10            THE COURT:  So it could have been early 2016?

11            THE WITNESS:  Correct.

12            THE COURT:  Do we know the latest date it could

13  have been?

14            THE WITNESS:  Mmm, from --

15            THE COURT:  From reference?

16            THE WITNESS:  I don't have anything like that,

17  according to the defendant I could give you a date.

18            MS. WICK:  May I inquire?

19            THE COURT:  You may.

20            MS. WICK:  Because there's quite a bit of differing

21  information on that subject.

22            Thank you, Your Honor.

23  BY MS. WICK:

24  Q.    Regarding Jane Doe's statements, when did she indicate,

25  to the best of her ability, this event at the residence

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        25

1  occurred that involves sexual intercourse?

2  A.    She said approximately two months before her initial

3  disclosure.

4  Q.    And her initial disclosure was?

5  A.    In February of 2016.

6  Q.    Okay.  So that could put it back, I'm approximating,

7  late November would be the earliest?

8  A.    Correct.

9  Q.    Okay.  When, in terms of the Facebook records you

10  reviewed, when was the earliest communication on the subject

11  matter of sex between Mr. Nieto and Jane Doe?

12  A.    The earliest communication on sex?  Just a second

13  please.  It was either the 2nd or 3rd of December.

14  Q.    So early December?

15  A.    Yes.

16  Q.    Would you disagree if I indicated December 2nd there was

17  a statement by Jane Doe about can't lose her virginity?

18  A.    Correct.

19  Q.    When would Jane Doe -- or when did Jane Doe turn 12?

20  A.    December 31st, 2015.

21  Q.    Okay.  All right.  And I assume, through preparation for

22  today's hearing you became aware of statements by Mr. Nieto

23  about when this sexual intercourse took place?

24  A.    Correct.

25  Q.    And is it your understanding that he indicated on or

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

26

1  about January 1st of 2016?

2  A.   Correct.

3  Q.   Are you able to put those dates in some kind of context?

4  Make sense of all of them?

5  A.   Yes.

6  Q.   Well, and before -- go ahead, I'll let you answer that

7  question.

8  A.   In regards to his statements and the -- the statements

9  we --

10 Q.   Trying to pin down when the sexual intercourse took

11 place.

12 A.   Correct.  Mr. Nieto says that he learned the victim was

13 turning 12 just before her birthday and that three days after

14 the birthday is when he engaged in sexual intercourse with

15 her.  He also stated that he learned on a previous occasion

16 that he had attempted to insert his finger into her vagina

17 and that was the point of which he learned that she was a

18 virgin.

19    Facebook records indicate that she made him aware she

20 was a virgin on December 2nd, through the Facebook

21 communication.  And then again on December 24th she tells him

22 that he was the first person to kiss her, first person to

23 touch her boobs, and he acknowledges that if they had sex it

24 would be her first time.

25 Q.   On the December 24th date?

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          27

1  A.   Correct.

2  Q.   You've indicated --

3       THE COURT:  Just a moment.  So that's why you say

4  it happened after December 24th?

5       THE WITNESS:  Correct.

6       THE COURT:  And the defendant said it happened

7  three days after her birthday which would be January 2nd or

8  3rd, 2016?

9       THE WITNESS:  Correct.  And then he indicated that

10 he attempted to put his finger in her vagina before learning

11 she was a virgin; and the record show that they talk about

12 her virginity on December 2nd and December 24th.

13      THE COURT:  Which would suggest that act occurred

14 sometime before December 24th?

15      THE WITNESS:  Correct.

16      THE COURT:  And the victim in an interview in

17 February 2016 said that the act of intercourse occurred

18 roughly 2 months earlier?

19      THE WITNESS:  Correct.

20      THE COURT:  Which could be early December --

21 sometime in late November through late December?

22      THE WITNESS:  And if -- the disclosure was made

23 towards the end of February and so it could have been the end

24 of December.

25      THE COURT:  Okay.

---

4:16-CR-0132-BLW          **U.S. v. Nieto**          **07/11/17**          **Sentencing**

1        THE WITNESS:  Approximately two months would be

2   towards the end of December.

3        THE COURT:  But regardless, the act of intercourse

4   took place either just before or just after her 12th

5   birthday?

6        THE WITNESS:  Yes, sir.

7        THE COURT:  With some indications that it was just

8   before and the defendant saying it was just after?

9        THE WITNESS:  Correct.

10       THE COURT:  Okay.

11  BY MS. WICK:

12  Q.   Where, or in what context did Mr. Nieto make the

13  statements about the digital penetration that you referred

14  to?

15  A.   In his polygraph evaluation.

16  Q.   In the, like the pre-interview questions?

17  A.   Correct.

18  Q.   And to be clear you indicated --

19       THE COURT:  Just a moment.  Was the polygraph done

20  post-plea?  I mean, I'm concerned, I'm not sure whether to

21  consider admissions made post plea and --

22       MS. WICK:  It was -- I don't know the -- I can

23  look.  I can look it up.  It was negotiated as part of the

24  plea agreement that it would be done and provided to the

25  government and the Court.

1          THE COURT:  Okay.  Go ahead.

2          MS. WICK:  Okay.

3    BY MS. WICK:

4    Q.   His -- I want to make sure we understand his statement.

5    His statement indicated that he did the digital --

6          THE COURT:  Bit I guess the bottom line is, it is

7    somewhat exculpatory in any event because he had claimed

8    during that polygraph process that the events took place

9    after her 12th birthday.  Is that correct?

10          MS. WICK:  Correct.

11          THE COURT:  All right.  Go ahead.

12    BY MS. WICK:

13    Q.   Regarding the digital penetration, did he indicate that

14    he did that act prior to knowing that she was a virgin?

15    A.   Yes.

16    Q.   And that as a result of that act that's when he learned

17    she was a virgin?

18    A.   Correct.

19    Q.   And if I understood you correctly, on December 2nd

20    there's a Facebook communication where the two, Mr. Nieto and

21    Jane Doe discuss that she can't lose her virginity?

22    A.   Correct.

23    Q.   And there's additional subsequent statements by Jane Doe

24    that also referred to not losing her virginity prior to

25    marriage?

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          30

1  A.   Correct.

2  Q.   So what he says about the digital penetration, had to

3  either occur before December 2nd?

4  A.   Correct.

5  Q.   Or he's -- or Mr. Nieto is lying about when he knew she

6  was a virgin, is that the two conclusions that have to be

7  drawn?  One or the other?

8  A.   Yes.

9  Q.   With regard to Jane Doe 2 then, another minor that's

10  part of the charges before the Court, just a couple of small

11  areas of inquiry.  Were there Facebook records with regard to

12  Jane 2 -- Jane Doe 2 that you reviewed?

13  A.   Yes.

14  Q.   Within those Facebook records is there some kind of

15  indication that Mr. Nieto sent Jane Doe 2 pictures that --

16  pictures or videos that would be of his penis?

17  A.   Yes.

18  Q.   Can you tell us a little bit more about that please?

19  A.   Yes.  On December 9th, Mr. Nieto says he wants to send --

20          THE COURT:  Again 2015?

21          THE WITNESS:  2015, yes, sir.

22          THE COURT:  All right.  Thank you.

23          THE WITNESS:  Mr. Nieto says he wants to send a

24  good picture to victim 2, her response is, she asked if it's

25  a D-pic, and again dick-picture?  Mr. Nieto responds for her

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          31

1  to look quick and that he will delete it.  After a short

2  period Mr. Nieto says, did you like the video?  And then in

3  her inter -- in a CAC interview with the victim, Jane Doe 2,

4  she indicates to us that Mr. Nieto had sent her pictures and

5  videos of his penis.

6  Q.   When you say CAC interview, what is that?

7  A.   Child Advocacy Center.

8  Q.   So subsequent to -- well, as part of your investigation

9  was Jane Doe 2 interviewed?

10  A.   Yes.

11  Q.   By -- with a forensic interview?

12  A.   Correct.

13  Q.   And you're indicating that she disclosed in that

14  interview process that Mr. Nieto sent pictures and videos of

15  his penis?

16  A.   Yes.  On a second occasion Mr. Nieto -- victim 2 asked

17  for a picture of Mr. Nieto and his response was, "like of my

18  face, my dick or what?"  And Jane Doe 2 says she requested a

19  picture of his face.

20  Q.   This is preceding the video conversation?

21  A.   This was after the video.

22  Q.   This was after.

23  A.   This was the second incidence.

24  Q.   Within the communications between Mr. Nieto and Jane

25  Doe 2, is there something that can be characterized as a

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  fantasy on the part of Mr. Nieto about the under aged 15-

2  year-old Jane Doe 2?

3  A.   Yes.

4  Q.   Okay.  Could you summarize it and do the best you can to

5  perhaps sanitize for explicit --

6  A.   Yes.

7  Q.   -- information?

8  A.   I just need to find my notes that I wrote.

9         MS. WICK:  I would note for the record that there

10 are underage people present in the courtroom.  So if you

11 could be as clean as possible.

12        THE COURT:  Well, you know, that's a decision that

13 the guardians of the children in this -- I think -- whether

14 to have the children here or not, I'm not sure it is a good

15 idea, but this is a Court proceeding and I can't ask the

16 witness to sanitize the testimony, so.  And I --

17 BY MS. WICK:

18 Q.   Then going ahead and give us the summary please.

19        THE COURT:  Well, it's up to the parents or

20 guardians of the children to make that decision.  So I think

21 we just need to proceed.

22        Go ahead.

23        MS. WICK:  Thank you, Your Honor.

24 BY MS. WICK:

25 Q.   With that in mind, would you go ahead and summarize what

1  I asked about, is something that can be characterized as a

2  fantasy on Mr. Nieto's part?

3  A.   Yes.  In a sexting conversation with the Jane Doe --

4           THE COURT:  I'm sorry, you said a sexting

5  conversation?

6           THE WITNESS:  Sexting.

7           THE COURT:  All right.  Thank you.

8           THE WITNESS:  Where Mr. Nieto was fantasizing about

9  having sexual relations with Jane Doe 2, Mr. Nieto said that

10 he was looking forward to riding on top and fucking you.  He

11 also said, after the video he sent to her and told he was

12 going to delete, and she asked if it was a D-picture, he said

13 I want to do that to you so bad, slide in between your legs

14 and OMFG.  I want to make you drip in cum and he also said I

15 can imagine how tight you are.

16 BY MS. WICK:

17 Q.   What was the approximate time frame of this

18 communication?

19 A.   The last three were all in the same time.  And then the

20 other one was a separate incident.  The first.

21 Q.   Can you give us what -- what year, approximate, in?

22 A.   This was 2015, the end.

23 Q.   Okay.

24 A.   During their conversations.

25 Q.   Finally with regard to Jane Doe 2, did she allege

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          34

1  anything about Mr. Nieto threatening her in relation to the

2  pictures that she ultimately sent him?

3  A.    Yes.

4  Q.    How did she make those allegations?

5  A.    During her Child Advocacy Center interview, her forensic

6  interview, she stated that Mr. Nieto threatened her that if

7  she didn't send pictures to him, he would come and kill her

8  family and take her away.

9  Q.    Did she indicate how he communicated those threats?

10 A.    Through Facebook Messenger.

11 Q.    And did -- did your review of Facebook information

12 include Facebook Messenger's documents or --

13 A.    Yes.

14 Q.    Did you find anything to corroborate those statements?

15 A.    I did not find any threats.

16 Q.    Did she indicate when those threats were made that would

17 somehow explain how they wouldn't be in Messenger?

18 A.    She didn't explain when they were made.  The fact that

19 they're not in Messenger could mean they were deleted before

20 a search warrant or a preservation request was made.

21 Q.    Okay.  So there is a possible reason why they wouldn't

22 be in there even if true?

23 A.    Correct.

24 Q.    Transitioning, if you would, Special Agent Knight, after

25 Mr. Nieto was in custody on the state allegations and in fact

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

35

1  after he had been indicted federally, are you aware of

2  communication between Mr. Nieto and law enforcement agencies

3  surrounding his offer to cooperate?

4  A.   Yes.

5  Q.   And how did you become aware of the first such

6  incident?

7  A.   I received a phone call from you regarding Mr. Nieto

8  being in contact with Idaho State Police detectives.

9  Q.   And what did you do in response to my phone calls?

10 A.   I called the Idaho State Police detectives.

11 Q.   And what was your objective in that -- that effort?

12 A.   To figure out why they were in contact with Mr. Nieto.

13 Q.   Okay.  And what did you learn from the ISP personnel

14 that you contacted?

15 A.   That Mr. Nieto had called them on multiple occasions.

16 That he had told them that his lawyer had directed him to

17 call them.  His lawyer Steve Richert had directed him to call

18 them that he had information about drug smuggling in the

19 area.  After they went to the jail and realized that he

20 wasn't -- he wasn't being directed by his lawyer.  That they

21 didn't have anything they wanted to talk to him about based

22 on his charges, they cut contact with him.

23      Mr. Nieto then called them again and told them to

24 disregard Mr. Richert, that he was no longer their attorney

25 -- he was no longer Mr. Nieto's attorney and that he needed

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                36

1  to talk to them about the information he had on drug

2  smuggling.

3  Q.  Do you know whether or not, by the time of this

4  communication from Mr. Nieto, Steve Richert still represented

5  Mr. Nieto?

6  A.  At the time of that communication he did.

7  Q.  What happened in response to that phone call by Mr.

8  Nieto?

9  A.  There was a court hearing and --

10  Q.  Not regarding Mr. Richert's representation.

11  A.  Oh.

12  Q.  The phone call from Mr. Nieto to law enforcement, the

13  second reach out to ISP?

14  A.  Oh, they -- they disregarded him completely.  They did

15  not want to talk to him.

16  Q.  What did he do next?

17  A.  He --

18  Q.  What did Mr. Nieto do next?

19  A.  He passed a note to the jail staff and said that a law

20  enforcement officer's life was in danger and that he needed

21  to talk to ISP about the threat.

22  Q.  And --

23        THE COURT:  I'm sorry.  He needed to talk to?

24        THE WITNESS:  The Idaho State Police about the

25  threat.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

 1          THE COURT:  All right.

 2   BY MS. WICK:

 3   Q.   Did ISP respond to that?

 4   A.   No.

 5   Q.   Did another law enforcement agency respond?

 6   A.   Yes, the agency that had officers who -- where the

 7   officers that were being threatened responded.

 8   Q.   What did Mr. Nieto indicate in terms of what agency was

 9   under threat?

10   A.   The Oneida County Sheriff's Department.

11   Q.   And you know how Oneida County Sheriff's Department was

12   notified of his allegations in this regard?

13   A.   Just that Bannock County, where Mr. Nieto was being held

14   at the time contacted them about the threat and the note.

15   Q.   So Oneida County Sheriff's personnel responded?

16   A.   Correct.

17   Q.   Did they speak with Mr. Nieto?

18   A.   They did.

19   Q.   Were you present in some fashion?

20   A.   I was.

21   Q.   And having observed that interaction, can you summarize

22   the nature of it?

23   A.   Yes.  Mr. Nieto began the, you know, the interview and

24   stated that he had information for the Idaho State Police.

25   The investigators in the room told him that they were -- and

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  he told him that he had information about a certain officer

2  with a death threat put out against him.  The officer

3  indicated that he was the officer who was being threatened.

4  Mr. Nieto was surprised because he had planned on talking to

5  Idaho State Police and he told him that.

6       They -- he then proceeded to tell them that his

7  cellmate had made a confession to him about murdering people

8  in Oneida County and Mr. Nieto then went on to give pretty

9  good details about the murder and the way it was done and

10 things of that nature.  The police then left the room, came

11 into the observation room where I was and told me that

12 everything Mr. Nieto had just told them about the murder was

13 incorrect.

14 Q.   Can you be more specific about -- for -- an example of

15 something significant that was incorrect?

16 A.   The method of murder.  Mr. Nieto had the exact -- I mean

17 a very wrong way that the people were murdered.

18 Q.   Stabbing versus shooting kind of discrepancy?

19 A.   Correct.  Exactly.

20 Q.   Okay.  Anything else material that you recall in terms

21 of being inaccurate?

22 A.   The number of people murdered was inaccurate.

23 Q.   The -- what was the general impression then about the

24 reliability or accuracy of the information that Mr. Nieto was

25 relaying?

1  A.   They said he had zero reliability, zero credibility and

2  they were not interested in talking to him.

3  Q.   Did they leave not concerned that there was any actual

4  threats being made?

5  A.   Correct.

6  Q.   Finally, Special Agent Knight, are you aware of some

7  underage minor females that were interviewed or identified in

8  some fashion in connection with the investigation in this

9  case?

10 A.   Yes.

11 Q.   Specifically, I'm going to ask you about three by first

12 name.  Are you familiar with one by the name of Ida?

13 A.   Correct.

14 Q.   And generally speaking how are you familiar or what's

15 her relationship to the investigation?

16 A.   She was identified as part of the forensic interviews as

17 a person who had a relationship with Mr. Nieto.

18 Q.   She was identified by another individual?

19 A.   Correct.

20 Q.   During the course of a forensic interview?

21 A.   Correct.

22 Q.   And the other individual was another minor female?

23 A.   Correct.

24 Q.   Are you familiar with -- or what and have -- what was

25 Ida's age at the approximate time frame of the forensic

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  interview?

2  A.   She was 13 in April 2016.

3  Q.   Are you familiar with a girl by the name of Danielle,

4  again through the course of this investigation in some

5  fashion?

6  A.   There is a Daniella who Mr. Nieto was convicted of

7  stalking.

8  Q.   Do you recall whether that's the adult conviction of

9  stalking or the juvenile adjudication?

10  A.   The adult conviction of stalking.

11  Q.   And are you familiar with one by the name of Ismay?

12  A.   Yes.

13  Q.   In what context is she identified in the course of this

14  investigation?

15  A.   She was identified through the Child Advocacy Center

16  forensic interviews.

17  Q.   Did she submit to one herself or was she identified by

18  someone else?

19  A.   She submitted to one herself.

20  Q.   Okay.  Did she speak about Mr. Nieto in that forensic

21  interview?

22  A.   She did.

23  Q.   What did she indicate?

24  A.   She indicated that she was in the car with Nieto --

25  Mr. Nieto when he was arrested for stalking Daniella.  That

4:16-CR-0132-BLW          **U.S. v. Nieto**          07/11/17          **Sentencing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          41

1  he had kissed her on the neck and mouth and that he showed

2  her nude pictures of another underage female that was later

3  interviewed through the CAC, that he had showed her nude

4  pictures of her that had been sent to Mr. Nieto.

5  Q.    Are there initials for this other individual?

6  A.    Yes.  M.S.

7  Q.    Was M.S. known to Ismay?

8  A.    Yes.

9  Q.    And Ismay knew the pictures were of M.S.?

10  A.    Correct.

11  Q.    And M.S. was later interviewed by law enforcement?

12  A.    Correct.

13  Q.    A forensic interview as well?

14  A.    Yes.

15  Q.    And did she corroborate the nude pictures?

16  A.    She did.  She said that Mr. Nieto asked her to send nude

17  pictures.  She said she sent nude pictures, then clarified

18  that she meant pictures in her bra and panties.  She also

19  said that Mr. Nieto asked her why she didn't want to lose her

20  virginity to him.  And she told the interviewer that she

21  knows Mr. Nieto had showed -- had shown the pictures that she

22  took and sent to him two other people.

23  Q.    She said that she knew he had --

24  A.    She said she knew.

25  Q.    -- shown the pictures?

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    42

1  A.    Correct.

2  Q.    What was the time frame of M.S.'s forensic interview?

3  A.    It was during the April 2016.

4  Q.    And how old was she at that time?

5  A.    She was 13 at the time of the interview.

6  Q.    And what was the time frame of Ismay's forensic

7  interview?

8  A.    The same, April 2016.

9  Q.    And how old was Ismay at that time?

10  A.    She was 13 at the time of the interview.

11  Q.    I need to return -- we've finally come full circle, back

12  to the Facebook records and your documentation of things in

13  ROI-1, report of investigation 1.  You indicated there was

14  some communications between Mr. Nieto and his mother that

15  were about something other than flight?

16  A.    Correct.

17  Q.    Were those about contacting Jane Doe or Jane Doe's

18  family?

19  A.    They were.

20  Q.    And what time frame were those communications taking

21  place?

22  A.    The -- during the initial -- when he was in -- in 2016,

23  after he had been alleged to assault --

24  Q.    Around the same time frame as the flight conversation

25  A.    Fleeing.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  Q.    -- if you will?

2  A.    Yes.

3  Q.    What was the communication between Mr. Nieto and his

4  mother?  And please be as specific as possible.

5  A.    Yes.  Mr. Nieto sent a message to his mother that said,

6  listen, mom, can't you speak to her mom and have a serious

7  conversation with her and see if we can come to an agreement

8  and even pay her money if she wants also.  His mother

9  replied, of course I can talk to her, send me her number, I

10 hope she accepts.  Mr. Nieto told his mother that he didn't

11 have the number but he provided her with a screenshot of the

12 mother's Facebook account information.

13 Q.    Does that end the conversation regarding that contact?

14 A.    And then the mother asked, is that the mother or is that

15 the brat?

16 Q.    Did Mr. Nieto respond to that question?

17 A.    That's all I have.

18        MS. WICK:  I have no further questions at this

19 time, Your Honor.

20        THE COURT:  Mr. Parmenter.

21                  **CROSS-EXAMINATION**

22 BY MR. PARMENTER:

23 Q.    Special Agent Knight, -- it's Special Agent, right?

24 A.    Yes, sir.

25 Q.    Okay.  Mr. Nieto's date of birth on September 20th, 1996?

---

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

 1  A.   That sounds right.

 2  Q.   Okay.  So he was, I guess 20 now.  Was 18 years old

 3  during some of this conduct?

 4  A.   I -- boy, I'd have to do the math, sir.

 5  Q.   Okay.

 6  A.   I thought he was 19 at the time.

 7  Q.   But you're talking about --

 8  A.   I apologize, sir.  No, he was -- I have his date,

 9  actually in one conversation he was 19 years and two months

10  and 13 days old during the time he told victim 1 that he was

11  18.

12  Q.   Okay.  Jane Doe 2 for example, he had communicated with

13  over a significant period of time, a year and several months,

14  right?

15  A.   That is what he said, yes, sir.

16  Q.   Okay.  But don't you have those records?

17  A.   I only have the records that I made notes of.

18  Q.   Okay.  All right.  So is that what she informed you,

19  when you interviewed -- you --

20  A.   Yes, that they had been talking for awhile.

21  Q.   Okay.  So she confirmed that they had an ongoing

22  dialogue on Facebook?

23  A.   Correct.

24  Q.   Okay.  And there was some discussion as well about her

25  coming to visit him at some point in time?

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                45

1    A.    Correct.

2    Q.    But that never actually happened?

3    A.    No, sir.

4    Q.    Okay.  And did you actually go and personally interview

5    her yourself?

6    A.    No, sir.

7    Q.    Okay.  And there's some assertion that he made some kind

8    of threat against her, but it's not part of their Facebook

9    record, is that what I understand?

10   A.    Correct.

11   Q.    Okay.  And did you -- did she tell you that personally

12   or the other person that talked to her?

13   A.    She told it during the interview.

14   Q.    Okay.  But you were present during the interview?

15   A.    No, sir.

16   Q.    Okay.  With Jane Doe 1, I guess it's fair to say there's

17   some question about when exactly the sexual intercourse took

18   place?

19   A.    Yes, sir.

20   Q.    Okay.  And Mr. Nieto has indicated that that happened

21   shortly after her 12th birthday?

22   A.    Yes, sir.

23   Q.    Okay.  Okay.  And as part of the psychosexual

24   evaluation, you've reviewed that I assume?

25   A.    Yes, sir.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1 Q.   Okay.  Many, if not all of these other names that you've

2 referred to have come into play in that -- in that report?

3 A.   I would not say that's accurate.

4 Q.   Okay.  Some of the names have been mentioned?

5 A.   As far as the psychosexual, no.  As far as the polygraph

6 with the psychosexual, then names were --

7 Q.   Okay.  Well, all right.  So when I say psychosexual,

8 I'm also referring by implication to the polygraph report.

9 A.   Okay.

10 Q.   Is it fair to say that some of those names came out in

11 conjunction with the polygraph examination?

12 A.   Yes, sir, but the ages are in dispute.

13 Q.   Okay.  But --

14 A.   So I don't know.

15 Q.   All right.

16 A.   What I'm saying is I don't know because the age that I

17 think Mr. Nieto said he had sex with a girl named Ismay, who

18 was 15, the Ismay that I know of was 13 at the time of the

19 disclosure.

20 Q.   Okay.

21 A.   So again, I don't know if those names are the same

22 names.

23 Q.   All right.  And there was a Daniella mentioned in the

24 psych -- in the polygraph report?

25 A.   Correct.  Or Danielle.  Yep.

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        47

1  Q.   Okay.  You assume that's the same one?

2  A.   I assume that's the same one that was the conviction of

3  stalking --

4  Q.   Okay.

5  A.   -- but I don't have --

6  Q.   And also there was an Ida mentioned as well?

7  A.   Correct.  There was an Ida and she was -- she was

8  identified as part of a CAC and she was 13 at the time of

9  identification.

10 Q.   Okay.  And presumably that's the same Ida that was

11 referred to?

12 A.   If it -- if it is the -- he, -- Mr. Nieto gave incorrect

13 ages.

14 Q.   Okay.  Be that as it may, do you -- do you believe there

15 are other victims with those same names or that these are

16 basically who we're talking about?

17 A.   I believe that they are the same people we're talking

18 about.

19 Q.   Okay.

20 A.   Yes, sir.

21 Q.   So just differentiation on what their ages were from

22 Mr. Nieto's report in the polygraph versus what the girls

23 actually reported when they came in?

24 A.   Yes, sir, I believe that's true.

25 Q.   Okay.  And isn't it true that he came out with a non-

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    48

1  deceptive polygraph?

2  A.   Yes, sir.

3  Q.   Okay.  You've indicated that Mr. Nieto initially

4  contacted Idaho State Police through Mr. Richert?

5  A.    No, sir.  He contacted Idaho State Police on his own and

6  told them that his lawyer, Mr. Richert, had told him to

7  contact them.

8  Q.   But when Mr. Richert was representing him?

9  A.   Correct.

10 Q.   Okay.  The contact with Mr. Nieto's mother, you're

11 relying on the transcript of -- of the communication device,

12 which I assume was -- was that Messenger?

13 A.   Correct.  It was Facebook records.

14 Q.   Facebook?

15 A.   Yes.

16 Q.   Okay.  And that was in Spanish?

17 A.   Correct.

18 Q.   And that was translated by you or someone else?

19 A.   No, sir.  It was translated by Special Agent Brad Rodell

20 [phonetic].

21 Q.   Okay.  And all of that is part of the record that we

22 have before us, right?

23 A.   Correct, sir.

24 Q.   Okay.  And as I understand it, his contact with his

25 mother referred to the possibility of coming down and

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        49

1  visiting her?

2  A.   Correct.

3  Q.   Okay.  He'd not had any, at least physical contact with

4  his mother for many years?

5  A.   That's what I was told, sir.

6  Q.   Okay.  So as far as you know, he hadn't seen his mother

7  for a long long time?

8  A.   Correct.  That's what I'm told.

9  Q.   Okay.  And he's a U.S. citizen?

10  A.   Yes, sir.

11  Q.   Okay.  So he would probably need a passport to go visit

12  her?

13  A.   No, sir.

14  Q.   No?

15  A.   He'd only need a passport to come back into the U.S.

16  Q.   Okay.

17  A.   And only then to make it easier to come back into the

18  U.S.

19  Q.   Okay.  Aren't passports required for U.S. citizens now

20  to go to Mexico?

21  A.   No, sir.  You can still get into Mexico without a

22  passport.

23  Q.   With a birth certificate?

24  A.   If you just want to cross the border you could.

25  Q.   Okay.  Was there any follow-up conversation with his

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          50

1  mother by you or any other investigators?

2  A.   No, sir.

3  Q.   Okay.  So you

4  don't know what capacity, if any, his mother had to even make

5  communication with another individual on his behalf?

6  A.   No, sir.

7  Q.   Okay.  And as far as any money, any capability of paying

8  anything if --

9  A.   I have no idea on her finances.

10 Q.   Okay.  All right.  Do you recall when this communication

11 with his mother was?

12 A.   I could tell you.

13 Q.   Okay.

14 A.   If you give me just a second.  February 11th.

15 Q.   Okay.  So it was after the state charge -- or before

16 the state charge.  I guess it was before this state charge,

17 right?

18 A.   It was after the allegation was brought to the police

19 but before it was charged, yes.

20 Q.   Before it was charged?

21 A.   Yeah.

22 Q.   Okay.  All right.

23       MR. PARMENTER:  That's all I have, Your Honor.

24 Thank you.

25       THE COURT:  Just as a quick follow-up.

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        51

1        **EXAMINATION BY THE COURT**

2            THE COURT:  Just as a quick followup.  I'm assuming

3   from the testimony you've given that the -- that Jane Doe 1

4   did not -- well, my question really is this.  If Jane Doe 1

5   turned 12 on December 30th or 31st, I'm assuming from the lack

6   of any testimony to that effect that when she was interviewed

7   in February she did not reference that point as being of

8   significance?  In other words, that the act of intercourse

9   either took place before or after that date?  The reason I

10  asked that is, the birth date is kind of an important date

11  and December 31st is kind of an -- I mean a New Year's Eve

12  birth date and may be age 12 is kind of an important date as

13  becoming kind of a teenager and I'm just wondering if Jane

14  Doe 1 ever made any specific reference to that birth date as

15  -- whether the act of intercourse occurred before or after

16  that?  She did not, I assume?

17           THE WITNESS:  No, sir.  Her only indication was

18  that it was approximately a couple months before.

19           THE COURT:  Okay.  One other question.  You

20  indicated that, I think it was Jane Doe 2 had indicated that

21  -- that the defendant had made kind of a threat to her, if

22  she didn't provide him with explicit photos of herself and

23  did so using Facebook Messenger, but that either she

24  suggested or you assumed they may have been deleted because

25  they were found, but I'm assuming no effort was made to

---

4:16-CR-0132-BLW        **U.S. v. Nieto**        07/11/17        **Sentencing**

1  subpoena records from Facebook to see if there was any

2  available deleted messages from their files?

3        THE WITNESS:  Mmm.

4        THE COURT:  Do you understand my question?

5        THE WITNESS:  I do.  I do.

6        THE COURT:  Okay.

7        THE WITNESS:  I'm trying to answer it the best way

8  I can.  The Facebook messages that we got were based on a

9  search warrant from the American Falls Police Department

10  which included all records, which would have been deleted

11  records.

12        THE COURT:  From Facebook?

13        THE WITNESS:  From Facebook.

14        THE COURT:  Okay.

15        THE WITNESS:  So if -- if they existed, they would

16  have been deleted.  I don't know that they existed though.

17        THE COURT:  Okay.  But did Facebook indicate that

18  they were not responding to a request for deleted messages or

19  did they just provide you with a bunch of messages that they

20  said were responsive to the subpoena?

21        THE WITNESS:  They provided us with every -- every

22  message that they had in relation to the accounts requested.

23  If they were deleted, Facebook only keeps deleted record for

24  a certain period of time before they overwrite that data

25  to --

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1          THE COURT:  Okay.

2          THE WITNESS:  -- to reuse the hard drive space.

3          THE COURT:  And you know that from other

4 investigations?

5          THE WITNESS: Yes, sir.

6          THE COURT:  Okay.  And you don't know what that time

7 frame is?

8          THE WITNESS:  No, sir.  It depends on how much hard

9 drive they have and what point they get overwritten.

10         THE COURT:  But the request was made, perhaps as

11 much as a year later?

12         THE WITNESS:  Correct.

13         THE COURT:  Okay.  All right.  Thank you.

14         Ms. Wick, you --

15         Mr. Parmenter, I --

16         MR. PARMENTER:  Just one other question in follow-

17 up on what the Court asked.

18         THE COURT:  All right.

19              **CROSS-EXAMINATION  (Continued)**

20 BY MR. PARMENTER:

21 Q.   Was there any indication of any deleted records with

22 Jane Doe 2?

23 A.   Oh, there were plenty of indications of deleted records.

24 We have indications that the -- there were -- these

25 conversations were taking place on multiple platforms and

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  there were nonlinear conversations that had to be pieced

2  together by me during the investigation.

3  Q.   Okay.

4  A.   And there were chunks of data missing that we don't know

5  what was there.

6         MR. PARMENTER:  Thank you.

7         THE COURT:  Okay.  Ms. Wick, redirect.

8         MS. WICK:  Thank you, Your Honor.

9                  **REDIRECT EXAMINATION**

10 BY MS. WICK:

11 Q.   With regard to the Facebook records and Special Agent

12 Brad Rodell's translation, he is another Special Agent with

13 Homeland Security?

14 A.   He is.

15 Q.   What is his Spanish familiarity and background, if you

16 know it?

17 A.   He served as Spanish-speaking mission for the LDS

18 Church.  He then further went to get a degree in Spanish and

19 I don't know if -- if it was a major or a minor, I just know

20 that he received credentials in Spanish as part of -- he is

21 also certified by HSI to be a Spanish speaker and he is

22 certified at the level that he does not need to retest every

23 year.

24 Q.   Okay.  And is he frequently called upon to provide

25 translation?

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  A.    He is.

2  Q.    Are you also familiar with Spanish?

3  A.    I am.

4  Q.    Presumably not to the same level as Special Agent

5  Rodell?

6  A.    No, ma'am, not to the same level.

7  Q.    All right.  Can you say between your familiarity and

8  Special Agent Rodell's translation that they're at least

9  consistent?

10  A.    Yes.

11  Q.    With regard to the psychosexual evaluation polygraph

12  report that's incorporated to a certain degree, and the names

13  of the underage girls have been discussed, did you make --

14  did you make some notes about the disclosure by Mr. Nieto

15  regarding his sexual contact with underage minors within the

16  evaluation in the polygraph?

17  A.    Yes.

18  Q.    How many underage minors did Mr. Nieto report in one

19  mechanism or another, between the evaluation and the

20  polygraph, having some kind of sexual contact with, after he

21  reached the age of 18?

22  A.    Nine.

23  Q.    And --

24          THE COURT:  After he was what?

25          MS. WICK:  After he reached the age of 18.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          56

1          THE COURT:  Okay.

2    BY MS. WICK:

3    Q.   Of those nine, are the names Ida, Danielle and Ismay

4    within that?

5    A.   Yes.

6    Q.   And do you have notes where you can quickly reference

7    what the disclosure were -- were, with regard to those

8    three?

9    A.   Yes.  Mr. Nieto indicated that he had sex with Ismay.

10   That he had sex with Danielle.  And that he engaged in

11   fondling with Ida.

12   Q.   At what age did he indicate he in -- he had those

13   contacts with those three girls?

14   A.    Mr. Jesus indicated that he was 18 or 19 when he had sex

15   with 15-year-old Ismay, in his words 15.  He indicated that

16   he was 18 or 19 when he had sex with 15-year-old Danielle,

17   again his words 15.  And he was 18 when he engaged in

18   fondling with 14-year-old, Ida, and again those are his words,

19   14.

20   Q.   Do those ages, as reported by Mr. Nieto jive with those

21   girl's dates of birth and his date of birth as far as the

22   accuracy of that information?

23   A.   No.

24   Q.   In what regard?

25   A.   Ismay is 13.  Ismay was 13 in April of 2016.  Danielle

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

                   NW TRANSCRIPTS, LLC. - Idaho Division
                   P.O. Box 33, Issaquah, Washington 98027-0002
                   206-953-7066 - gayle@nwtranscripts.com          57

1  was -- Danielle, Daniella, was 13 when Mr. Nieto was arrested

2  for stalking her, based upon a previous relationship.  And

3  Ida was 13 in -- at the time of the disclosure in April 2016.

4  Q.   And at the time that those girls would have been their

5  true ages, how old would Mr. Nieto have been, if you're able

6  to say?

7  A.   I don't know because I don't know at what point Mr.

8  Nieto engaged them in sexual contact.

9  Q.   With regard to his reports to the polygrapher regarding

10 Daniela, did he indicate he was 18 at the time of his

11 interaction with her?

12 A.   18 and then later 19.  He indicated that he was 18 or

13 19.

14 Q.   At the time that she would've been what age truly?

15 A.   13 is when he was arrested for stalking her and their

16 relationship was --

17 Q.   With regard to Ismay did he report how old, that he was

18 18 at the time?

19 A.   18 or 19.

20 Q.   At the time of contact with her?

21 A.   Correct.

22 Q.   And according to him, she was 15 at that time?

23 A.   Correct.

24         THE COURT:  But she was in fact 13?

25         THE WITNESS:  She was 13 in April of 2016.

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                58

 1      THE COURT:  So if the event occurred when he was 18,

 2 which would have been a year earlier?

 3      THE WITNESS:  Correct.

 4      THE COURT:  She might have been 12?

 5      THE WITNESS:  Correct.

 6      THE COURT:  Okay.

 7 BY MS. WICK:

 8 Q.   And then the same question with regards to Ida, he

 9 reported to the polygrapher that he was how old at the time

10 of his contact with her?

11 A.   18.

12 Q.   At the age of her being 14?

13 A.   At the age of her being 14.

14 Q.   And then her true age in what -- the time frame was

15 what?

16 A.   She was 13 in April 2016, which would have made her at

17 least 12 when he was 18, if not younger.

18 Q.   The sum total is that the ages reported by Mr. Nieto in

19 the polygraph questionnaire or questions was that he reported

20 the girl's older than their true age?

21 A.   Correct.  I believe so.

22 Q.   At some point in your investigation did you learn from

23 some source that Mr. Nieto's mother did in fact try to

24 communicate with Jane Doe's family?

25 A.   She -- the mother of the victim indicated that she had

4:16-CR-0132-BLW      U.S. v. Nieto      07/11/17      Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com      59

1  received some sort of friend request from what she believed

2  was Mr. Nieto's mother, but she did not accept it.

3  Q.   When did she report this attempted communication?

4  A.   I do not have that in front of me.

5  Q.   Before or after the communication from Mr. Nieto to his

6  mother in Facebook?

7  A.   Oh, after.  It was after he had been charged and things

8  were --

9  Q.   And you know whether the attempted communication or

10 friend request by Mr. Nieto's mother occurred before or after

11 the communication between the two of them about reaching out

12 to Jane Doe's family?

13 A.   It was after that.

14 Q.   Okay.  Finally, you are asked about a conversation

15 between Mr. Nieto and Jane Doe 2 coming to visit Mr. Nieto

16 here in Idaho.  And you indicated there was such a

17 conversation?

18 A.   Correct.

19 Q.   What was the substance of that conversation?

20 A.   Mr. Nieto told our victim that he would pay for her

21 plane ticket to come up here and visit him.

22 Q.   And the time frame of this communication was what?

23 A.   In late 2015, early 2016 when he was --

24 Q.   What was the purpose of her visit to be?

25 A.   According to the conversations it was so that they could

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        60

1 have sex.

2 Q.   And there -- was there a discussion about her age in

3 relation to that purpose?

4 A.   Yes, she told him that she was 15.  That she had just

5 had her Quinceañera.  Reminded him that she had just had her

6 Quinceañera.

7 Q.   Do you recall whose idea was for her to come visit Mr.

8 Nieto?

9 A.   Only that he said he would buy her a plane ticket if she

10 were able to come up here.

11         MS. WICK:  Thank you.  Nothing further.

12         THE COURT:  Recross?

13         MR. PARMENTER:  I don't believe I have any other

14 questions, Your Honor.  Thanks.

15         THE COURT:  All right.  You may step down.

16         MR. PARMENTER:  Your Honor, my client indicates he

17 needs to use the restroom.

18         THE COURT:  All right.  We were going to take a

19 break in just a few minutes anyway.  We might as well take

20 it now.  All right, we'll be in recess for, let's say 10

21 minutes.

22         THE CLERK:  Please rise.  Court will be in recess.

23     (Court recessed at 2:49:37 p.m., until 3:03:49 p.m.)

24         THE CLERK:  Ladies and gentlemen, please rise.

25 The United States District Court for the District of Idaho is

1  again in session.  The Honorable B. Lynn Winmill presiding.

2         THE COURT:  Thank you.  Please be seated.

3         Ms. Wick, that was your only witness, is that

4  correct?

5         MS. WICK:  Correct.  I have some brief proffer,  but

6  no further witness.

7         THE COURT:  Victim proffers?

8         MS. WICK:  A proffer from myself, Your Honor.

9         THE COURT:  Oh.  Okay.  Do you want to make that

10 now?

11        MS. WICK:  I can.

12        THE COURT:  Okay.  Go ahead.

13        MS. WICK:  It just -- my proffer completes some --

14 completes the story in little ways, on a couple of things

15 where there just really wouldn't be another witness, at least

16 Special Agent Knight wouldn't be the appropriate witness to

17 call.

18        For example, in relation to the Idaho State Police

19 communication with Mr. Nieto, Special Agent Knight indicated

20 he received a call from myself that prompted him to reach out

21 to Idaho State Police and then relayed what he learned.  My

22 call was a result of a call from Mr. Richert, where Mr.

23 Richert was inquiring why was Idaho State Police contacting

24 his client.  And then the full picture that Your Honor heard,

25 had to do with his client contacting Idaho State Police and

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                62

1  presumably didn't -- didn't tell Mr. Richert.  And then of

2  course Mr. Richert is no longer involved in the case.

3          The other area where I needed to proffer in this

4  really, Special Agent Knight wouldn't be the appropriate

5  person to call on that.  There are -- there's overlapped with

6  United States Deputy Marshals who could testify to some of

7  it, but there is some reference to alleged threats that Mr.

8  Nieto provided information on regarding myself and AUSA Fica.

9  And there were letters written from Mr. Nieto to my office,

10 at least one letter to myself and two letters to Mr. Fica;

11 more than two actually, but the letters to Mr. Fica

12 surrounded allegations of drug trafficking information that

13 Mr. Nieto could -- could discuss or provide.

14          There was also communication about a supposed

15 threat by another inmate.

16          Regarding the letter to myself, there was an

17 allegation that another inmate, another one of defendants on

18 my case load, a Mr. Dixon, the letter didn't contain his

19 name, but the letter alluded to Mr. Dixon as someone who had

20 threatened my safety and knew things about where I lived, for

21 example, and other details that presumably supported Mr.

22 Nieto's knowledge about the matter.

23          That letter was relayed to the United States

24 Marshal Service, as well as the FBI and of course they

25 investigated.  If I called U.S. Deputy Marshal Brandon

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          63

Snyder, he could testify to some of the events that was the investigation of the threats, alleged threats against myself and Mr. Fica.

Mr. Nieto was interviewed as a result of the letters he sent. With regards to Mr. Dixon he did, in that interview with the Marshal's Service indicate that Mr. Dixon was the person he alluded to in the letter, as the person supposedly threatening myself.

The two of them, Mr. Dixon and Mr. Nieto were separated, as you might expect would happen, and Mr. Dixon was interviewed, and Mr. Dixon denied making such threats. He was convincing to those interviewing him, the law enforcement, I believe it was the U.S. Marshal Service making that interview, and made statements -- Your Honor, is familiar with Mr. Dixon, but he made statements to the effect of Ms. Wick has given me a plea agreement to where she could have made things worse for me and I have no ill will about that. I just want to do my time. I didn't make these threats. And the whole -- the whole matter was resolved with basically a finding that the threats were not -- not supported. That what Mr. Nieto said were not supported  facts or allegations.

And there really isn't any other way to put that in. U.S. Marshal Deputy Ryan Weissare [phonetic] was more of in a primary or lead on that investigation and he is not

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1 available this week to come in and explain further.

2          And I don't have sufficient information to feel

3 comfortable proffering the circumstances around the threat

4 against Mr. Fica that was alleged, other than that the result

5 was that it was not found to be a credible or reliable threat

6 on that one either.

7          And I will leave it at that, Your Honor.

8          THE COURT:  All right.  Thank you.

9          Mr. Parmenter.

10          MR. PARMENTER:  Your Honor, I would call Jesus

11 Nieto, Sr.

12          THE COURT:  Not as a witness?

13          MR. PARMENTER:  As a proffer.  As a character

14 witness.

15          THE COURT:  Okay.  And again, Ms. Wick, there's no

16 objection to Mr. Nieto just addressing the Court from the

17 microphone?

18          MS. WICK:  Correct, Your Honor.

19          THE COURT:  All right.

20          Mr. Parmenter, could you -- I'm not sure the

21 microphone is actually on -- apparently it is, so if you want

22 to have --

23          MR. PARMENTER:  Okay.  Mr. Nieto.

24          THE COURT:  Mr. Nieto, also when you get to the

25 microphone would you start off by announcing and spelling

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  your last name for the record.

2  **PROFFER BY JESUS NIETO, SENIOR**

3  JESUS NIETO, SR.:  Sure.  My name is Jesus Nieto.

4  My last name is spelled N-I-E-T-O --

5  THE COURT:  Okay.  Go ahead.

6  JESUS NIETO, SR.:  -- Senior.  We have the same

7  name, but I'm his father.

8  And I'm -- really don't know where to start.  I

9  mean I wasn't prepared to talk, but I just want to outline

10  his -- pretty much his lifestyle which hasn't been a really

11  good one.

12  Starting from when I was -- him and his mother

13  were -- myself and his mother were together.  We had a lot of

14  personal issues together, which he had to see and everything,

15  being a child.

16  And he had a lot of problems that ended up causing

17  him to have seizures as a child.  He was only about the age

18  of two.  At one time I was at work and I got a call saying

19  that he was passed out, so I ran home.  I found him

20  unconscious in the living room.  I took him outside to the

21  car and he wasn't breathing.  I mean he wasn't -- he was just

22  limp as could be and I didn't know what to do.  I just

23  performed some CPR on him and he came to.  After that,

24  probably a week later the same thing happened.  I got called

25  to work and they already took him to the ambulance, to the

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

66

hospital.  And when I got to the hospital he was on pretty
much there on life support.  They told me that he -- they
don't know if he was going to make it or if he was going to
have brain damage because he had been without oxygen for
such a long time.  They ended up airlifting him to Pocatello.
I'm sorry, it's hard to think about that, but.

THE COURT:  What was the cause of -- what was the
underlying medical problem?

JESUS NIETO, SR.:  They had -- they couldn't
explain to us.  They didn't give us an exact reason why he
was going through that, but he had to be put to sleep for
about a week because if he woke up he would have the
seizures.  And finally when they -- the week was through, he
was in the hospital and they told us that they were going to
let him wake up and that's when we were going to know if he
had any brain damage or anything; if he was even going to be
able to recognize us.  And as he awoke he -- the first word
that came out of his mouth was peta [phonetic], which means
bottle.  He was hungry.  So that was a good sign, you know,
he recognized us all and everything.

They told us that he would have to take some
medication which was pretty nasty medication for the rest of
his life.  That's all that they told us.  They didn't give us
an explanation for what.  And it was very expensive
medication.  I didn't have very good money at that time, so

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        67

gave that medication to him for about a year and I didn't

have the money to buy it anymore.  I took him off it and I

took him to another doctor, they evaluated him again and they

said that they didn't know why he was even taking that

medication.  He -- there was no problems with him that they

could find.

So I mean after that, you know, his mother and I

separated and she went back to Mexico to stay with her father

because her father was the only one residing in Mexico and he

was alone over there.  So since our relationship didn't work

out she ended up going back to Mexico with her father.

Me and my son lived with my mother, sitting right

here behind me, and that's where we resided.  My mom and I

worked.  I mean most of the time I didn't even work because

I didn't have anybody to watch him.  I had to stay at home

and watch my son.  And my mom would work and support us

both.

Later on in life, you know, I got friends and

everybody involved, family, they started helping me watch

him so I could get myself back to work and start helping

support.

And, I mean we have a really close family.  Growing

up I remarried in 2002 and -- well, I told him, you know,

we're going to have to go -- move to a new house and I took

him with me and he didn't even -- not even an hour later, you

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          68

know, he's like dad, I understand that you're remarried and
everything, he's like but I don't want to leave my mom,
because that's what he calls my mother, it's his mom; that's
who he knows as his mom.  He's like I don't want to leave my
mom by herself, so.  He's like if it's okay with you I want
to live with her.  And I didn't have any issues with that
because my mother at the time was alone because we had all
married and moved on and she was alone, so he went to live
with her.

And throughout the life I can't say I was the
perfect father because I mean I should have been there a lot
more with him and everything, showing him the guidelines of
life and everything, but my mom's pretty much the one who
brought him up.

Later on my sister, she passed away also in 2013,
but she moved in with my mom with her husband and kids.  So
she was another mother to him.

But in 2004 we lost one of my brothers which to him
was like a brother as well, in a car accident.  A really bad
car accident.  That brought a lot of pain into him.  Like I
said, I wasn't there as a father that I should have been, to
help him support and understand these things going on.

Later on in life, like I said in 2013 my sister
died in a head-on crash with a semi.  That was his -- a
second mother to him.  And again, he didn't have any -- I

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

think ever since he was young, he -- having these things
going through his head, you know, all these things happening,
he should've had some counseling or something.  I should've
been there with him more as a father, but I think that's
when he started having a lot of issues at school and
everything.

At school he had kids bullying him and making fun
of his aunt's death.  And I had no knowledge of this until I
got the call from the school saying that he was going to get
expelled because I guess he had physically attacked one of
the kids that was making fun of his aunt's death, which in
all reality if somebody had done that to me I would have done
the same thing, but.

I mean like I said I haven't been there until maybe
two years ago.  I finally got the nerves to tell him, you
know what, you're coming back to live with me.  Me and my
wife right now, we're still married but we are separated
because we were having issues as well, so it was just me and
him at my house.  But even then, like I work a lot, so he was
-- I was never really a true father.  Like I said, I should
have been there a lot more for him.

He's had a hard life and -- I mean all these things
that I'm learning here in Court is something that I had never
-- I don't think anybody that's here in this room, from my
side of the family, understands.  I mean we're all -- he's

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

```
 1  had issues, like I said, but he's a really good kid.  He's
 2  hard-working.  He's dedicated to his family and -- I mean,
 3  that's just a little way I can put his life.  I mean he
 4  hasn't had an easy life and I just want -- I don't want his
 5  life to end here.  I mean, he's too young.  His life is
 6  barely starting and we're all here to support him and
 7  hopefully get him home and get him in the life -- lifestyle
 8  that he should be in; me, as a father, especially.  But
 9  that's pretty much what I got.
10          THE COURT:  All right.  Thank you very much, Mr.
11  Nieto.
12          JESUS NIETO, SR.:  Thank you.
13          THE COURT:  Mr. Parmenter, any other proffer or
14  witnesses?
15          MR. PARMENTER:  I do have one document I would
16  like to submit.
17          THE COURT:  Is that the Jefferson County incident
18  report?
19          MR. PARMENTER:  Yeah.
20          THE COURT:  All right.  I was provided a copy
21  earlier.
22          MR. PARMENTER:  Okay.  Do you want me to --
23          THE COURT:  Yeah.  Go ahead.
24          MR. PARMENTER:  Just go ahead and submit this
25  officially, or?
```

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          71

1          THE COURT:  Is there any objection to it being

 2    admitted as Exhibit A?

 3          MS. WICK:  There's not.  I presume it would be

 4    filed under seal?  And with that I would have no objection.

 5          THE COURT:  I'm not sure I know why, I generally

 6    -- it's a very high standard to file something under seal.

 7    Is there -- does it contain sensitive information and if so,

 8    can you describe it in a way that won't reveal its contents?

 9          MS. WICK:  It's an unredacted incident report --

10          THE COURT:  Oh.

11          MS. WICK:  -- that has the names of other witnesses

12    and suspects, with dates of births and --

13          THE COURT:  Can we just redacted names?

14          MS. WICK:  -- and dates of birth and addresses and

15    phone numbers.

16          THE COURT:  Okay.  Why don't we -- Mr. Parmenter,

17    if you could submit a copy which you and Ms. Wick have agreed

18    upon, in terms of redactions.  By federal statute we're

19    required not to include in the public record any personal

20    identifying information of third parties.  So I think that's

21    a legitimate concern but I think the answer is not to file it

22    in its entirety under seal, but to -- rather have it redacted

23    so as to protect that private information.

24          MR. PARMENTER:  Sure.

25          THE COURT:  All right.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

```
 1          MR. PARMENTER:  Is that something you'd like us to

 2   do right now?

 3          THE COURT:  No, we can go ahead and proceed now.

 4          MR. PARMENTER:  Okay.

 5          THE COURT:  Just, let's not refer to names,

 6   addresses --

 7          MR. PARMENTER:  Exactly.

 8          THE COURT:  -- or any other kind of identifying

 9   information.

10          MR. PARMENTER:  I'm certainly agreeable to that.

11          THE COURT:  All right.

12               (Defendant's Exhibit A admitted)

13          MR. PARMENTER:  Other than that, I don't have

14   anything else, Your Honor.

15          THE COURT:  I've not had a chance to review this

16   and I -- it was provided earlier but it was just before I

17   came into Court.  You want to --

18          MR. PARMENTER:  And I can give the Court a brief

19   summary --

20          THE COURT:  If you could.

21          MR. PARMENTER:  -- comment, so.

22          THE COURT:  Okay.

23          MR. PARMENTER:  Your Honor, as Ms. Wick has

24   indicated, Mr. Nieto has made other efforts to try and pass

25   on information to authorities.  I've been involved with some
```

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    73

1 of that. I think he's certainly indicated that he's willing
2 to cooperate. This came to my attention just a month or so
3 ago, I think it was actually a couple of months ago -- a
4 little less than a couple of months ago, he and I -- again
5 provided me information indicating that he had information
6 about individuals in the jail passing on narcotics and -- and
7 wanted me to come up and meet with him and a detective and
8 the captain of the jail. We did that. He provided
9 information. Based on that information this report was
10 issued. And it's my understanding -- and I just obtained
11 this report this morning. There's another report that's a
12 little different, but basically provides the same
13 information; that based on his information they were able to
14 apprehend or at least stop the transfer of drugs into the
15 jail. So that's in effect, what the report provides.

16        THE COURT: All right. I glanced at it and I could
17 tell that's pretty much -- I understand that.

18        Do you have any dispute of that, Ms. Wick?

19        MS. WICK: No. I'll have further comments --

20        THE COURT: All right.

21        MS. WICK: -- but that gist.

22        THE COURT: All right. If there's nothing else
23 then, I'll just hear the arguments and recommendations of
24 counsel.

25        Ms. Wick. Ms. Wick, here's the challenge in this

4:16-CR-0132-BLW      U.S. v. Nieto      07/11/17      Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com     74

1  case.  I just need to know where -- what I'm thinking.  We
2  are faced with a 10 year -- as I understand it, a 10 year
3  mandatory minimum, correct?
4          MS. WICK:  Correct.
5          THE COURT:  All right.  So, and the guideline range
6  is 30 years to life based upon the various aggravating
7  factors.  So, to me, we're looking at -- you know, there's no
8  way -- I have no discretion even to impose less than a 10
9  year prison sentence.  That's an absolute given.  You're
10  recommending 30 years.  The probation office recommended 30
11  years.  What I'm concerned with is, the challenge and charge
12  of 3553(a)(2).  What is the sentence which is sufficient, but
13  not greater than necessary to protect the public, impose a
14  just sentence, et cetera, et cetera.  Why is 30 years
15  necessary as compared to say 20 years?  Whether under a best
16  case scenario the defendant is out of prison when he's 30.
17  Worst case scenario, based on your argument, he's going to be
18  50.  Why is something less than 30 years, him getting out of
19  prison when he's 50 necessary to achieve those 3553(a)(2)
20  objectives?
21          And I've reviewed pretty much everything.
22  Certainly feel free to highlight anything, but that's really
23  where -- what I'm struggling with.
24          MS. WICK:  Certainly.
25          THE COURT:  Okay.  And I am mindful of the

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        75

1  psychosexual evaluation putting him in at a moderate to high

2  risk of re-offending which is somewhat extraordinary.  I

3  mean, of course maybe it's because of -- more of the

4  children pornography cases, typically they almost always

5  indicate a low risk of re-offending.  This is moderate to

6  high, which is very troubling to the Court.  The predatory

7  nature of his conduct with multiple victims and potential

8  victims is also very troubling.  But then the question is

9  why is 30 years, as opposed to say 20 years, the -- the

10  appropriate sentence?

11          MS. WICK:  Certainly.

12          THE COURT:  Go ahead.

13          MS. WICK:  Well, I'll reorganize where I would have

14  normally started, to be a little bit more responsive to the

15  Court's inquiry.

16          THE COURT:  Well, go ahead and make your --

17          MS. WICK:  And I don't -- I don't mean that

18  negatively.

19          THE COURT:  No.  No.

20          MS. WICK:  -- just as a signal that I'm kind of

21  reorganizing, instead of starting where I would've.

22          The psychosexual is an interesting point to make

23  with regard to where he comes in as a category, because aside

24  from the risk that's in there, that's identified by Ms.

25  Hatzenbuehler, you have her -- also her note that he doesn't

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          76

1 think he has a problem to be addressed, or an issue to be
2 addressed, and that if he could be convinced then he would
3 benefit. And that's a reasonable position in pretty much
4 any evaluation, I suppose, I would take where if the person
5 is not willing to even acknowledge they have a problem, then
6 they're not amenable to treatment and that's where we are
7 with Mr. Nieto, on top of the other things.

8 Regarding the risk that the Court noted, quite
9 frankly, the sentencing memo from the government alluded to
10 some flaws in the evaluation. Some of those flaws had to do
11 with the statements that Mr. Nieto made during the course of
12 the evaluation, what he informed Ms. Hatzenbuehler. What he
13 told the polygrapher that was inconsistent with one another.
14 What he told them that was inconsistent with just
15 uncontested facts that are in his plea agreement, for
16 example.

17 And the fact that the evaluation doesn't ever
18 really reconcile some of the material factual discrepancies.
19 And in one instance, at least one instance there's an area
20 where that failure to reconcile the inconsistent statements
21 affects the scoring that Ms. Hatzenbuehler gives him.

22 So regarding the static -- I want to say it's the
23 Static '7, yeah, Static 2007, there's a score with regard to
24 using sex to cope with negative emotions such as stress and so
25 forth. Mr. Nieto tells Ms. Hatzenbuehler that part of the

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    77

1  reason he had sex with Jane Doe was because he had -- was

2  under stress and having negative emotions essentially.  She

3  gives him a zero on that score.  And the difference where

4  he's at, in terms of the risk that she assesses him, being

5  what it is anyway, that -- if she'd given him only one point

6  on that, based on his admission to her that that was part of

7  his explanation for his criminal conduct, it would bump him

8  into the next highest level of risk.

9          And I just -- I say that to point out the

10 significance of her notable findings anyway are what the

11 Court reflected and worth -- worth some serious consideration

12 where then there are areas in the evaluation that you can

13 point to that then add to that and make it a much more

14 serious concern.  And that's -- that's just one example.

15         There's other example in the evaluation that aren't

16 necessarily flaws of the evaluation but they are the

17 discrepancies that Mr. Nieto offers that are not confronted

18 and resolved between the evaluation or the polygraph,  in any

19 way that I can make sense of it, out of the report anyway,

20 but he -- he doesn't admit to knowing it was wrong to have

21 sex with Jane Doe at her age.  Whereas in the polygraph

22 process he indicates that he knew it was wrong to have sex

23 with a 15-year-old because he -- his story is that he

24 originally thought she was 15 and it was wrong to have sex

25 with her and -- but then later on when he learns her true age

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                78

1  he still has sex with her at the age of 12.

2         He tells Ms. Hatzenbuehler, according to her

3  evaluation, that he doesn't admit to knowing it was wrong to

4  have sex with Jane Doe at the age she was.

5         He tells her he doesn't use the Internet to

6  sexually interact with a minor.  That's not even true based

7  on the factual basis of his plea agreement.

8         He denies having attempted to engage a child in

9  sexual activity.  Again that's refuted by the factual basis

10 of the plea agreement.  It's refuted by statements to the

11 polygrapher.

12        His list of underage girls that he's interacted

13 with, either full intercourse, or groping, or makeout

14 sessions and so forth is -- refutes his having attempt --

15 denying having attempted to engage a child in sexual

16 activity.

17        He denies fantasizing about sex with children.

18 Sure, people could take a different view about children

19 being -- whether 15-year-old is really a child, but there's

20 still some fantasy involved in his offense conduct with Jane

21 Doe 2.

22        Ms. Hatzenbuehler indicates that he's got kind of

23 a lesser knowledge in some way about the human anatomy.

24 Again, that's refuted by the communication to Jane Doe 2

25 that's rather explicit and demonstrates quite a knowing

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          79

1 understanding of the human anatomy in regards to sex.

2 So there's those inconsistencies that, if nothing

3 else reflect some honesty problems for Mr. Nieto. That of

4 course ties directly into whether he's really accepting

5 responsibility for what he's done. He's done enough to get

6 the acceptance of responsibility points. I'm not at all

7 suggesting not. Someone else could form a different opinion,

8 but in terms of addressing the Court's question about what

9 sentence is sufficient, he isn't coming in here and taking a

10 position of -- A, he can't come in here and claim this was a

11 one-time thing. Whoops, I, on one occasion, had

12 inappropriate sexual contact with an 11-year-old or a 12-

13 year-old. He can't factually claim that.

14 However, he could come in and say, you know, bad

15 judgment on my part. I'm really immature. And I mean he's

16 with Jane Doe 1 and Jane Doe 2, I really made some bad

17 judgment calls and that's the end of it and I'm really

18 sorry. That is not the Mr. Nieto that is before this Court.

19 It's not the Mr. Nieto present in the violation. It's not

20 the Mr. Nieto present in the polygraph. It's not the Mr.

21 Nieto present in any way regarding his Facebook records.

22 And it's not the Mr. Nieto that was -- that quite frankly

23 wrote a letter to the Court at some point during the pendency

24 of this case where he swears to God that he didn't have sex

25 with Jane Doe or Jane Doe 2. I think it's Jane Doe that

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          80

he's specifically talking about in that letter in September 2016 that he wrote to the Court, that he's now had to correct the record on.

So that plays a significant role in the government's recommendation for the low end of the guideline. And the government's mindful of other cases before the Court, especially where you can say the ages are comparable. So Mr. Rodriguez was a case, and I won't get into it because counsel wasn't that counsel, but the age is similar to Mr. Nieto, in -- close in years. The case involved hand -- physical contact with an under age girl of a very tender age. His offense conduct itself was less than full on intercourse and it was certainly less than rape, you know, vaginal rape that Jane Doe alleges in this case. And that individual got over 20 years. And that individual, from the government's perspective presented as remorseful.

So the fact that Mr. Nieto is predatory, because really that is the accurate descriptor, and then recognizes nothing wrong with what he did, and then continues to lie about it and other things, makes him a very real danger to the community.

They -- he has two stalking cases before he gets to where he's using Facebook to interact with these other two young girls and before he makes the call, whether she was 12 or 11, he thought it was an okay thing to have sex with her

4:16-CR-0132-BLW     U.S. v. Nieto     07/11/17     Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com     81

1  and again, whether it was forced or not.  He still thought it

2  was okay to have sex with an under age girl who, for about a

3  month leading up to it had continually said "I'm not ready

4  for sex.  I can't lose my virginity.  I don't want to lose my

5  virginity before I get married.  My heart says one thing, my

6  brain says another."

7        His response to this 11-year-old girl is, "a

8  promise is a promise."  I mean basically you told me at some

9  point that you were willing to have sex once you got that

10  birth control in your arm.  A promise is a promise, little

11  girl."  And that's -- and that's really what encapsulates the

12  problem with trying to assess Mr. Nieto's danger to the

13  community.  That's his take on things.

14        There's a demonstrated sexual interest in underage

15  girls.  There's a demonstrated admitted history of sexual

16  contact and sexual intercourse with underage girls when Mr.

17  Nieto is 18 or older, so I'm setting aside, you know,

18  anything that -- leading up to it.

19        He indicates in his -- between the polygraph and

20  the psychosexual evaluation, I believe it's 9 if you include

21  Jane Doe; 9 underage girls that he had sexual contact with

22  total.  And he indicates that he's 18 to 19 years old for all

23  of those 9 that I just referenced.

24        Ms. Hatzenbuehler notes in the evaluation --

25        THE COURT:  Dr. Hatzenbuehler?  Did you say Ms.?

---

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          **Sentencing**

1          MS. WICK:  Mm-hmm.

2          THE COURT:  It's Dr. Hatzenbuehler that just --

3          MS. WICK:  Dr. Hatzenbuehler indicates in her

4    evaluation three individuals that he had sexual contact with

5    where the difference in age was greater than three years.  So

6    even when you limit that [sic].

7          One further note on the polygraph.  I'm not really

8    going to -- I don't ever offer the results even when it's

9    stipulated as part of plea agreement to get 'em, I don't get

10   into that unless it's favorable to the defendant quite

11   frankly.  I will tell the Court in candor that they passed a

12   polygraph.  And I guess technically, he did pass the

13   polygraph here where the results from Mr. Nelson are that he

14   was not deceptive after they reconcile an issue.

15         This polygraph to me, is not the same as others

16   where I can say that he passed with flying colors because one

17   of the material questions limits his conduct to outside of

18   the State of Idaho, with no apparent reason to limit that

19   question.  So, okay, Mr. Nieto passed on that question but it

20   ignores all the allegations from these local girls.  And

21   there's other things, but I don't want -- I don't really want

22   to beat up the process on that too much, other than to

23   indicate why it's, to me not as -- not the same as saying he

24   passed a polygraph that has a little more objective

25   indicators of usefulness.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          83

1      Speaking to the 3553(a) factors, an offense that
2  involved two girls and we sometimes forget Jane Doe 2.  We
3  meaning PSR, even myself when we talk about the offense
4  conduct because the offense conduct with regard to Jane Doe
5  is much more aggravating.  It's much more coercive and
6  oppressive, if you will.  It results in the full on sexual
7  intercourse that Jane Doe says is actual, you know, forcible
8  rape over her consent.  And so -- and it results in the
9  higher guideline calculation.

10      If the Court doesn't overrule any of the defense
11  objections, Jane Doe 2's calculations for offense conduct
12  doesn't come close to Jane Doe -- Jane Doe 1's.  And so Mr.
13  Nieto's guideline calculations are based on the conduct with
14  Jane Doe 1 in all material regard if the Court adopts the
15  PSR the way it is and the calculations that are in there.
16  However, his offense conduct with regard to Jane Doe 2 is
17  significant to consider in the big picture and to answering
18  the Court's question about sufficient but not more than
19  necessary sentence.

20      He manipulates Jane Doe 2, she's 15.  She's older.
21  But when you read the communications it's very clear that he
22  uses the romantic nature of things, this relationship to
23  apply pressure to her to do what he wants and then he
24  threatens to withdraw his affections if she doesn't want to
25  do what he wants.  He gets very upset over the idea that --

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                84

1  she having -- I think if she had any sex with other boys or
2  something to that effect and he displays kind of this
3  jealousy type of side of him, if you will.

4         So even though she's older there is this
5  manipulation.  She does -- she initially tells him that she
6  doesn't want to send him nude pics, because he asks her
7  something to the -- and this is all in our -- in either a
8  factual basis is most of this are -- or the ROI-1 has some of
9  this as well.  This is not contested facts really.

10        She -- he asked her about, "when are you going to
11 send me a nude pic already," or a pic of her behind,
12 something like that.  And she says "never."  That's what her
13 starting point was in the communications that we have and
14 eventually she is convinced to send these other pictures of
15 herself.

16        With regard to Jane Doe 1, we've already gone over
17 that quite a bit, but his offense conduct does include
18 telling her to hide the relationship from her family.  He
19 actually tries to lie to her about his age and she calls him
20 on it.  He tells her that he's 18 when he's 19.

21        Small things, but they add up, especially for an
22 individual who, leading up to this stalk little girls.
23 That's what his history is, is to stalk 11, 12, 13-year-old
24 girls, to the point where the authorities get involved and
25 have ample evidence to use to prosecute a case.  The juvenile

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          85

1  case is a November from one year 'til, I believe August of

2  the following year course of conduct.  And it starts as a

3  felony stalking.  It's amended to a misdemeanor.

4        I actually pulled the code to see what the

5  difference was for how -- for what, you know, what's the

6  basis of that amendment.  Looking at it, it looks like it was

7  a felony because their victim was under 16 at the time.  She

8  was 14.  And so when they amend it, it no longer becomes an

9  element that she's under 16, so now it's a misdemeanor.

10 That's the difference as far as I can tell.  There's nothing

11 that would suggest otherwise.  And he makes the admission.

12        And then you have the second girl.  So you have two

13 separate girls, two separate courses of conduct and in

14 between the first report by the second girl and the one that

15 really ends up really getting him in trouble, he's warned to

16 just leave this girl alone and he can't or he won't.

17        When he's caught, he's got other little girls with

18 him.  And at least one of them, Ismay, is referenced in other

19 context.  And he appears to be honest to a degree when he

20 reports having sexual contact with three of the girls that

21 we've talked about because it corroborates information that's

22 learned in the investigation except for when the rubber hits

23 the road, he says they're about two years older than they

24 actually were, because it's significant.  If he was 18 and

25 they were 13, it looks lots worse than if he was 18 and they

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        86

1  were 15 and so forth.

 2          So I just -- I -- go ahead, I'm sorry.

 3          THE COURT:  No, no, no.  I was -- we must be

 4  reading my mind because I was going to ask, but I didn't

 5  think I had indicated that.  But the difference between,

 6  before December 30th, 2015 and after, for guideline purposes

 7  really does not make a difference because there was an

 8  admitted contact, not full-blown intercourse before that,

 9  correct?

10          MS. WICK:  Correct.

11          THE COURT:  It just requires sexual contact.

12          MS. WICK:  There's actually a better reason for why

13  it doesn't matter.

14          THE COURT:  Right.

15          MS. WICK:  And the better reason is that that

16  guideline that your -- you're talking about a guideline

17  enhancement, correct?

18          THE COURT:  Right.

19          MS. WICK:  The guideline enhancement refers to the

20  offense conduct involving.  Unless I'm mistaking which --

21  which calculation --

22          THE COURT:  Of?

23              (Pause in the Proceedings)

24          MS. WICK:  I believe that the -- is the Court

25  referring to the two point enhancement?

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          87

1          THE COURT:  No, I was talking about the 8-level

2     increase.

3          MS. WICK:  Okay.

4          THE COURT:  2G1.3(b)(5).

5          MS. WICK:  Correct.  So I am -- I am getting to the

6     right point on that.  I just wanted to make sure that we

7     didn't confuse enhancements.

8          With regard to that one, if you look at 2G1.3, it

9     refers to the offense involving a minor who had not attained

10    the age of 12 years old.  His offense is the enticement

11    conduct that's covered by the factual basis in the plea

12    agreement.

13         THE COURT:  All right.

14         MS. WICK:  His offense does not require completion

15    of the sex act, such as the intercourse that, whether it was

16    forced or not, there's no contest about the intercourse

17    taking place now.  His offense covered when she was 11.

18         In fact, if I'm not mistaken, regarding Jane Doe 1,

19    the offense, the criminal conduct that's captured in the

20    Facebook records is -- ends prior to the sexual intercourse

21    that had taken place.  Yeah, clear up to December 24th --

22         THE COURT:  Right.

23         MS. WICK:  -- this communication and his factual

24    basis information I think starts around December 2nd.

25         THE COURT:  Okay.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                88

1          MS. WICK:  You know, so that encapsulates -- that's

 2    his offense conduct.  If nothing else, that is the agreed

 3    offense conduct that was in the factual basis of his plea

 4    agreement.  She was 11.  Plus to the extent that it matters

 5    to the Court or the calculation that there was sexual

 6    contact.  Mr. Nieto admits to digitally penetrating Jane

 7    Doe's vagina prior to learning that she was a virgin.  He

 8    says in that disclosure that that's when he learned she was

 9    a virgin.  It's clear from the December 2nd communication that

10    that's when she's also telling him she was still a virgin.

11    So if you've got to -- if you're going to take him at his

12    word and put it in the time line, they did that before

13    December 2nd.

14          THE COURT:  Okay.

15          MS. WICK:  So anyway -- so either way I believe

16    that's supportive.  But the government's position is not that

17    the sexual contact itself is required, given that it's the

18    offense conduct at issue.

19          The Court -- there's a number of things, as I

20    suggested in the government's sentencing memorandum that do

21    not go to a guideline calculation and that also are not

22    required to support a guideline sentence in this case.  There

23    are a number of contested facts, meaning Mr. Nieto's

24    objections to various factual statements in the PSR that do

25    not go to a guideline calculation and are not necessary to a

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    89

1 guideline sentence.

2 　　　　They are -- there's certainly information that the

3 Court can consider at sentencing.  For example, an easy one

4 is the escape conduct, referring to his attempt to go out a

5 window that gets to the main area of the jail from which he

6 could escape.  Especially when you view it in context of his

7 statements that demonstrate a genuine interest in what would

8 happen if I tried to escape.  That kind of thought process on

9 his part.

10 　　　　However, the government's not asserting, unless --

11 other than as an alternative basis that that be the reason

12 for the obstruction of justice enhancement.  And quite

13 frankly, given the totality of information before the Court

14 about Mr. Nieto's overall predatory behavior and the forecast

15 of his danger to the community, that the escape conduct is so

16 minor that the Court literally can make a finding that it's

17 not material to whatever sentence the Court imposes.  And I

18 would urge the Court to make such a finding where there is

19 information that is, especially where it's contested that

20 it's not part of the sentence ultimately imposed.  Or if it

21 is something that weighs in favor, I'd ask the Court to make

22 that finding as well.

23 　　　　I do think it's significant that he, early on ask

24 his mom to intervene on his behalf with the victim's family

25 and suggest paying them off.  That just adds a little bit of

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          90

salt to the wound, if you will. It's not just reach out to them and see if you can talk to them, it's even pay 'em off if they want it. And it's not -- from the government's perspective it's not required that she do what he asked. However, she indicates a willingness, which means she's taking him somewhat seriously. He takes the next step of sending the Facebook profile and then the victim's family indicates that she sent a friend request.

So it didn't amount to an interference it sounds like. It's significant that he went through that thought process, again when he's also thinking about what would happen if I tried to escape.

It gets to a point where it almost feels a bit like piling on because there is quite a record of negative information about Mr. Nieto, especially again when you consider he really doesn't think he did anything wrong, which means what's he ever going to do to change his behavior and that's significant in terms of are you really ever going to be safe out in the community? Are you going to continue as you age to prey on girls that are 11, and 12, and 13, and 15 years old? Because that's -- that's really the only evidence that's before the Court that that's his target. He demonstrates an interest in particularly girls that are still virgins and has no interest in addressing an issue in regards to his sexual activity there and his behavior with these

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          91

1  young girls.

 2          So unless the Court has questions?

 3          THE COURT:  No.

 4          MS. WICK:  Or wants me to make specific arguments

 5  on the objections, I did -- again, there's a sentencing

 6  memorandum that incorporates my arguments on some of the

 7  legal matters.

 8          THE COURT:  I've reviewed that, so.

 9          MS. WICK:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          Mr. Parmenter.

12          MR. PARMENTER:  Your Honor, this has been a

13  difficult case for me and let me just make some comments that

14  I think are kind of geared to what you were asking originally

15  when Ms. Wick stood up.

16          Mr. Nieto is obviously fairly young.  And I

17  understand the Court often sees young defendants before it.

18  I think his age and immaturity is certainly a big part of

19  what's happened.  His upbringing, those kinds of factors have

20  all kind of played in.

21          His father pointed out that, you know, he may not

22  have been the best guide growing up and leaving him with his

23  grandmother and so on, but it is what it is and that's what

24  he's had to deal with.

25          I'm not making excuses for him.  I would indicate

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        92

1  that contrary to what Ms. Wick says, he does acknowledge that

2  he's done something wrong.  I think it's been an ongoing

3  process for him to realize what he's looking at, what he's

4  dealing with.  My frustration with Mr. Nieto has primarily

5  been just being able to communicate with him because he does

6  have somewhat tangential thoughts and I -- I must be getting

7  hard of hearing because I have a hard time hearing him

8  because he speaks in such a low voice that I have to several

9  times ask him to repeat what he saying.

10        But again, contrary to what she says, I think that

11  he does understand what's going on.  I think he's amenable to

12  treatment.  I've discussed that with him at length.  I've

13  represented similar -- or clients in similar situations,

14  mostly on a state level.  I don't think I've ever had a case

15  quite like this on a federal level, but it seems to me that

16  many times when it comes to treatment, successful

17  rehabilitation, it takes them a while to comprehend that,

18  hey, this is something I need to deal with.  Something I need

19  to factor in.  And I think that's something that Mr. Nieto

20  has gravitated to.  Something that he realizes that, you

21  know, he needs assessment for.

22        Getting to the offense conduct itself, it certainly

23  is abhorrent what he did, and the circumstances that have

24  been committed here.  I would point out that there are

25  several factors that enter in, the fact that he was

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          93

1   essentially abandoned by his mother and his father hasn't had
 2   a lot of contact with him being raised by his grandmother and
 3   his aunt; those are certainly all factors that have played
 4   into his life, not to say that anybody else in a similar
 5   circumstances would act the same way.

 6          But in paragraph 24 in the PSR, there is one of the
 7   young ladies that was being interviewed and she basically
 8   said, you know, he was desperate for love or something
 9   special, and I think that probably hits home to me as much as
10   anything, that he was just looking for somebody to care for
11   him, to have a relationship with, and he couldn't do that
12   among young ladies his -- that were his peers agewise or they
13   weren't responsive and so he started hanging out with younger
14   girls.

15          Certainly inappropriate, certainly illegal and then
16   certainly something for which he needs incarceration and some
17   time and rehabilitation.  But I don't think that he needs to
18   be thrown away.  I think that he would be amenable to
19   treatment.  I know that he would, in addition to what Dr.
20   Hatzenbuehler reports.  I guess I would point out that she
21   talks about his impulsivity.  He admits readily his
22   impulsivity.  I don't know that he readily admits poor
23   judgment when I first started represented him, but I think
24   he's certainly acknowledges now that and that he was
25   emotionally needy.  Her comment was that his offense was a

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          94

1 product of poor judgment and insecurity with peer-age females

2 rather than deviant sexual desires.  And I think that's

3 really where he's at.

4   So I -- and I certainly acknowledge and noted that,

5 as the Court did, that he was on the moderate to high level

6 on some of the risk factors that she discussed.  That's

7 concerning, but I think it's something that he can deal with

8 as he grows and matures and as he goes through whatever

9 treatment.

10   The Court certainly needs to punish him and I know

11 the Court will and I know the Court will also consider

12 deterrence to himself and others, but I think ultimately

13 rehabilitation is what the Court needs to consider.  How long

14 is it going to take for him to be able to get to the point

15 where he can be released into society and I don't think it

16 takes 30 years.  I don't think it's going to take 20 years.

17 I think it's going to take some time and certainly he's

18 looking at a mandatory fixed 10 years, but that's what I

19 would recommend.

20   Thank you.

21   THE COURT:  All right.  Mr. Nieto, is there

22 anything you want to say on your behalf?

23   DEFENDANT JESUS NIETO:  Do I speak here or up in --

24   THE COURT:  That's fine.  You can stand there.

25 Speak -- sit there, whatever.

4:16-CR-0132-BLW  U.S. v. Nieto  07/11/17  **Sentencing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com  95

1    DEFENDANT JESUS NIETO:  Well, Your Honor, first of

2    all I want to apologize to you and to the prosecutor for

3    putting us through this.  The sentencing, once I've been in

4    here I literally realize what the person I was before has

5    helped me become a better man.  I'm trying to show you and

6    the government I can make a better life for myself.  I don't

7    think what she's recommending is fair, 30 years.  Yes, I made

8    a -- I made this mistake.  I take full responsibility for

9    that.  I'm trying to do my best for my family that's back

10   there that's suffering through all this, but I thank you for

11   putting me into this because I found my way towards God.  I

12   read the Bible everyday and I'm trying to be a better man for

13   society and for you guys.

14        I'm just asking you to please reconsider the stuff

15   that they're trying to give me and I hope you find in your

16   heart that you can forgive me through all this that I've

17   done.  I'm very sorry for my actions and that's all I got,

18   Your Honor.

19        THE COURT:  Okay.  All right, well, I'm going to

20   have to take a few minutes and go through some objections

21   that were made to the presentence report and indicate my

22   rulings.  So I'll then move on to kind of lay out my

23   evaluation of this case under the sentencing statutes and the

24   factors the Court's required to consider and then finally

25   pronounce sentence.  It takes some time for me to create a

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          96

1 record here as to my rulings.

 2         First, I would note that there were a lot of

 3 objections.  A number of them were to items that do not

 4 affect the guideline range or they were -- resulted in an

 5 amendment to the presentence report by the probation officer.

 6 Those include paragraph 6, 7, 72, 75, 84, 85 87, 90, 92, 94,

 7 95 and 96.  So I'm not going to address those specifically

 8 because I think they are now moot since they were -- neither

 9 resulted in changes in the presentence report or agreements

10 to the objection made by the defense.

11         Turning to the objections that I think are still

12 unresolved that need to be resolved, there's an objection to

13 paragraph 34.  The defendant objects to a 2-level increase in

14 the offense level pursuant to guideline section 2G1.3(b)(2),

15 arguing that he did not use undue influence over, I think

16 it's referred to as MV-1, but Jane Doe 1 in the presentence

17 report.  I mean the defendant maintains he never forced

18 anyone to engage in sex and relying on a promise does not

19 rise to the level of undue influence.  And he further

20 contends that undue influence should not apply where the

21 victim already possesses some inclination to commit the

22 offense before any pressure by the defendant.

23         Guideline Section 2G1.3(2)(b) states that if a

24 participant otherwise unduly influenced a minor to engage in

25 prohibited sexual conduct increase by 2-levels.  According to

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          97

1  comment note, I think it's (3)(b), the Court should closely
2  consider the facts of the case to determine whether a
3  participant's influence over the minor compromised the
4  voluntariness of a minor's behavior and the voluntariness of
5  the minor's behavior may be compromised without prohibited
6  sexual conduct occurring.

7        As noted in the probation officer's response to the
8  objection, it's quite clear that during his communication
9  with Jane Doe 1, Mr. Nieto repeatedly told her he wanted to
10 have sex with her but she repeatedly told him she was not
11 ready.  He also urged her to keep her promise to have sex
12 with him once she was on birth control, which she apparently
13 had begun using.  And during a forensic interview Jane Doe 1
14 told the investigators that Mr. Nieto took her to his home,
15 undressed her, had full vaginal intercourse with her, did not
16 wear a condom, and all of that occurring, despite her having
17 told him she was not ready for sex.

18       I think these actions clearly fall within the
19 category of undue influence under the guidelines.  Moreover,
20 the case cited by the defense, the _Meyers_ [phonetic] case,
21 really does not have application here.  In that case, the
22 District Court found evidence that the defendant had not
23 compromised the victim's voluntariness because she had
24 already contemplated running away and she stated that the
25 plan to run away was both of their ideas.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          **Sentencing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          98

1    Here, there is direct evidence that the victim

2  stated she was not ready for sex and that the defendant

3  continued to pressure her despite her objections.  And

4  finally, she either with -- well, he, either with or without

5  her consent, had sexual intercourse with her.

6    Consent obviously is not a defense in this case and

7  it's clear from these circumstances that there was undue

8  influence applied by the defendant to the victim Jane Doe 1.

9    There's also objections to paragraphs 35 and 43,

10  objecting to the 2-level increase for the use of a computer,

11  arguing that using a telephone and personal contacts with

12  Jane Doe 1 and Jane Doe 2 did not involve a computer.

13  However, guideline section 2G1.3 note 1 explains that a

14  computer under 18 U.S. Code Section 1030(e)(1) is defined as

15  including any electronic or other high-speed data processing

16  device performing logical arithmetic or storage functions and

17  it includes essentially a wide range of devices.

18    Here, this communication occurred through Facebook

19  which is the social media network.  The Facebook message

20  cannot be used through a simple telephone.  It can only be

21  used through a computer, tablet or smart phone which really

22  is a mobile personal computer through the Internet.

23    This fits the definition of computer under the

24  statute and based upon the information, I think it is clear

25  that the defendant used his smart phone, which is a computer

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          99

1   and the Internet to entice, encourage, offer, or solicit a

2   person in prohibited sexual conduct with a minor.

3         There was also kind of an oblique reference to the

4   Court's practice in child photography cases not to impose a 2-

5   level enhancement called for by the guidelines for the use of

6   a computer, but child photography is far different from  the

7   offense here.  All child pornography is accessed with

8   computers and the same cannot be said of soliciting sexual

9   conduct with a minor.

10        There's an objection to paragraphs 19 and 37, and

11  this is a significant factor because it resulted in an  8-

12  level increase.  This turns upon whether Jane Doe 1 was 12

13  at the time she engaged -- well, whether she was 12 at the

14  time of the prohibited conduct.

15        According to the factual basis of the plea

16  agreement, which was signed by the defendant, the defendant

17  agreed that he raped Jane Doe 1, a 12-year-old female child,

18  at his residence in American Falls, Idaho, and that based on

19  Jane Doe's birth date, she was 11 years old at the time.

20  And it seems to me that essentially is an admission in the

21  plea agreement that resolves the dispute.

22        Moreover, as I think Ms. Wick has pointed out, the

23  critical date is the date in which the conduct occurred, that

24  is the solicitation.  And here that solicitation clearly goes

25  back to early December, well before the defendant -- the

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          100

1 victim turned 12.

2          Finally, the enhancement applies where the

3 defendant commits a sex act or sexual contact and that

4 contact is defined as the intentional touching and -- of

5 either directly or through the clothing of genitalia, anus,

6 groin, breast, inner thigh or buttocks of any person with an

7 intent to arouse or gratify the sexual desire of any person.

8 There's clear reference to the defendant touching the

9 victim's breasts sometime on or before December 16th and

10 December 24th, 2015.  There's clear reference to that

11 occurring and so even on that basis the objection is

12 overruled.  But for the record, I think based upon the

13 admission in the plea agreement, the act of intercourse took

14 place before the victim turned 12.

15          There was an objection in paragraphs 41, 48 and 49,

16 suggesting that the total offense level should be 27, but

17 that's based upon objections which I've now overruled.

18          There was also an objection to the assessment of a

19 criminal history point under 4A1.1(c) because Mr. Nieto was a

20 juvenile during the commission of the offense.  However, the

21 guideline is clear that even a juvenile sentence can be used

22 to calculate the criminal history category if it was imposed

23 within five years of the defendant's commencement of this

24 offense.  So therefore, it was properly included.

25          The defendant also indicates that he was pressured

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          101

1    to admit the earlier offense and that this should result in
2    the Court not considering it.  However, it's absolutely clear
3    that the Court cannot and must not permit collateral attacks
4    on prior convictions in state court as part of the sentencing
5    process in federal court.  If there was some defect in the
6    defendant's conviction in state court, with the exception of
7    an uncounseled plea, that has to be taken up in state court
8    and that conviction expunged or removed before sentencing in
9    federal court or the Court must consider it.

10           There was an objection to paragraph 62, 63 and 66,
11   which were a little cryptic.  I think the objection was to
12   the assessment of two additional criminal history points
13   because he argues he was no longer on probation for the
14   events discussed in paragraph 62 and 63.  But the guidelines
15   clearly say that you add two points if the defendant
16   committed this offense while under any criminal justice
17   system, including probation.

18           The information presented in these paragraphs is
19   based on documents provided in Power County Magistrate and
20   District Court.  According to their records, there's no
21   indication of the disposition of a probation violations.
22   Only that they were filed.  The record show that the Judge in
23   that case did not order that a revocation proceeding take
24   place but rather that the defendant's probation term be
25   allowed to expire given his custody on the federal charges.

---

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          **Sentencing**

1  Thus, the defendant was on probation from December 9, 2015

2  through December 9, 2016, and the offense under the

3  Superseding Information took place between November 3rd, 2015

4  and January 28th, 2016.  Thus, there was clearly an overlap in

5  the commission of the offense and the period of time in which

6  the defendant was on probation.  So I think I will limit it

7  to that and overrule those objections as well.

8        There was an objection to the criminal history

9  category but that's based upon the foregoing objections which

10 I'm overruling.

11        I assume, Ms. Wick, you would move for the third

12 level for acceptance of responsibility?

13        MS. WICK:  So moved.

14        THE COURT:  And I'll grant that motion.  I'm

15 overruling all objections and adopting the presentence report

16 and specifically the addendum to the presentence report as my

17 findings in this matter and to the extent I've not done so

18 explicitly, I'm also adopting the addendum as my response to

19 the objections to the presentence report.  This results in a

20 guideline range of 360 months to life and a criminal history

21 category 3.

22        Now, Mr. Nieto, I need to take some time and I know

23 this is -- this has been a long proceeding today and this may

24 seem rather impersonal, but that's kind of the process in

25 federal court.  We have to go through this process.  But now

---

4:16-CR-0132-BLW        U.S. v. Nieto        07/11/17        Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        103

1  I'm required to go through a process of identifying what it
2  is about this case that justifies the sentence that I'm going
3  to impose and there's specific sentencing factors I have to
4  consider.  Sometimes I balk at them but in this case I think
5  they fairly nicely lay out what is the critical issue in this
6  case, some of which I've already addressed.

7       The first factor I'm to consider is the nature and
8  circumstances of the offense.  Here the crime, Mr. Nieto,
9  with which you have been charged, you pled guilty and you are
10 now before the Court for sentencing arose from a report made
11 in February of 2016 to law enforcement.  This was a response
12 to a disturbance between the parents of yourself and that of
13 Jane Doe 1.  It was alleged that you had engaged in sexual
14 contact with Jane Doe 1 when she was 11.

15      During the investigation, the police learned that
16 you had communicated with Jane Doe 1 through Facebook
17 Messenger and sought sex with her, that she had repeatedly
18 refused, but that you had had sexual contact with her on or
19 before December 16, 2015 through December 24th, 2015 and that
20 you had had sex with her on an unknown date but prior to her
21 12th birthday.

22      It is notable to me that when you are under
23 investigation for this offense, you asked your mother to
24 reach out to Jane Doe's family to see if you could reach an
25 agreement, and even pay her money if she wants.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com        104

1          Also while investigating the offense against Jane

2   Doe 1, the police also discovered that you had communicated

3   with Jane Doe 2 over Facebook and in those communications

4   discussed the desire to have sex with Jane Doe 2 who was also

5   a child, I think age 15.  That you had sent sexually explicit

6   images to her.  Solicited her sending sexually explicit

7   images to you and in fact she did send such an image that

8   would qualify as child pornography.

9          In addition, the law enforcement learned of

10  multiple additional juvenile females with whom you had had

11  contact, including sexual contact and solicitations

12  requesting naked images from them.

13          What this points out, Mr. Nieto, is this kind of

14  predatory contact -- conduct that I -- we've described.  That

15  this is not a single incident.  It was essentially what you

16  were spending a great deal of your time doing was seeking out

17  these very young preteen children and young teen children to

18  have sexual intercourse with them, to solicit sexual images

19  from them.

20          The suggestion was made in the briefing submitted

21  by your counsel that as evidenced by your own parents'

22  relationship when they were very young that resulted in your

23  birth that there may be some cultural difference between

24  Hispanic culture and other cultures in the United States.  I

25  reject that as a justification.  There's been no studies

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          105

submitted indicating that there's any cultural justification or difference. In fact I was curious and even tried to find if there had been any studies. The only studies I indicated indicate there really is no difference between Hispanic and non-Hispanic culture in that regard and that would be -- I'm not sure it would be a justification under any circumstance but there's just no factual predicate for that explanation. The bottom line is as an 18, 19 or 20-year-old man, you have no business engaging in sexual acts with 11, 12, 13, 14, 15-year-old children. It's against the law in every state and it certainly could not have been understood by you as being anything but criminal conduct.

The next factor I'm to consider is your history and characteristics. You are a single 20-year-old white male of Hispanic origin. You have no children. Report no significant romantic relationships. You dropped out of high school. Your work experience is limited to washing and repairing farm equipment and driving 10 wheeler trucks.

As I noted, your parents were very young at the time of your birth. Your mother was reportedly abusive and you were thereafter raised initially by your father and grandmother and then later by your grandmother and aunt. Your aunt, who was a mother figure to you, died in an automobile accident and I recognize this had a significant impact on you.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    106

1        As you grow older, your father played a more

2   significant role in your life.  You've been in fairly good

3   health but lately have suffered from some minor health

4   problems.  You apparently had seizures as a child and as your

5   father related, had some other health problems that were

6   never really sorted out as to what their cause was.

7        According to a psychosexual evaluation you have

8   below average intelligence.  Suffer from an unspecified

9   depressive disorder.  You are misinformed about sex, anatomy

10  and physiology.  You have a preference for young pubescent

11  females.  You've had sexual contact with multiple underage

12  females and falls in the moderate to high risk category for

13  being charged or convicted for another sexual offense.

14       And as I noted, my experience is that it really is

15  exceptional for someone before this Court to be categorized

16  as anything but a low risk of reoffending.  It may be that

17  your expressed -- expression that you don't understand that

18  you really have a problem and until literally today appearing

19  in Court have not expressed any interest in treatment.  That

20  may be one explanation, but I think it's also the predatory

21  nature of your conduct.  All of this is of great concern to

22  the Court obviously and this forces me then to kind of

23  address what I think drives the sentence in this case.

24       I'm required by statute to impose a sentence

25  sufficient but not greater than necessary to achieve certain

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          107

1 | objectives including reflecting the seriousness of the
 2 | offense, promoting respect for the law, providing just
 3 | punishment, adequate deterrence, protection of the public and
 4 | any needed training, care or correctional treatment.

 5 | I think this case turns on a number of those
 6 | factors. First, the seriousness of the offense. Any adult
 7 | age 18 or older who engages in sexual contact with children
 8 | who are 11, 12 and 13 years old, clearly that is an extremely
 9 | serious offense. But I think what is probably more important
10 | in this case is frankly, the need to protect the public and
11 | to deter others from engaging in this conduct.

12 | Particularly protecting the public. Given the
13 | psychosexual evaluation assessment of your risk of
14 | reoffending, the predatory nature of your conduct, your
15 | unwillingness to acknowledge the seriousness of this matter
16 | until fairly recently, the fact that you apparently are
17 | willing to say or do virtually anything to avoid being held
18 | responsible for this, as evidenced by communications with
19 | your mother, trying to buy your way out of this problem;
20 | repeated unsuccessful efforts to essentially cooperate in an
21 | untruthful way with government authorities to try to minimize
22 | responsibility; and your only -- only recent expression of
23 | your willingness to engage in treatment. All of that calls --
24 | seriously calls into question the -- and the reliability of
25 | your willingness to make changes and accept responsibility

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    108

1    here.

2            Another major factor is the need for correctional

3    treatment.  But until an individual faced -- or dealing with

4    these kind of problems is willing to embrace their problems

5    and engage in treatment voluntarily, it's not at all clear

6    whether that treatment could be successful.  Now it may be,

7    as Mr. Parmenter suggested, that you've made some strides in

8    that direction and it may be that in the next 5, 10, 15 years

9    you'll make major strides in that direction and be amenable

10   to treatment, but the problem is we don't know.  All we know

11   is that up until this point in time, almost literally this

12   day in Court, you have not expressed or embraced

13   wholeheartedly both the need and the willingness to

14   participate in such treatment.  And when I weigh that against

15   the need to protect the public against what is a clear

16   predatory pattern of conduct, I have to err on the side of

17   protecting the public.

18           Now having said that, I don't believe that a 30

19   year prison sentence is necessary but I also feel that a 10

20   year prison sentence, the mandatory minimum is nowhere near

21   enough to protect society and for that reason, I will impose

22   the following sentence which I think is reasonable and just

23   under the circumstances.  It is that sentence which is

24   sufficient but not greater than necessary to achieve the

25   3553(a)(2) factors that I've discussed in some detail here.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    109

1          Mr. Nieto, if you'll stand I'll pronounce sentence.

2          The defendant Jesus Nieto, Jr., having pled guilty

3    to Count One of the Superseding Information and the Court

4    being satisfied that you're guilty as charged, I hereby order

5    and adjudged as follows:

6          Pursuant to Sentencing Reform Act of 1984, it is

7    the judgment of the Court that you be committed to the

8    custody of the Bureau of Prisons for a term of 300 months.

9          It is further ordered that you pay to the United

10   States a special assessment of $100 which will be due

11   immediately.  The Court finds that you do not have the

12   ability to pay a fine, accordingly the fine will be waived in

13   this matter.

14         All monetary penalties will be due and payable

15   immediately.  After considering your financial resources I

16   will order payments of the special assessment under the

17   following schedule, unless modified by the Court.  While in

18   custody you will submit nominal payments of not less than $25

19   per quarter pursuant to the Bureau of Prison Inmate Financial

20   Responsibility Program.  And during the term of supervised

21   release, will submit nominal monthly payments of 10 percent

22   of your gross income but not less than $25 per month.

23         Let me digress.  Ms. Wick, my understanding is

24   there were no restitution requests submitted by the victims

25   in this matter?  As of the -- my understanding is, and as of

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          110

1  the preparation of the presentence report, that was true but
2  perhaps I'm mistaken?

3          MS. WICK:  No, that's correct and we've -- we, the
4  government have reached out, the only -- only thing that
5  would bear on restitution is that there was a request made by
6  Jane Doe 2 to the state Crime Victim's Comp Fund.  Crime
7  Victim's Comp Fund requested additional information because
8  they weren't seeing the connection and I myself haven't seen
9  what that was for.  I was prepared to ask the Court, you
10 know, maybe for another 30 or 60 days just to make sure that
11 I don't unwillingly, you know, waive someone's right to
12 collect for counseling or something.  But I haven't received
13 an actual request from Jane Doe myself.  Or the government
14 hasn't, it's just been through the Crime Victim's Comp Fund.
15 So I would, you know, defer to the Court then on what to do.
16 But Jane Doe 1 for sure has not submitted the restitution
17 request.

18          But the reason, just so -- while I'm speaking, I
19 was going to double check, I believe there's a $5100 special
20 assessment in this case?  I was going to double check and
21 make sure that we were under that statutory requirement
22 versus the 100.  It all depends on the date of -- I think his
23 offense --

24          THE COURT:  I will admit I'm going off from --

25          MS. WICK:  I'm going to double check the plea

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          111

1  agreement as --

2      THE COURT:  -- the recommendation of the probation

3  officer is $100.  And, Ms. McDonald, do you know?

4      PROBATION OFFICER McDONALD:  Your Honor, I believe

5  that the defendant is subject to the Justice for Victims

6  Trafficking Acts and it is an additional $5000 special

7  assessment.

8      THE COURT:  All right.  Then I will modify that to

9  $5100.

10      Mr. Parmenter, do you have any reason to dispute

11  that?

12      MR. PARMENTER:  No, I -- I don't have any reason

13  to dispute it.  I don't think I've ever seen any number on

14  this --

15      THE COURT:  All right.  I'm inclined, you know as

16  long as the victims were properly notified, if they have not

17  responded then I'm just not inclined to leave matters open.

18  But I will modify my -- the special assessment.  It will

19  actually be $5100, but the same payment schedule will apply.

20  $25 per quarter while incarcerated, $25 per month during

21  supervised release.

22      Mr. Nieto, upon your release from incarceration

23  you'll be placed on supervised release for a term of 15

24  years.  Within 72 hours after your release from the custody

25  of the Bureau of Prisons you'll report in person to the

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  probation office in the district to which you are released.

 2          Supervised release will be imposed upon the

 3  following terms and conditions:

 4          First, that you not commit another federal, state

 5  or local crime.

 6          The Court will find that you pose a low risk of

 7  future substance abuse and therefore will suspend immediate

 8  drug testing.

 9          You will be prohibited from possessing any

10  firearms, ammunition, destructive devices or any other

11  dangerous weapons.

12          You will cooperate in the collection of a DNA

13  sample as directed by your probation officer.

14          You will comply with the requirements of the Sex

15  Offender Registration and Notification Act in any state in

16  which you reside, work, or a student, or were convicted of a

17  qualifying offense.

18          You will pay the special assessment that I've

19  imposed in accordance with the schedule of payments as

20  ordered by the Court.

21          You will comply with all general and special terms

22  of supervised release, and all standard conditions of

23  supervision, as will be outlined in the Court's written

24  judgment to be filed later in this proceeding.

25          You will also comply with the following special

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          113

1   conditions of supervision.

2           You will not be employed in any capacity related to

3   children under the age of 18, nor will you perform any unpaid

4   or volunteer activities in this area during the term of

5   supervised release without the permission of the probation

6   officer.

7           You will submit your person, property, house,

8   residence, vehicle, papers, office, as well as your computers

9   as defined in 18, U.S. Code, Section 1030(e)(1), and other

10  electronic communications or data storage devices or media,

11  to a search conducted by a U.S. Probation Officer.  You will

12  warn other occupants that the premises may be subject to

13  searches pursuant to this condition.

14          You will not be allowed to possess or use a

15  computer, again as defined by statute, 18, U.S. Code, Section

16  1030(e)(1), without the prior permission of your probation

17  officer.

18          You will comply with the requirements of the U.S.

19  Probation Offices' Computer Monitoring Program as directed

20  and will consent to the U.S. Probation Office's conducting

21  ongoing monitoring of your computers, hardware, software, and

22  other electronic devices and media.  The monitoring may

23  include the installation, at your expense, of hardware or

24  software systems which allows evaluation of your computer

25  use.  Monitoring may also include the retrieval and copying

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    114

1  of all data from your computers or other electronic devices

2  and media.  Monitoring may occur at any time, with or without

3  reasonable suspicion of violations of supervised release or

4  probation.

5        You will participate in a program of mental health

6  treatment, as directed by your probation officer with the

7  cost to be paid by both yourself and the government based

8  upon your ability to pay.

9        You will participate, at the direction of your

10  probation officer, in an evaluation for sexual deviancy by a

11  qualified mental health professional who is experienced in

12  treating and managing sexual offenders.  You'll agree to

13  waive any right to confidentiality and allow the treatment

14  provider to supply a written report to the U.S. Probation

15  Office.

16        You will successfully complete any course of

17  treatment related to your offense, as directed by your

18  probation officer, including, but not limited to, cognitive

19  and behavioral treatment for sexual deviancy under the

20  direction of a qualified mental health professional who is

21  experienced in treating and managing sexual offenders.

22        You will follow the rules of the treatment program

23  as if they are orders of the Court, with the cost to be paid

24  by both yourself and the government based upon your ability

25  to pay.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1    You will participate in polygraph testing at the

2 direction of your probation officer and/or treatment staff to

3 monitor compliance with treatment conditions and supervised

4 release conditions specific to the supervision of a sex

5 offender, with the cost to be paid by both yourself and the

6 government based upon your ability to pay.

7    Throughout the term of supervised release, you will

8 participate in GPS monitoring, at the discretion of your

9 probation officer, to ensure that you do not frequent

10 restricted locations, with the cost to be paid by both

11 yourself and the government based upon your ability to pay.

12    You will not knowingly have unsupervised contact

13 with children under the age of 18 without the written

14 approval of your probation officer, and then only in the

15 company of an adult approved by your probation officer and

16 treatment provider who is trained to serve as a chaperone for

17 sexual offenders.

18    You will not reside or loiter within 500 feet of

19 schoolyards, parks, playgrounds, arcades or other places

20 primarily used by children under the age of 18.

21    You will be prohibited from residing at 560 Calder

22 Avenue, in American Falls, Idaho, given that it is within

23 view of the William Thomas Middle School.

24    You will not possess any obscenity, or sexually

25 explicit or nudist visual material involving minors, or

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          116

persons who appear to be minors, nor will you knowingly patronize any place where such material or entertainment is available.

You will not possess any written text material describing sex with minors, except that which may be necessary to complete sex offender treatment and to prepare collateral challenges to aspects of the your case and/or sentence.

You will have no contact, either directly or through a third party with the victims in this case or the three individuals identified as additional witnesses in the investigative materials.

If determined by the results of the test of adult basic education that you have the cognitive ability to do so, you will obtain your GED or High School Equivalency during the term of supervised release with the costs of education and testing to be paid by yourself.

Mr. Nieto, do you have any questions about the conditions of supervised release that I've imposed?

DEFENDANT JESUS NIETO: No.

THE COURT: Okay. I would advise you that if you violate the terms of supervised release you will be brought back before the Court and a further sentence of incarceration will be imposed.

Typically a defendant has the right to appeal their

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          117

conviction or sentence but you have signed a plea agreement
which contains a provision waiving essentially all of those
rights, with just a few exceptions. Such waivers are
generally enforceable but you may argue to the contrary.
However, because you may wish to file an appeal to challenge
the waiver of your appeal rights or to appeal an issue not
waived by the terms of your plea agreement, I will advise you
of your appeal rights despite the waiver of those rights in
your plea agreement.

          If you wish to pursue an appeal you must file a
notice of appeal within 14 days after judgment is entered in
your case. If unable to pay the cost of an appeal, you may
apply for leave to appeal in forma pauperis. If you so
request and qualify, the clerk of the court will arrange for
legal representation and will prepare and file a notice of
appeal on your behalf.

          Ms. Wick, I don't believe there's any forfeiture in
this case, is that correct?

          MS. WICK: I don't believe so, Your Honor. The
only physical item that was ever recovered by law enforcement
was the phone and I don't --

          THE COURT: Yeah, that's why I -- but I didn't --

          MS. WICK: -- I don't believe is in federal custody.

          THE COURT: All right. All right, then I won't
deal -- I will not issue any orders on forfeiture.

4:16-CR-0132-BLW         U.S. v. Nieto         07/11/17         Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                  118

1          I will recommend to the Bureau of Prisons that Mr.

 2    Nieto receive credit for all time in federal custody.

 3          Is there any recommendation as to a place of

 4    confinement?

 5          MR. PARMENTER:  I would normally recommend

 6    Sheridan Oregon.  But I don't know, do they handle sex

 7    offender treatment, those kind of issues, or do you know?

 8          THE COURT:  Ms. McDonald, do you know?

 9          PROBATION OFFICER McDONALD:  I'm not aware of their

10    programming, Your Honor.

11          THE COURT:  There are some programs available, I

12    think at every institution.  Well, the option, Sheridan,

13    Oregon or Florence, Colorado which are closest to this area.

14    I think probably the best course is to recommend one of those

15    two locations and then the Bureau of Prisons will ultimately

16    make the determination based upon his needs.  I think all

17    things being equal, it would be far better if he'd be close

18    to where his family can visit him, which I assume would be in

19    one of those two locations, but.

20          MR. PARMENTER:  And, yeah, he has no preference at

21    this time.

22          THE COURT:  All right.  Perhaps I just -- I'll just

23    make a recommendation that he be placed as close to

24    Southeastern Idaho as possible, given needs for correctional

25    treatment and perhaps mental health counseling and other

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          119

1  factors considered by the Bureau of Prisons.  I'll leave it at

 2  that.

 3          All right, Ms. Fulwyler, Mr. Metcalf, Ms. McDonald,

 4  did I overlook anything?

 5          THE CLERK:  No, Your Honor.

 6          PROBATION OFFICER McDONALD:  No, Your Honor.

 7          THE COURT:  And, Ms. McDonald, in terms of the

 8  reason for the variance or sentence below the guidelines,

 9  it's really just keyed to 3553(a)(2) and the parsimony

10  requirement there.  I just simply imposed a sentence that was

11  the minimum sentence that I thought would achieve those

12  objectives, so.

13          Mr. Nieto, I don't know what to say, I -- this is a

14  hard case.  Obviously it's an extremely long prison sentence.

15  I can't say that Ms. Wick was wrong in making the

16  recommendation that she made or a lesser sentence as

17  recommended by your attorney, I simply had to exercise my

18  judgment.  At the end of the day I have to protect the

19  public and your conduct has been such that there's a great

20  deal of concern in that regard.  And while I exercised some

21  leniency, I just simply couldn't do anything more in this

22  case given  the background, the facts and circumstances of

23  this case.

24          I do wish you the best of luck.

25          We'll be in recess.

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          120

1          THE CLERK:  Please rise.  Court will be in recess.

2              PROCEEDINGS CONCLUDED AT 4:28:28 P.M.

3                        *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          Sentencing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          121

**<u>CERTIFICATION</u>**

I (WE) CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

**NW TRANSCRIPTS, LLC**
**IDAHO DIVISION**
**P.O. BOX 33**
**ISSAQUAH, WASHINGTON 98027-0002**
**(206) 953-7066**
**gayle@nwtranscripts.com**

/s/ Gayle Martin-Lutz
FEDERALLY CERTIFIED MANAGER/OWNER

/s/ Gayle Martin-Lutz                      02/05/18
TRANSCRIBER                                DATE

4:16-CR-0132-BLW          U.S. v. Nieto          07/11/17          **Sentencing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    122